# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| **AZEEZ LAWAL,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **v.** | § **Case NO.: 4:25-CV-00810-SDJ-BD** |
| | § |
| **TURO INC., FAIRCLAIMS INC, and** | § **HON. JUDGE SEAN B. JORDAN** |
| | § **HON. MAGISTRATE BILL DAVIS** |
| **TRAVELERS INSURANCE CO.** | § |
| **Defendants.** | § |

# Exhibit G Series: FairClaims Structural Taint

## Summary

FairClaims is not a neutral forum - it is a corporate-aligned adjudication engine designed to suppress claims, evade oversight, and obstruct judicial review. Its architecture weaponizes arbitration to serve reinsurers and repeat players, converting due process into a liability shield.

**Prepared By: AZEEZ LAWAL | Pro Se Litigant**

# Exhibit G Series: FairClaims Structural Taint

| | |
|---|---|
| **Prepared by** | Azeez Lawal |
| **Parties** | Lawal v. Turo, FairClaims Inc and Travelers |
| **Docket #** | **4:25-CV-00810-SDJ-BD, Eastern District Court of Texas** |
| **Judge(s)** | **The Honorable Magistrate Bill Davis**<br>**The Honorable Justice Sean B Jordan Presiding** |
| **Email** | azeezlawal@gmail.com<br>Tel 281-903-4644 |
| **Date** | September, 2025 |
| **Last Updated** | November 30, 2025 |

# Legal impact consolidation of G-Series

- **FAA vacatur grounds proven:**

  - **§10(a)(1)  -  Fraud/undue means:** G1, G4, G5

  - **§10(a)(2)  -  Evident partiality:** G2, G3, G6, G7, G8, G10

  - **§10(a)(3)  -  Misconduct:** G2, G3, G4, G5, G6

  - **§10(a)(4)  -  Exceeded powers:** G4 (Rule 29), G6

- **Federal exposure:**

  - **Honest services/wire/mail fraud:** G1 - G5, G7 - G8

  - **Obstruction:** G4; systemic refusal/evasion patterns

  - **RICO enterprise:** GLRE ↔ FairClaims ↔ Turo chain (G7 - G10)

# Proactive Rebuttal

Th defense may argue that FairClaims's arbitration model merely reflects industry norms—offering efficiency, repeat-player familiarity, and streamlined procedures—these defenses collapse under the weight of ==**_undisclosed_**== structural taint and statutory violations.

1. Efficiency and cost savings cannot justify **_fraudulent award procurement or concealment of material relationships_**, as prohibited by 9 U.S.C. § 10(a)(1) and Texas Insurance Code § 541.061, with *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145 (1968) establishing that even the appearance of partiality is grounds for vacatur.

2. Repeat-player dynamics become legally problematic when they result in evident partiality, especially where a *reinsurer funds the adjudicator and arbitrator conflicts are hidden*, violating 9 U.S.C. § 10(a)(2) and SEC Reg S-K Item 404; see *Monster Energy Co. v. City Beverages, LLC*, 940 F.3d 1130 (9th Cir. 2019), which vacated an award due to *undisclosed arbitrator relationships*.

3. The mere presence of corporate investors is not misconduct per se, but when their *influence is concealed from consumers and regulators, it constitutes honest services fraud* under 18 U.S.C. § 1346, as discussed in *Skilling v. United States*, 561 U.S. 358 (2010).

4. Procedural rules like *fee-shifting and page limits* may be standard, but when *weaponized to suppress evidence and obstruct judicial review*, they breach 9 U.S.C. § 10(a)(3) and 18 U.S.C. § 1512; *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83 (2000) held that *unconscionable procedures invalidate arbitration agreements*.

5. Transparency gaps and lack of appeals might be common, yet when coupled with undisclosed related-party risks and prospective waivers of statutory rights, they violate Texas DTPA § 17.50(a)(3) and SEC regulations. In sum, the undisclosed taint— manifested through *hidden investor entanglements, procedural suppression, and regulatory omissions—transforms what might appear as industry practice into a pattern of adjudicative misconduct and statutory breach*, as repeatedly recognized by courts in the precedents cited.

# Exhibit G series structural bias and taint matrix with cross-validation and counterintuitive evidence

| Title | Summary | Statutes broken | Cross-validation / corroboration | Counterintuitive evidence |
|---|---|---|---|---|
| Executive Summary | Synthesizes systemic bias, structural capture, adjudicative taint; frames vacatur, sanctions, and multi-agency referrals. | **FAA** §10(a)(1) - (4); Texas Insurance Code §541.003, §541.061; **Texas DTPA** §17.46(b), §17.50(a)(3) | **Triangulation:** G1 enterprise marketing + G3/G4 CEO admissions + G6 integrity failures unify the vacatur grounds. | The "neutral platform" narrative collapses when the forum's business value is reducing complaints for repeat corporate clients. |
| G1: FairClaims commercial outreach p. 14 | Enterprise-facing promises: "protect brand, limit liability, reduce litigation spend," and KPI emphasis on speed and complaint reduction. | **18 U.S.C.** §1346 (honest services fraud); **FAA** §10(a)(2); Texas Insurance Code §541.061; UDAAP | **Matches:** G3 quotes on complaint reduction; G10 loss-ratio control motive; G5 synthesis of suppression marketing → bias outcomes. | Marketing "neutrality" to consumers while selling "claim suppression" to corporations is the inversion of impartial adjudication. |
| G2: Comparative arbitration provider assessment p. 18 | Benchmarks vs AAA/JAMS: extreme client concentration, opaque arbitrator selection, no appeal, transparency gaps; repeat-player risk. | **FAA** §10(a)(2) (evident partiality); §10(a)(3) (misconduct); antitrust (Sherman Act §2); DTPA unconscionability | **Corroborates:** G6 integrity matrix failures; G3 admissions of repeat-client dependence; G9 parallels to CFPB's Ejudicate findings on bogus processes. | Lower fees and speed are framed as consumer-friendly, yet they primarily serve corporate liability control and faster denial cycles. |

| Title | Summary | Statutes broken | Cross-validation / corroboration | Counterintuitive evidence |
|---|---|---|---|---|
| G3: CEO Stephen Kane public admissions p. 27 | Admissions against interest: repeat-player dependence (Turo), "carrots and sticks," live-hearing promises contradicted, flat-rate arbitrator pay. | **FAA** §10(a)(2) - (3); **18 U.S.C.** §1346; DTPA deception | **Confirmed by:** G4 ex parte threat demonstrates practice aligns with admissions; G1/G2/G6 show operationalization of those incentives; G10 mirrors motive to control loss ratios. | Publicly promising fairness and transparency while describing coercive funnels and corporate-aligned KPIs defies neutrality claims. |
| G4: Email from CEO Kane p. 41 | Fee-shifting threat (Rule 29), refusal to participate, self-professed neutrality while monitoring outcomes; obstruction posture. | **FAA** §10(a)(1) (undue means); §10(a)(3) (misconduct); §10(a)(4) (exceeded powers); **18 U.S.C.** §1512 (obstruction). | **Reinforces:** G3 "carrots and sticks" → coercion; G5 maps threats to **FAA** grounds; Executive summary's TRACKS mnemonic documented in-message. | A "neutral tribunal" threatening a pro se litigant for seeking judicial review while claiming to "sit this out" is neutrality turned upside down. |
| G5: Captured forum report p. 52 | Synthesis report linking G3 admissions and G4 threats to **FAA** §10(a) vacatur; articulates procedural entrapment and suppression pattern. | **FAA** §10(a)(1) - (3); **Texas DTPA** §17.50(a)(3) | **Pulls through:** G1 marketing, G2/G6 structural failures, G3/G4 conduct → unified vacatur theory and discovery map. | Even with no "smoking gun" award error, the forum's own words and conduct prove the process—not just the outcome—is tainted. |
| G6: Comparative integrity matrix p. 67 | Seven-metric integrity failure vs AAA: selection, discovery, impartiality protocols, governing law, safeguards, transparency, bias mitigation. | **FAA** §10(a)(2) - (4); unconscionability (Armendariz) | **Echoes:** G2 statistical and procedural disparities; G7 investor entanglements elevate partiality risk; G9 enforcement comparables. | "Efficiency" and "simplicity" are marketed as virtues; in reality, they strip safeguards and amplify repeat-player bias. |

| Title | Summary | Statutes broken | Cross-validation / corroboration | Counterintuitive evidence |
|---|---|---|---|---|
| G7: FairClaims Investor matrix p. 68 | Documents investors including Greenlight Re (GLRE); highlights insurance-adjacent entanglements and undisclosed conflicts. | **FAA** §10(a)(2); **SEC** Reg S-K Item 404; **18 U.S.C.** §§1961 - 1962 (RICO predicates) | **Linked to:** G8 press release naming Turo and FairClaims; G10 strategy of investment + capacity; G1 corporate-centric KPIs. | A reinsurer investing in the adjudicator of claims that affect its loss ratios is the opposite of "neutral third-party" governance. |
| G8: GLRE investment disclosure failure p. 70 | GLRE 2019 press release: investment in FairClaims; names Turo; omissions across **SEC/CIMA/** participants; timeline precedes FairClaims exclusivity. | **Securities Exchange Act** §10(b)/Rule 10b-5; **SOX** §302; **FAA** §10(a)(2); RICO | **Hard proof:** GLRE/Turo/FairClaims disclosed publicly to investors but concealed from consumers and regulators; dovetails with G7 and G10. | Publicly touting the relationship to investors while hiding it from arbitration participants and regulators flips disclosure norms. |
| G9: FairClaims vs CFPB enforcement on Ejudicate p. 100 | Comparative table: FairClaims misconduct exceeds Ejudicate's UDAAP violations—adds obstruction, structural conflicts, evidence suppression. | UDAAP; **FAA** §10(a)(2) - (4); **18 U.S.C.** §1512; RICO predicates | **Bridge case:** Validates enforcement thresholds; maps FairClaims' behaviors to already-banned platform patterns; supports agency referrals. | FairClaims presents "consumer-friendly ODR," yet its features align more with debt collection, suppression, and anti-review tactics than fair resolution. |
| G10: GLRE vertical integration and loss-ratio control p. 111 | GLRE CUO interview: strategy of minority investments + reinsurance capacity; preference for short-tail products; ability to "control" loss ratios. | **SEC** omissions; **FAA** §10(a)(2); RICO structure | **Completes chain:** Confirms motive and method behind GLRE - FairClaims - Turo ecosystem; corroborates G7/G8 facts and G3/G4 outcomes. | A reinsurer openly aiming to "control" loss ratios while invested in the arbitration forum deciding those losses is neutrality in name only. |

# FRE 1006-style table:

## LEGAL IMPACT ANALYSIS  -  EXHIBIT G SERIES

| Claim / Ground | Legal Basis | Statutes Broken | Exhibit G Series Page Ref (to be inserted) |
|---|---|---|---|
| **FAA § 10(a)(1)  - Fraud/Undue Means** | Fraudulent award procurement; concealment of GLRE - FairClaims relationship; suppression of CEO consent orders | **9 U.S.C.** § 10(a)(1); **TIC** § 541.061; **TIC** § 541.003 | G3 (Interview admissions); G4 (Confession by conduct) |
| **FAA § 10(a)(2)  - Evident Partiality** | Reinsurer funding adjudicator; 40% client concentration; undisclosed employee-arbitrator (Bespalko, 500+ cases) | **9 U.S.C.** § 10(a)(2); Commonwealth Coatings, 393 U.S. 145; Monster Energy, 940 F.3d 1130 | G7 - G8 (FairClaims Taint); G10 (Loss-minimization KPIs) |
| **FAA § 10(a)(3)  - Misconduct** | Retroactive page limits; suppression of evidence; no live hearing; CEO threats; refusal of summons | **9 U.S.C.** § 10(a)(3); **TIC** § 542.003; **TIC** § 541.060 | G4 (Procedural coercion); G9 (Evidence suppression) |
| **FAA § 10(a)(4)  - Exceeding Powers** | Rule 29 adhesion contract; prospective waiver of statutory rights | **9 U.S.C.** § 10(a)(4); **TIC** § 4101.001(a)(3); **Texas DTPA** § 17.50(a)(3) | G6 (Rule 29 text) |
| **Obstruction of Justice** | Refusal of service; Kane email threatening fees; promise to "sit out" court; Rule 29 supersedes court authority | **18 U.S.C.** § 1512 | G4 (Kane threats); G6 (Rule 29 adhesion) |

| Claim / Ground | Legal Basis | Statutes Broken | Exhibit G Series Page Ref (to be inserted) |
|---|---|---|---|
| **Honest Services Fraud** | Marketed neutrality while serving corporate interests; concealed GLRE conflicts; CEO admissions ("carrots and sticks") | **18 U.S.C. § 1346; TIC** § 541.061 | G3 (Admissions); G10 (Embedded KPIs) |
| **RICO Predicate Conduct** | Wire/Mail fraud concealment scheme; enterprise proven (GLRE→FairClaims→Turo); pattern 2019 - 2025 | **18 U.S.C. §§ 1961 - 1962; 18 U.S.C.** §§ 1341 - 1343 | G Series overall (2019 - 2025 pattern) |
| **SECurities Fraud - GLRE Omissions** | Failed to disclose FairClaims investment and GLRE-Travelers offshore risk treaties; related-party transaction unreported (Travelers→Turo→FairClaims→GLR→Guy Carpenter, TTFGG); material conflict affecting reserves. ~ see Exhibit T Series | **Securities Exchange Act** § 10(b); Rule 10b-5; **SOX** § 302/404; SEC Reg S-K Item 404 | G10 (Loss-minimization software) |
| **SECurities Fraud - Turo Omissions** | S-1/A failed to disclose arbitration bias; failed to disclose GLRE - FairClaims relationship | **SEC**urities Act § 11; Rule 10b-5 | G3 + G10 (Undisclosed related-party risks) |
| **State Law - UDAAP/DTPA** | Definitional arbitrage (insurance vs. not insurance); deceptive neutrality claims; fee-shifting threats | **TIC** § 541.003; **Texas DTPA** § 17.46(b) | G4 (Confession by conduct) |
| **State Law - Unconscionability** | Adhesion contract; no opt-out; prospective waiver of statutory rights | **Texas DTPA** § 17.50(a)(3); **TIC** § 542.003 | G6 (Rule 29 text) |

# Exhibit G: FairClaims Structural Taint Series

## Executive Summary of Exhibit G: FairClaims Structural Taint Series

This exhibit presents a contradiction-tagged, evidentiary matrix exposing systemic procedural irregularities, bias indicators, and regulatory vulnerabilities within FairClaims arbitration proceedings. It documents a pattern of adjudicative taint, including:

- **Contradiction Clusters:** Repeated misalignment between FairClaims' public-facing policies and actual procedural conduct, undermining claims of neutrality, transparency, and due process.

- **Adjudicative Integrity Breaches:** Instances of arbitrator partiality, selective evidence exclusion, and inconsistent application of rules, suggesting structural predisposition against pro se litigants.

- **Regulatory Exposure:** Highlighted intersections with state and federal oversight frameworks, including potential violations of consumer protection statutes, arbitration fairness mandates, and insurance regulatory obligations.

- **Systemic Risk Mapping**: Scenario-based modeling reveals cascading risk across judicial, regulatory, and reputational domains, with implications for platform liability, insurer complicity, and enforcement gaps.

- **Escalation Triggers:** The document identifies actionable thresholds for judicial vacatur, agency intervention, and legislative scrutiny, supported by contradiction-tagged exhibits and procedural timelines.

Every element is curated for strategic escalation, evidentiary reproducibility, and multi-forum resonance. The exhibit functions not merely as documentation, but as a precision tool for dismantling adjudicative opacity and catalyzing systemic accountability.

## Summary of Sections and Exhibits – FairClaims Structural Bias Series

| Ref | Title | Pages | Summary |
|-----|-------|-------|---------|
| Executive Summary | N/A | 1 | Synthesizes systemic bias, structural capture, and adjudicative taint across FairClaims, framing the case for vacatur and regulatory escalation. |
| G1 | FairClaims Commercial Outreach | 4 | Reveals FairClaims' structural dependence on enterprise clients like Turo. The platform's claim of neutrality is contradicted by corporate-centric KPIs, amounting to Honest Services Fraud and violations of Fair Trading Laws. |
| G2 | Comparative Arbitration Provider Assessment | 8 | Benchmarks FairClaims against AAA and JAMS. Analytical estimates show Turo may comprise 40% of FairClaims' docket. The platform's solvency is tethered to Turo's continued participation—Turo Exit = FairClaims Insolvency. |
| G3 | CEO Stephen Kane – Public Admissions | 17 | Three video interviews where Kane admits to procedural shortcuts and enterprise favoritism. These are admissions against interest, exposing systemic bias and undermining FairClaims' neutrality. |
| G4 | Ex-Parte Email from CEO Kane | 31 | Direct threat to plaintiff involving fee-shifting and refusal to appear in court. The email captures TRACKS: Threat, Refusal, Arbitrator bias, Concealment, Knowledge of harm, and Skewed Rules—proving irredeemable bias. |
| G5 | Captured Forum Report | 42 | Synthesizes G3 and G4 to build a vacatur case under FAA §10(a). Maps Kane's conduct to statutory triggers for judicial nullification of the award. |
| G6 | Comparative Integrity Matrix | 57 | Evaluates FairClaims against AAA across seven arbitral integrity metrics. FairClaims fails all, implicating FAA violations and precedent-based vacatur grounds. |
| G7 | Investor Matrix | 58 | Lists FairClaims investors including Greenlight Re. Highlights undisclosed financial entanglements in insurance-adjacent claims, violating FAA (fraud/partiality), SEC rules, and RICO statutes. |
| G8 | Greenlight Re Investment Disclosure Failure | 60 | Documents Greenlight's 2019 investment in FairClaims, undisclosed to the SEC. First known FairClaims-Turo adjudication occurred in 2020, raising RICO implications (see Exhibit T Series). |



Exhibit G1: Screenshot of FairClaims' Commercial Outreach to Enterprise Clients

# What Is FairClaims?

FairClaims is an easy alternative to court. With nearly a decade of experience as a leading online dispute resolution provider, we've resolved thousands of disputes online. We <mark>can help you</mark> <mark>save employee time, protect your brand, limit liability, & reduce litigation spend.</mark>

**Honest Services Fraud Contradicts Neutrality**
"FairClaims markets itself as neutral, yet advertises to enterprises that it will limit liability (suppress claims) and reduce litigation spend (obstruct justice).
√ **This dual representation constitutes a scheme to deprive claimants of the intangible right of honest services under 18 U.S.C. §1346.**"
√ "By embedding loss-prevention incentives into adjudication, FairClaims transforms arbitration into a vehicle for claim suppression, violating the statutory guarantee of honest services."
√ **GLRE investment in G7-G8 is the kickback loop**

Value proposition from FairClaims is to
√ **Protect brand,**
√ **Limit liabilities and**
√ **Suppress claims**

# Benefits

Resolve disputes quickly to <mark>save employee time and mitigate customer backlash.</mark>

**Demonstrates**
√ **Outcome-based Marketing,**
√ **Institutional Bias,**
√ **Monetized Justice Model,**
√ **Solicitation of Repeat-Players, and**
√ **Predicate Marketing Conduct.**

Platform Conflicts with **FAA § 10(a)(2)** and Canon I Impartiality Norms (archived July 20 2025)

**FairClaims** presents itself to consumers as a <u>neutral</u> <u>and</u> <u>independent</u> <u>arbiter</u> while allegedly operating with a **<u>structural bias favoring its corporate clients,</u>** this conduct constitutes a **<u>deceptive act</u>** or practice in violation of consumer protection statutes like the **Texas Deceptive Trade Practices Act (DTPA) / UDAAP**

FairClaims: Helping Enterprise Resolve Disputes Online                                      1/16/25, 5:44 PM



## Protect Your Brand

Preserve your NPS score and mitigate social media + PR backlash by making people feel heard.



## Quality

Our Arbitrators are carefully vetted - we only accept 7% of applicants, all experienced attorneys. They spend an average of 90 minutes resolving each claim.



> **Legal Inference:** FairClaims markets itself to corporations as a **claims suppression tool**, not neutral adjudication. This is Honest Services Fraud (18 U.S.C. §1346) and **contradicts neutrality claims.**

## Save Employee Time

Avoid endless back and forth in customer support. Avoid sending employees to small claims court.



## Quick

Simple disputes can be resolved in less than a week, and more complex ones only take about three weeks.

> **Suppression/Reinsurance Metric:** Speed of resolution is a KPI aligned with GLRE's strategy to minimize loss ratios and suppress claims (Exhibit G10)

## Financial ROI

You can save money on outside counsel spend, recover more unpaid invoices and fight more chargebacks.

## Results

85-90% of respondents pay out on an award. Even customers who lose usually appreciate the process and respect outcomes.

> **Gatekeeper. Enforcer. Debt Collector.** FairClaims evades oversight, overrules public policy and it obstructs regulatory and judicial oversight (C_TheAward, G4, G5)

# What is FairClaims?

Resolve your dispute 100% online and much quicker than small claims court.





**1**  ## Make Your Case

Tell us about your dispute. We will invite the other side to resolve it and assign a qualified and friendly Arbitrator.

**2**  ## Online Hearing

You will upload evidence and have a live phone or video hearing where the Arbitrator will hear both sides of the story.

**3**  ## Decision

Your Arbitrator will issue a decision within 8 days of your hearing. This decision is legally binding and enforceable.

Learn More About How FairClaims Works

No Phone or Video Hearing

# How Your Company Can Use Fairclaims



Resolve disputes between you and your customers, vendors, or contractors.

Resolve disputes between two sides of your marketplace.

Recover on unpaid invoices.

Fight chargebacks.

**Contact Us**

**Exhibit G2:  Comparative Arbitration Provider Assessment**: FairClaims vs. AAA vs. JAMS

---

**Abstract:**

This exhibit illustrates the procedural disparities and conflict-driven architecture of FairClaims, in stark contrast to AAA and JAMS. These deviations from accepted arbitral norms support vacatur under **FAA §10(a)(1)–(4)**, and present indicia of systemic partiality sufficient to meet the plausibility pleading standard for civil **RICO** liability under 18 U.S.C. § 1962(c).

---

**FAIRCLAIMS DEFAULTED
SEE DOCKET 71, P. 122**

**Comparative Table: Structural Bias and Repeat-player Risk:** Comparative Analysis of FairClaims, AAA, and JAMS

(Sources: Cornell Arbitration Study, JAMS Annual Report, AAA Rules - **COMPLETE LITERATURE REVIEW ~ G11 p. 119**)

| Metric | FairClaims | AAA | JAMS | Inference / Legal Implication | |
|---|---|---|---|---|---|
| Market Focus | Gig economy, low-stakes SME claims | Broad: Commercial, labor, and consumer | High-value, complex disputes | FairClaims occupies a **structurally imbalanced niche**—high-frequency, low-value cases—creating incentives for efficiency over fairness. | |
| Pricing (Per Case) | $350–$1,200 | $500–$5,000+ | $1,000–$10,000+ | "Pay-per-case" platform model creates pressure to appease repeat corporate clients—raising evident partiality risks (**FAA §10(a)(2)**). | Platform Pricing Disclosures |
| Consumer Win Rate | 28% (Cornell Law, 2019) | 41% (Cornell Law, 2019) | 38% (JAMS Annual Report, 2023) | Consumers fare 13% worse under FairClaims. Supports statistical inference of bias (see Honeycutt v. JPMorgan Chase, 25 Cal. App. 5th 909, 925 (2018)). | |
| Top Clients | Turo (38%), TIDY (22%), EFS Group (13%) | Comcast, UPS, Walmart | Apple, Tesla, Goldman Sachs | 73% of FairClaims cases stem from just 3 corporate clients, triggering **repeat-player** bias doctrine and "structural conflict of interest." Platform Capture: Turo's economic dominance over FairClaims produces a coercive dispute system | **Contractual Clause Analysis** |
| Exclusivity Clauses | Common (6 of 10 clients have mandatory FairClaims clause) | Rare (<5% of contracts) | Very rare; generally negotiated | Coercive "channeling" mirrors Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451 (1992)—potentially triggering antitrust "essential facility" doctrine. | |

| Metric | FairClaims | AAA | JAMS | Inference / Legal Implication |
|---|---|---|---|---|
| | | | | Deceptive Arbitration System: Consumers are funneled into a pseudo-legal process with financial conflicts of interest |
| Arbitrator Selection | Assigned solely by FairClaims (no party input) | Party-chosen from published panel | Party-chosen (elite vetted panel) | Non-party-controlled selection violates customary arbitration norms; cf. AAA Rule R-12(b). Potential violation of **FAA §10(a)(2)** (evident partiality) and §10(a)(3) (misconduct). |
| Appeal Process | None | Optional (AAA Appellate Arbitration Rules) | Optional arbitration appeal | Denial of any appeal option exacerbates risk of one-sided awards. Contrasts with AAA/JAMS optional procedures and raises procedural unconscionability issues. |
| Transparency | No public database; arbitrator records undisclosed | Partial data; some case statistics available | Annual performance and arbitrator reports available | FairClaims' black-box opacity violates public **policy** favoring transparency. Potential noncompliance with Cal. Civ. Proc. Code § 1281.9(a) and judicial estoppel doctrines. |
| Client Concentration | 73% caseload from top 3 clients; no conflict audits published | <20% of caseload from top 3 clients | <15% of caseload from top clients | Extreme client concentration suggests lack of neutrality, violating AT&T Mobility v. Concepcion, 563 U.S. 333, 352 (2011) ("neutrality" of arbitration forum is essential). |

**See Also: Conel ILR "Arbitration Under Fire: Research Evidence on Pros and Cons of Binding Arbitration"**, retrieved from https://youtu.be/SePhYacUYLs?si=dCQjgu9lIPYKp-OG;

**Key Observations**

1. Market Dependency & **Repeat-player** Bias Compromises Impartiality

- FairClaims shows acute client concentration—Turo alone drives ~40% of its docket.
- Fee incentives for repeat corporate clients mirror precluded impartiality, violating neutrality norms.
- 73% of FairClaims Case Loads come from 3 top clients
- 6 out of 10 FairClaims clients have exclusivity clauses
- If Turo were to sever this relationship, **FairClaims would face substantial operational distress, if not insolvency**.

2. Procedural Fairness Disparities

- Consumers fare 13% worse at FairClaims vs. AAA.
- Arbitrator assignment by FairClaims (vs. party selection at AAA/JAMS) creates opaque neutrality risks.

3. Accessibility vs. Outcome Integrity

- FairClaims' lower fees mask hidden risks:
  - No appeal mechanism.
  - No published arbitrator backgrounds or rulings.

**Extreme Dependency:
If Turo bails →
FairClaims fails**

4. Transparency Gaps

- AAA and JAMS release partial or full annual datasets.
- FairClaims offers zero public insight into arbitrator demographics, client win ratios, or procedural safeguards.

**Regulatory Referral Triggers**

- Agency Triggers

| Agency | Potential Violations/Review Angles |
|---|---|
| CFPB | UDAAP violations via opaque arbitration and denial of neutral forum access<br>• Non-disclosure of win rate data + lack of opt-out = potential UDAAP violations |
| FTC | Structural unfairness and **repeat-player** bias under Section 5<br>• **Repeat-player** bias + exclusive arbitration mandates = structural unfairness under Section 5 |
| DOJ (Antitrust) | Market lock-in via FairClaims exclusivity and refusal to engage AAA arbitration<br>• 73% caseload from 3 clients + exclusivity = "essential facility" dynamics under Sherman Act §2 |
| NAAG | Coordinated scrutiny of arbitration abuse and consumer harm<br>• State-level coordination to challenge systemic market distortion and opaque arbitration schemes |
| State AGs / TDI | Oversight of insurance-like practices and dispute resolution failures<br>• Failure to meet fair dispute resolution standards under state consumer protection and insurance laws |

## IV. UNCONSCIONABILITY AND PUBLIC **POLICY** VIOLATIONS

A. Procedural Unconscionability

- Adhesion Contracts: Mandatory clauses with no opt-out (Armendariz, 24 Cal.4th at 113).
- Gross Disparity in Win Rates: Consumers lose 13% more often at FairClaims vs. AAA.

B. Substantive Unconscionability

1. No Appeal Mechanism (unlike AAA/JAMS);
2. **Repeat-player** Bias: High-volume clients (e.g., Turo) create implicit pressure to rule favorably;
3. Fee Structure: "Pay-per-case" model incentivizes anti-claimant outcomes.

III. **RICO** PREDICATES: THE ENTERPRISE OF FRAUD

A. Pattern of Racketeering Activity (18 U.S.C. § 1961(5))

| Predicate Act | Evidence | Legal Basis |
| --- | --- | --- |
| Mail/**Wire fraud** | Corporate TOS disseminated electronically mandating FairClaims arbitration. | 18 U.S.C. §§ 1341, 1343 |
| Monopoly Maintenance | Exclusivity clauses blocking FairClaims competitors (AAA/JAMS) in 6/10 client contracts. | Sherman Act § 2; Kodak v. Image Tech (504 U.S. 451) |
| Concealment of Bias | FairClaims Withholding consumer win rates (28% vs. 41% at AAA). | Honeycutt v. JPMorgan (25 Cal.App.5th 909) |

B. Enterprise Structure

- **Association-in-fact**: FairClaims + Corporate Clients (Turo, TIDY, EFS Group).
- Common Purpose: Minimize liability via biased outcomes while monetizing dispute resolution.
- Control: Corporate clients dictate arbitration terms; FairClaims rubber-stamps outcomes.

**Legal Precedents Supporting Vacateur**

- AT&T Mobility v. Concepcion (2011): AAA's safeguards upheld; FairClaims lacks comparable fairness.
- Armendariz v. Foundation Health (2000): Procedural unconscionability and lack of neutral forum.
- Eastman Kodak v. Image Tech (1992): Client lock-in mirrors monopolistic dynamics under antitrust doctrine.

- FAA § 10(a)(2): Vacatur for "evident partiality" (Commonwealth Coatings).
- Cal. Civ. Proc. § 1286.2(a)(3): Arbitrator misconduct warrants vacatur.

- **RICO** Standing: Sedima, S.P.R.L. v. Imrex Co. (473 U.S. 479 (1985)): Claimants injured by racketeering may sue.

-

---

**Legal Implications for Courts and Agencies**

1. Presume Unconscionability
    - Where FairClaims clauses are mandatory with no opt-out, unlike AAA/JAMS – an adhesion contract.
        1. Armendariz v. Foundation Health, 24 Cal.4th 83 (2000): Establishes the requirement for a neutral forum and the elements of procedural and substantive unconscionability in arbitration agreements.
        2. Ramirez v. Charter Comm., 16 Cal.5th 478 (2024): Reinforces principles of unconscionability, particularly regarding one-sided arbitration provisions.
        3. Lhotka v. GeoExpeditions, 181 Cal.App.4th 816 (2010): Addresses the lack of mutuality and fairness in arbitration clauses.

2. Mandate Data Disclosure
    - Case-level win rates per client
    - Arbitrator assignment criteria and compensation structures
        1. CCP § 1281.9
        2. Ethics Standards for Neutral Arbitrators, Std. 7
        3. Honeycutt v. JPMorgan, 25 Cal.App.5th 909
        4. Grabowski v. Kaiser, 64 Cal.App.5th 67
3. Cap Client Dominance
    - Limit any single corporate client to ≤15% of total docket to align with JAMS/AAA norms
        1. Eastman Kodak v. Image Tech., 504 U.S. 451

       2. AT&T Mobility v. Concepcion, 563 U.S. 333
       3. IBA Guidelines on Privilege in Arbitration (2021)
4. Demand Conflict Audits
    o Audit FairClaims' arbitrator assignment logs and corporate influence metrics.
       1. CCP § 1281.9(a)
       2. Ovitz v. Schulman, 133 Cal.App.4th 830
       3. Mt. Holyoke Homes v. Jeffer Mangels, 219 Cal.App.4th 1299
       4. IBA Conflicts Guidelines (2024)

---

**Source Audit: Websites Consulted**

Primary Sources

- FairClaims Client List: https://www.fairclaims.com/clients
- Pricing: https://www.fairclaims.com/pricing
- Case Studies: https://www.fairclaims.com/case-studies
- SEC Filing (Turo): https://www.sec.gov/Archives/edgar/data/0001806061/000180606123000043/turo-20221231.htm
- Cornell Study: https://scholarship.law.cornell.edu/cgi/viewcontent.cgi?article=4873&context=facpub
- JAMS Report: https://www.jamsadr.com/annual-report-2024/

Corporate Terms of Service

- Turo: https://turo.com/terms
- TIDY: https://www.tidy.com/legal
- EFS Group: https://www.efsgroup.com/terms
- Others: Storelx, Lake Hop, Codi, Mothership, Boatsetter

Secondary Sources

- SimilarWeb: https://www.similarweb.com

Exhibit G2:  Comparative Arbitration Provider Assessment: FairClaims vs. AAA vs. JAMS

- Crunchbase: https://www.crunchbase.com
- CourtListener: https://www.courtlistener.com
- Casetext: https://casetext.com
- Wayback Machine: https://web.archive.org

Others

- Trifan v. Turo Inc. (Class Action Complaint): Alleged refusal to pay AAA fees, blocking arbitration access ~ https://www.classaction.org/media/trifan-v-turo-inc.pdf
- Reddit Host Testimonies: Reports of claim denials, procedural confusion, and arbitration outcomes ~ https://www.reddit.com/r/turo/comments/iv2ml9/fairclaims_arbitration_experience/
- Turo Terms of Service: Mandatory arbitration clause, Arizona choice-of-law, FairClaims default routing

-

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF

TEXAS

UNITED STATES DISTRICT COURT [Eastern District of Texas, Sherman Division]

AZEEZ LAWAL, Pro Se Petitioner,

**FAIRCLAIMS DEFAULTED SEE DOCKET 71, P. 122**

v.

TURO INC., FAIRCLAIMS, TRAVELERS INSURANCE CO., Respondents.

Civil Action No. 4:25-cv-00810-SDJ-BD

---

# EXHIBIT G3: FAIRCLAIMS CEO STEPHEN KANE – VIDEO INTERVIEWS (ADMISSIONS AGAINST INTEREST)

> Exhibits G3, G4, and G10 are corroborative: G4 substantiates the coercion revealed in Mr. Kane's G3 interviews—admissions against interest—by showing practice as confession by conduct. Taken together, G3 and G10 confirm the deployment of embedded loss-minimization reinsurance software with corporate-aligned KPIs, concealed from consumers and omitted from mandatory CIMA and SEC related-party disclosures.

## ABSTRACT

Exhibit G3 compiles three publicly available interviews of FairClaims CEO Stephen Kane, analyzed in the context of Arbitrator Bespalko's award, and filed in support of Plaintiff's Motion to Vacate under 9 U.S.C. § 10. The interviews contain multiple admissions against interest that demonstrate structural bias, procedural misrepresentation, and systematic arbitral capture favoring repeat corporate clients.

√ **Key Findings – Interview I (Nick J. Rishwain, LegalTechLIVE, Episode 129):**

1. **Arbitrator Independence:** Kane claims arbitrators are vetted external experts; objective evidence shows Arbitrator Bespalko was a FairClaims employee, creating a direct conflict under *Commonwealth Coatings v. Continental Cas.*, 393 U.S. 145 (1968).

2. **Structural Dependence / Repeat-Player Bias:** Kane admits Turo and Thumbtack were primary dispute sources, confirming financial and operational dependence that undermines neutrality.

3. **Procedural Misrepresentation:** Promised live hearings and transparent procedures were not provided; the arbitration imposed document-only review, retroactively limited submissions, and excluded material evidence, violating FAA §10(a)(3).

√ **Interviews II & III:**

- Confirm that FairClaims prioritizes enterprise clients and employs internal KPIs incentivizing complaint suppression.
- Demonstrate forced participation through ToS-based arbitration funnels and consistent structural bias, implicating §§10(a)(2)-(4) FAA.
- Highlight inconsistency in hearing formats, undisclosed caps, and procedural misrepresentations, establishing a systematic pattern of misconduct.

√ **Judicial Relevance:**
These admissions provide verifiable evidence supporting vacatur. They show the arbitration forum was captured, neutral adjudication was impossible, and statutory rights were materially impaired. The record demonstrates procedural gamesmanship and structural bias that raise broader implications for FAA application and enforcement.

√ **Supporting Exhibits:** E-series (arbitrator-related) and G1–G5 (FairClaims-related bias exhibits). Detailed matrices link CEO statements to FAA statutory grounds and controlling precedent.

# INTERVIEW I

FairClaims CEO Stephen Kane's public interview (Episode 129, NickJRishwain's Channel)

provides a set of self-incriminating **admissions against interest** that corroborate the evidentiary

record and prove structural bias, concealment, and fraud on the tribunal. When aligned with the

factual record, these quotes transform FairClaims' narrative of "fairness" into an insightful

**blueprint for arbitral capture.**

**1. The Arbitrator Is Not Independent, He Is a Captive Employee – Per Se Bias**

**CEO Claim:** "We assign an arbitrator who…is an attorney with at least 10 years' experience…we vet them very carefully."

*(Interview, 7:50–8:23)*

**Rebuttal:** This is corporate misdirection. Exhibits E series including LinkedIn evidence, which the Court can verify, shows Arbitrator Pavel Bespalko was not an 'independent neutral' as the arbitration narrative required, but a direct employee of FairClaims, Inc. This is not a mere 'financial entanglement' under *Commonwealth Coatings v. Continental Cas.*, 393 U.S. 145 (1968; it is an undisclosed, per se conflict of interest that fundamentally corrupted the arbitration from its inception. The arbitrator was on the payroll of the very company that Turo has a deep, financially concentrated relationship with—a fact that both FairClaims and the arbitrator actively concealed. The **award is therefore void ab initio and cannot be salvaged**. Kane's words are impeached by reality!

*Commonwealth Coatings v. Continental Cas.*, 393 U.S. 145 (1968

---

## 2. Monopolistic Funnel – Turo as Feeder and Paymaster

**CEO Claim:** "Our first two customers were Thumbtack and Turo…they feed us a lot of the disputes." *(Interview, 10:06–10:44)*

> Repeat-Player Admission
> **Legal Impact: Structural dependence on Turo confirmed**

**Rebuttal:** This is a devastating admission of structural dependence and a textbook demonstration of the **'monopolistic funnel'** alleged in Petitioner's filings. Kane concedes his business model is built on **'sharing economy marketplace partners'** as the **'major feeder of volume.'** When aligned with the LinkedIn evidence, this proves a **structural conspiracy**: Turo, a major client,

mandates disputes be heard in a forum (FairClaims) that employs the very arbitrator who decides those disputes. The arbitrator's financial viability is therefore structurally tied to the success of both FairClaims and, by extension, its primary 'feeder,' Turo. This concealed system, which this Court is exceptionally sensitive to, is an institutionalized conflict that cannot produce a neutral outcome. The award is thus a product of a captured forum, which is a non-negotiable violation of due process under controlling Fifth Circuit precedent. Neutrality is not possible in such a system; it is an institutionalized conflict.

---

### 3. Illusion of Due Process vs. Actual Suppression

The CEO's Admissions of a 'Transparent' Process Are a Fraud on the Record

**CEO Claim:** "Both sides can upload evidence, have a half-hour audio hearing…we're very clear and transparent, we don't hide the eight ball."
*(Interview, 7:31–8:06)*

**Rebuttal:** The reality of Claimant's case is a direct and actionable fraud on the tribunal. This is not a dispute over a subjective experience; it is an objective breach of the very process the CEO describes. The arbitrator:

- **Denied a Live Hearing:** In direct contradiction to the CEO's promise of a "live phone or video hearing," the arbitrator imposed a 'Document Review' format without Petitioner's consent. This violated FairClaims' own rules and is a per se ground for vacatur.

- **Concealed Material Limitations:** The arbitrator retroactively imposed a page limit after expressly permitting the upload of evidence, in a clear act of bad faith and a profound disregard for the law.

- **Suppressed Evidence:** Most damningly, the arbitrator reviewed Petitioner's hundreds of pages of evidence and then retroactively excluded it in his final award. This is not mere inefficiency; it is a willful, calculated act of suppression intended to neutralize a damaging evidentiary record. The FairClaims award can be summarized in "You lost because your evidence too much and we had to suppress it"

This is classic §10(a)(3) misconduct: refusal to hear "pertinent and material evidence," denial of a fair hearing, and suppression inconsistent with the parties' agreement. Exhibit G4 introduces an ex parte threat from FairClaims - the antonym of neutrality.

## JUDICIAL DUTY – NOT DISCRETION

The reality of Claimant's case is a direct and actionable fraud on the tribunal. This is not a dispute over a subjective experience; it is an objective breach of the very process the CEO describes. The arbitrator:

- **Denied a Live Hearing:** In direct contradiction to the CEO's promise of a "live phone or video hearing," the arbitrator imposed a 'Document Review' format without Petitioner's consent. Even after .timely challenge upon the award, FairClaims refused to reopen the

hearing for review directing to District Court instead.  This violated FairClaims' own rules and is a per se ground for vacatur.

- **Concealed Material Limitations:** The arbitrator retroactively imposed a page limit and an undisclosed $25,000 damages cap – disclosed post-award, in a clear act of bad faith and a profound disregard for the law.

- **Suppressed Evidence:** Most damningly, the arbitrator reviewed Petitioner's hundreds of pages of evidence and then retroactively excluded it in his final award without an opportunity for cure. This is not mere inefficiency; it is a willful, calculated act of suppression intended to neutralize a damaging evidentiary record.

---

This case is no longer about efficiency or arbitration policy. It is about whether justice can be privatized and outsourced to a **monopolistic funnel where the judge is on the payroll and the defendant is the paymaster.** The FAA does not permit such a masquerade. Such misconduct falls squarely within 9 U.S.C. § 10(a)(2), (3), and (4). The only lawful remedy is **vacatur of the award**.  The following tables provide an instructive review of other interview quotes  - admissions against interest - from Stephen Kane.

**CAPTIVE FORUM STRUCTURALLY DEPENDENT ON TURO (Combined with G7-G8 ~ FUNDED BY GLRE)**

# INTERVIEW I: FAIRCLAIMS CEO ADMISSIONS MATRIX

**Nick J. Rishwan.** *"ODR with FairClaims Founder & CEO Stephen Kane – LegalTechLIVE – Episode 129, 47:28 minute video interview with Stephen Kane, Founder/CEO FairClaims Inc."* October 12, 2021. Retrieved September 1, 2025, from https://youtu.be/31_vu9eQ8rY?si=9exxWkwtkuTM80Ms.

| Theme | CEO Admission (timestamp) | Legal Significance | FAA Ground & Precedent | Rebuttal / Counter |
|---|---|---|---|---|
| **Arbitrator independence claim** | "We assign an arbitrator… an attorney with at least **10 years' experience**… diligent about their job." (8:12–8:29) | Portrays arbitrators as independent experts. | § 10(a)(2) — nondisclosure of direct financial/employment ties is per se material (*Commonwealth Coatings*, 393 U.S. 145). | Contradicted by LinkedIn evidence that Claimant's arbitrator (Pavel Bespalko) was a **FairClaims employee**, not an independent attorney. Exhibit E3 shows Arbitrator Bespalko handled 500 cases for FairClaims - a fact that was not disclosed by FairClaims or the Arbitrator |
| **Repeat-player funnel/Structural Ties** | "Our first two customers were Thumbtack and Turo… they **feed us a lot of the disputes**." (10:12–10:44) | Confirms structural dependence on Turo for dispute volume. | § 10(a)(2) — material undisclosed ties mandate vacatur (*Monster Energy*, 940 F.3d 1130; *Positive Software*, 476 F.3d 278 (5th Cir.)). | In Claimant's arbitration, forum concealed that **Respondent was also one of its earliest and most important clients**. |
| **Promise of fairness & transparency** | "We work very hard not to **hide the eight ball**… we're **clear and transparent**… users sign up voluntarily." (7:50–8:06) | Public promise of transparency undermines credibility where concealment occurs. | § 10(a)(2) — nondisclosure; § 10(a)(3) — misconduct via concealment of material rules. DTPA violation. | Claimant faced procedural entrapment at different stages, retroactive **page limits**, a **$25,000 cap**, and post-award denial of challenge opportunity and misdirection. |
| **Hearing guarantee** | "Both sides pick a hearing date… upload evidence… have a **half-** | CEO describes live hearings as the standard safeguard. | § 10(a)(3) — refusal to hear pertinent and material | In Claimant's case, no live hearing occurred; instead, a "document review" with |

**CAPTIVE FORUM: Combined with G7-G8**

| Theme | CEO Admission (timestamp) | Legal Significance | FAA Ground & Precedent | Rebuttal / Counter |
|---|---|---|---|---|
| | hour audio hearing… decision in a few days." (8:42–8:53) | | evidence (*Karaha Bodas*, 364 F.3d 274 (5th Cir.)). | suppression of rebuttal evidence and statutory rights contradicted the promised process. |
| **Revenue & repeat-player dependence** | "Our **sharing economy partners** have been the major feeder of disputes… **they feed us**… **volume comes from them.**" (10:01–10:44) | Acknowledges reliance on corporate partners (e.g., Turo) for survival. | § 10(a)(2) — financial entanglements with repeat players create evident partiality. | Neutrality impossible when arbitrator is employed by forum **financially dependent on Respondent's repeat business**. |
| **Complaint reduction as deliverable** | "It saves [marketplaces] on staff time, mitigates social media backlash, and **reduces liability.**" (33:11–33:22) | Confirms forum's **true deliverable** is protecting corporate clients, not neutral adjudication. | § 10(a)(2) — structural bias demonstrated by KPIs aligned with enterprise reputation/liability. | Contradicts claim of neutrality: decisionmakers had incentive to **reduce complaints against Turo**, not adjudicate fairly. |
| **Flat-rate arbitrator compensation** | "We think an important part… is that arbitrators get paid on a **flat rate**… efficiency is part of who we are." (28:34–28:45) | Designed to market neutrality, but flat-rate employment reveals financial ties. | § 10(a)(2) — undisclosed employment is material; § 10(a)(4) — exceeds powers if independence required by agreement. | If arbitrator was salaried staff, flat-rate pay confirms **captive relationship**, and rush through tribunal without analysis or engagement, not neutrality. |
| **Experience claim: thousands of cases**  NOT DISCLOSED | "At this point they've had **hundreds or thousands** of arbitrations on the platform." (8:23–8:29) | Positions FairClaims as experienced but implies repeat assignment of the same arbitrators. | § 10(a)(2) — repeat assignments to a forum's employees create appearance of systemic bias. | Claimant's arbitrator was not disclosed as part of this "in-house rotation," depriving Claimant of chance to object. |
| **Indigent relief claim** | "We typically waive the fee if it's that kind of situation." (45:20–45:50) | Marketing fairness and access to justice. | § 10(a)(3) — misconduct if marketing fairness while | Claimant faced **retroactive page caps** and cost burdens that |

**Claim suppression (liability reduction) as a metric - whose liability? Corroborated by GLRE need for short cycles (or Turo's short-term rentals) in G10**

| Theme | CEO Admission (timestamp) | Legal Significance | FAA Ground & Precedent | Rebuttal / Counter |
|---|---|---|---|---|
| | | | imposing hidden barriers (e.g., caps, limits). | contradicted this "access to justice" narrative. |

**INTERVIEW II: FAIRCLAIMS CEO ADMISSIONS MATRIX**

**Automate and Grow Podcast**. "Episode 15: Stephen Kane Bringing Dispute Resolution Online with FairClaims.com – Automate and Grow – Episode 15, 31:03 minute video interview with Stephen Kane, Founder/CEO FairClaims Inc." (n.d.). Retrieved September 1, 2025, from https://youtu.be/WBlsgW0iuGk?si=yDjOrJJhMXfoNShy

CAPTIVE FORUM: Combined with G7-G8

Embedded loss-minimization reinsurance API. Confirmed by GLRE in G10

| Theme | CEO Admission (timestamp) | Legal Significance | FAA Ground & Precedent | Rebuttal / Counter |
|---|---|---|---|---|
| **Forum serves enterprises, not public neutrals** | "FairClaims is basically like a SaaS platform that allows enterprises to have a forum…" (0:45–1:03) | Forum identifies **enterprises** as its clients, not consumers. Incentives align with repeat-players. | § 10(a)(2): evident partiality — *Commonwealth Coatings*, 393 U.S. 145; *Positive Software*, 476 F.3d 278 (5th Cir.). | Neutrality is fictional. Claimant had no enterprise affiliation, yet was forced into a forum **built for enterprise customers**. Exhibit T4 |
| **Repeat-player capture (Turo named)** | "Our first couple of customers… one of whom was **Turo**." (7:50–8:07) | Explicit admission of Turo as early **"feeder."** Material nondisclosure of ties. | § 10(a)(2): nondisclosure of material ties mandates vacatur — *Monster Energy*, 940 F.3d 1130. | In Claimant's arbitration, Turo appeared as "Respondent," yet **the arbitrator was employed by a forum structurally dependent on Turo**. |
| **Enterprise workflow & API integration** | "A workflow tool for these companies to manage their disputes… API tools…" (8:40–9:13) | Forum describes itself as embedded in enterprise workflows; confirms structural bias. | § 10(a)(2): financial entanglement; material per *Positive Software*. | Claimant's case processed through the same **enterprise dispute funnel**; no disclosure of integration or incentives provided. |
| **Complaint suppression as service value** | "We've reduced a lot of our customers' claims by | Forum sells complaint suppression as a service, not neutral adjudication. | § 10(a)(2): bias evidenced by forum's | This admission impeaches neutrality: the "success metric" was **reducing** |

SUCCESS METRIC = CLAIM SUPPRESSION
CAPTIVE FORUM: Claim reduction as KPI / deliverable metric. Combine with G7-G8

Coercive Tactics / Adhesion Contract: Lack of mutual assent:
**Corroborated by G4**

**Coercive "channeling" mirrors Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451 (1992) - potentially triggering antitrust "essential facility" doctrine.**

| Theme | CEO Admission (timestamp) | Legal Significance | FAA Ground & Precedent | Rebuttal / Counter |
|---|---|---|---|---|
| | **like two-thirds"** (≈23:39–23:45) | | KPI alignment with corporate repeat-players. | **complaints**, not adjudicating fairly. |
| **Mandatory funnel via ToS** | "Companies… **put us in their Terms of Service**… make this process **mandatory**" (14:22–15:20) | Consumers are coerced into arbitration by ToS adhesion. | § 10(a)(4): exceeding powers — contractual displacement of statutory rights barred in *Hall Street*, 552 U.S. 576. | Claimant's Texas DTPA/Insurance Code rights were suppressed by California seat language embedded via ToS. |
| **Coercion via 'carrots and sticks'** | "We use different **carrots and sticks** to bring people to the table." (12:47–13:04) | Admits coercive mechanics; undermines voluntariness. | § 10(a)(3): misconduct (refusal to hear material evidence); § 10(a)(4): exceeded powers. | In Claimant's case, coercion was achieved through **retroactive page limits** and mandatory "document review," not hearing. |
| **Promise of live hearing** | "Once both sign up… **video hearing**… in **two to three weeks**." (10:13–10:24) | FairClaims markets live hearings as a standard safeguard. | § 10(a)(3): refusal to hear pertinent evidence — *Karaha Bodas*, 364 F.3d 274 (5th Cir.). | Award falsely recited that "Claimant and Respondent appeared at hearing," when in fact no hearing occurred. |
| **Claim of independence** | "Helpful to have this **independent neutral third party** take a look…" (8:12–8:24) | Advertises neutrality while assigning employee-arbitrators. | § 10(a)(2): nondisclosure of direct employment = per se material — *Commonwealth Coatings*. | Arbitrator Bespalko was **a FairClaims employee**; nondisclosed status impeaches claim of independence. |
| **Qualification flexibility** | "You **don't have to be a lawyer** to be an arbitrator…" (23:46–24:28) | Confirms low baseline qualifications; makes disclosure even more critical. | § 10(a)(2): where safeguards are minimal, nondisclosure of ties becomes fatal. | Claimant's arbitrator not only lacked judicial independence but also operated under **forum employment**. |
| **Rigorous vetting claim (7% accepted)** | "We **take 7%** of arbitrators… run them" | Marketing claim contradicted by reality of employee-arbitrators. | § 10(a)(2): misrepresentation of independence; material | Inconsistent with LinkedIn/employment records |

Admission to CoerciveTactics
**Corroborated by retaliatory fee-shifting threats later used in G4**

| Theme | CEO Admission (timestamp) | Legal Significance | FAA Ground & Precedent | Rebuttal / Counter |
|---|---|---|---|---|
| | through the wringer." (25:56–26:22) | | nondisclosure mandates vacatur. | showing arbitrator was staff, not an external vetted neutral. |

**INTERVIEW III: FAIRCLAIMS CEO ADMISSIONS MATRIX**

**The Arbitration Conversation with Amy:** "Arbitration Conversation #67: Stephen Kane, Founder and CEO of FairClaims.com – Arbitration Conversation #67, 16:57 minute video interview with Stephen Kane, Founder/CEO FairClaims Inc." (n.d.). Retrieved September 1, 2025, from https://youtu.be/WFzybp-BoSM?si=nbY0xy3sYuQ1bDBj

.

CEO admits system structurally favors repeat corporate players. **Crates motive for intimidation email: G4**

| Theme | CEO Admission (timestamp) | Legal Significance | FAA Ground & Precedent | Rebuttal / Counter |
|---|---|---|---|---|
| **Acknowledgment of structural bias in law** | "In the real world, **money and power matter… corporations who can afford attorneys have a much bigger voice… average people are intimidated.**" (7:06–7:20) | CEO admits that the system is structurally tilted toward corporate repeat players. | § 10(a)(2) — evident partiality where forum depends on repeat-player corporate clients (*Monster Energy*, 940 F.3d 1130). | Claimant's record shows **exactly this dynamic**: Turo, a repeat corporate client, received favorable treatment while consumer rights under Texas DTPA/TIC were suppressed. |
| **Founding rationale: small claims avoidance** | "People don't want to go to small claims court… it's intimidating, takes months, full of red tape." (3:44–4:22) | Admission that FairClaims markets itself as an "easy alternative" to court. | § 10(a)(3) — misconduct if forum markets fairness but conceals limits that **strip substantive rights** (*Karaha Bodas*, 364 F.3d 274). | In Claimant's case, FairClaims **denied live hearing, imposed hidden limits**, contradicting the promise of "easy, fair access." |
| **Early operations: manual handling via Weebly/Squarespace** | "I just put up a **Weebly site**… then built a Squarespace site and did our early arbitrations **manually**." (10:20–10:47) | Admission that FairClaims presented itself as automated while disputes were decided **by internal staff,** | § 10(a)(2) — nondisclosure of arbitrator employment or non-independence (*Commonwealth Coatings*, 393 U.S. 145). | Supports evidence that Claimant's arbitrator was **a FairClaims employee**, not an independent neutral. |

| Theme | CEO Admission (timestamp) | Legal Significance | FAA Ground & Precedent | Rebuttal / Counter |
|-------|---------------------------|--------------------|------------------------|--------------------|
| | | not neutral arbitrators. | | |
| **Market focus on sharing economy clients** | "We've mostly done digital arbitration… **focused on sharing economy marketplaces**… HomeAdvisor, Angie's List, Thumbtack, Turo, Outdoorsy." (12:36–12:50) | Admission of structural dependence on repeat-player corporate partners. | § 10(a)(2) — repeat-player funnel bias (*Positive Software*, 476 F.3d 278 (5th Cir.)). | Confirms that Claimant's arbitration was for **one of FairClaims' core repeat clients (Turo)**, not a neutral forum. |
| **Reliance on marketplaces to compel participation** | "Nobody knows who FairClaims is… the way we get respondents is through the **marketplaces holding them accountable.**" (13:01–13:34) | Admission that forum relies on corporate partner pressure to bind users into arbitration. | § 10(a)(4) — exceeds powers by enforcing **forced funnel arbitration** beyond statutory scope (*Hall Street*, 552 U.S. 576). | In Claimant's case, the binding ToS funnel deprived access to Texas statutory remedies and court review. |
| **Hearing format contradictions** | "We do live hearings and also text/document-only arbitrations… we actually **switched from video to audio.**" (14:02–14:26) | Public promise of live hearings contradicted by inconsistent practice. | § 10(a)(3) — refusal to hear material evidence when promised a live hearing. | Claimant received **no live hearing at all** — a pure document review — contradicting the CEO's description. |

**Coercion Tactics**

# EXHIBIT G4: EX PARTE EMAIL FROM STEPHEN KANE (FOUNDER/CEO OF FAIRCLAIMS)

Received: September 16, 2025

**FAIRCLAIMS DEFAULTED SEE DOCKET 71, P. 122**

Context: Sent after Plaintiff submitted Exhibit ServiceAttempts3 documenting FairClaims' evasive conduct and refusal to accept summons.

**Abstract**

This exhibit is not a routine correspondence—it is an unsolicited, ex-parte communication from the CEO of a purportedly neutral arbitration provider, sent after Plaintiff documented FairClaims' systematic refusal to accept service. The timing and content of this email reflect a strategic attempt to intimidate the plaintiff while disclaiming party status. In lay terms, the letter simply warns the Plaintiff: "Don't mention FairClaims, Or else…." The court should listen.

> Exhibits G3, G4, and G10 are corroborative: G4 substantiates the coercion revealed in Mr. Kane's G3 interviews—admissions against interest—by showing practice as confession by conduct. Taken together, G3 and G10 confirm the deployment of embedded loss-minimization reinsurance software with corporate-aligned KPIs, concealed from consumers and omitted from mandatory CIMA and SEC related-party disclosures.

**Introduction**

The email from Stephen Kane is not a stray remark; it is a calculated act of intimidation, designed to chill protected advocacy and obstruct judicial oversight. This Court's intervention is not optional—it is imperative to preserve the integrity of its own proceedings.

## This Is a Claim of Misconduct, Not Dissatisfaction.

Defendant may argue that vacatur is reserved for extraordinary circumstances. That threshold is met. Plaintiff does not challenge the merits of the award but the procedural sabotage that produced it. As this Court has held, sanctions for bad faith are grounded in the Court's inherent authority to protect its own proceedings.

## Evident Partiality Is Self-Proven.

Defendant will suggest that arbitrators need not sever all business ties. But the issue is not the existence of a relationship—it is the deliberate concealment of one. The arbitrator was a FairClaims employee who had handled hundreds of cases involving the defendant's feeder clients. Under *Commonwealth Coatings*, this failure to disclose mandates vacatur.

FairClaims is not a neutral tribunal—it is a platform-captured forum whose economic incentives and KPIs align with repeat-player defendants. The arbitrator was not independent; he was institutionally embedded.

## Rule 29 Is a Weaponized Clause.

Defendant invokes a fee-shifting provision to suppress statutory rights. As Judge Jordan has noted, private actors may not "evade procedural requirements" through contract. The Hooters precedent confirms that rules which "so skew the process" violate public policy. Rule 29 is not enforceable—it is unconscionable.

**Culpable Intent Is Clear.**

The Kane email reflects a continuation of pre-award misconduct and the systemic pattern of procedural obstruction detailed in Ex. ServiceAttempts3. FairClaims' CEO admits to tracking outcomes for financial gain. This is not neutrality—it is strategic obstruction. And while FairClaims finds time to monitor case outcomes and threaten fee exposure, it simultaneously dares this Court by refusing service—declaring it will "sit this one out."

When a tribunal declares it will 'sit this one out,' it does not merely refuse service—it invites scrutiny.

This Court should accept that invitation. That is not mere defiance; it is institutional contempt, like the impunity defense already documented at arbitration. A party that acts with a culpable mental state and suppresses evidence warrants sanctions and adverse inference. The Court should recognize this for what it is: a deliberate attempt to deny a fair hearing. The Court should note the contradictions in Kane's words and draw adverse inferences from FairClaims':

- Evasion of summons
- Refusal to participate
- Threats of fee exposure
- Concealment of arbitrator ties

# Turo–Travelers–FairClaims: An Enterprise-in-Fact of Defiance

The defendant, FairClaims, files a letter of defiance not with the court but as a direct threat to the Plaintiff! **Kane's** letter undermines the**ir** entire corporate defense. Turo and Travelers have a vested interest in the finality of the arbitration award. **Kane's threat** makes it impossible for them to argue that FairClaims is a neutral and fair forum. The core issue is not an error in the arbitration award but the willful subversion of the process itself.

- **Destruction of Finality:** The threat proves that <u>FairClaims is an active participant, not a passive administrator</u>. By refusing to appear while simultaneously threatening the plaintiff with fee-shifting, FairClaims' action brings to question not just the vacatur but the full evidentiary hearing and discovery of the forum's misconduct. The integrity of the arbitral process, designed for finality, has been intentionally sacrificed.
- **Conflation and Complicity:** Turo and Travelers may try to distance themselves from FairClaims' threat, but **<u>the Court should view FairClaims' willful obstruction as a proxy for Turo and Travelers' own desire to suppress evidence and chill litigation</u>**. As the plaintiff's Exhibit Regulatory shows, this "ping-pong of due process" is the only defense strategy meted out to consumers.

This Court need not tolerate enterprise-in-fact defiance dressed as discretion. It can, and must, act to restore the procedural integrity that the defendants have willfully abandoned.

## Executive Overview and Framing Statement

Table 1 uses the mnemonic TRACKS to summarize the substantive issues and fact pattern implicated by Kane's letter. Table 2 presents the implications of the self-impeaching contradictions in the letter. The letter from Stephen Kane (CEO/Founder) of FairClaims is presented with a few highlights and annotations. The Exhibit ends with a list of relevant arbitral licensing agencies, statutes, and regulators potentially triggered by the letter.

*To paraphrase Judge Jordan, **authority is not unbounded**. FairClaims' threats and concealment push it beyond the boundaries of neutrality, converting arbitration from a forum into an instrument of obstruction. In doing so, it reveals an enterprise-in-fact with Turo and Travelers — wielding arbitration as a weapon rather than a safeguard of justice.*

See *State of Texas v. United States Department of Labor, No. 4:24-CV-499-SDJ, 2024 WL __*, **at** * *(E.D. Tex. Nov. 15, 2024)*(Jordan, J.) (quoting *Mayfield v. Department of Labor*, 117 F.4th 611, 619 (5th Cir. 2024)) ("[The] authority … is not unbounded.")

> **JUDGE SEAN JORDAN QUOTE**

## Table 1: Mnemonic Framework: "TRACKSSE"

The following mnemonic captures the systemic misconduct at issue

| Mnemonic | Meaning | Judicial Implication | FAA Violation / Other Laws / Doctrines Violated |
|---|---|---|---|
| **T – Threats** | Fee-shifting threat to chill judicial review | Violates public policy; justifies vacatur and sanctions | § 10(a)(4) – Exceeded powers (imposing fee-shifting not authorized by FAA); § 10(a)(3) – Misconduct<br><br>**FTC Act §5** (unfair/deceptive practice); **State UDAP statutes** (TX DTPA, CA UCL, AZ CFA); **Void against public policy** doctrine |
| **R – Refusal** | Refusal of service, defiance of process | Grounds for adverse inference, default treatment, and sanctions | § 10(a)(3) – Misconduct (refusal to hear evidence/participate)<br><br>**Obstruction of justice** (18 U.S.C. §§ 1503, 1512 if systemic); **State civil procedure rules** (e.g., TX CPRC §154, CA CCP §1281.9 service obligations) |
| **A – Arbitrator Bias** | Staff arbitrator with undisclosed ties to repeat player | *Commonwealth Coatings* violation; vacatur under FAA § 10(a)(2) | § 10(a)(2) – Evident partiality<br><br>**State ADR disclosure statutes** (CA CCP §1281.9, TX ADR Act); **Professional licensing violations** (failure to disclose conflicts) |
| **C – Concealment** | Concealed outcome tracking, API integration, KPIs, knowledge skew and institutional ties | Breach of disclosure duty; regulatory and licensing exposure | § 10(a)(2) – Evident partiality; § 10(a)(3) – Misconduct<br><br>**FTC Act §5** (false neutrality); **State UDAP laws**; **Licensing violations** (arbitration provider misrepresentation) |
| **K – Knowledge of Harm** | CEO admits tracking outcomes for financial advantage | Culpable mental state; supports sanctions and RICO inference | § 10(a)(1) – Award procured by undue means<br><br>**Civil RICO (18 U.S.C. §1962)** (enterprise-in-fact, pattern of racketeering); **Mail/Wire Fraud predicates** (18 U.S.C. §§ 1341, 1343); **State conspiracy statutes** |

| Mnemonic | Meaning | Judicial Implication | FAA Violation<br>Other Laws / Doctrines Violated |
|---|---|---|---|
| **S – Skewed Rules** | Rule 29 weaponized to suppress statutory rights | Unconscionable clause; unenforceable under FAA/state law | § 10(a)(4) – Exceeded powers; § 10(a)(3) – Misconduct<br><br>**Unconscionability under state contract law**; **FTC Act §5** (coercive clause); **State UDAP statutes**; **Due process guarantees** (TX Const. Art. I §19; CA Const. Art. I §7; AZ Const. Art. II §4) |
| **Enterprise Synthesis** | Misconduct benefits Turo and Travelers, not just FairClaims | Coordinated scheme evidencing an enterprise-in-fact | § 10(a)(1) – Undue means; § 10(a)(2) – Evident partiality<br><br>**Civil RICO (18 U.S.C. §1962(c))**; **Conspiracy liability**; **State AG enforcement** (consumer protection & unfair competition) |

## Table 2: The Letter Against Itself: FairClaims' Self-Impeaching Contradictions

| Claimed Position | Contradictory Admission | Tag | Implication | Other Laws Violated |
|---|---|---|---|---|
| "We are a neutral third party." | "We track these sorts of things to incorporate whatever feedback the court might have." | Neutrality vs. Outcome Surveillance | Tracking outcomes for internal gain undermines neutrality and proves institutional bias. | § 10(a)(2) – Evident Partiality<br><br>FTC Act §5 (unfair/deceptive practice – false neutrality); State UDAP laws (TX DTPA, CA UCL, AZ Consumer Fraud Act) |
| "We are not trying to evade notice." | "We plan to sit this one out." | Service Acknowledgment vs. Procedural Defiance | Refusing to engage with lawful process contradicts claimed non-evasion. | § 10(a)(3) – Misconduct (Karaha Bodas)<br><br>Obstruction of Justice (18 U.S.C. §1503/§1512) if systemic; State civil procedure rules (TX CPRC §154, AZ Rule 72, CA CCP §1281.9) |
| "We care deeply about connecting parties with qualified arbitrators." | Arbitrator was a FairClaims staff member with undisclosed ties to repeat-player client. | Qualified Arbitrator vs. Captured Forum | Institutional employment of arbitrators violates disclosure mandates and shows evident partiality. | § 10(a)(2) – Evident Partiality (Positive Software)<br><br>State ADR disclosure statutes (CA CCP §1281.9 requires disclosure of relationships); Professional licensing violations (failure to disclose conflicts) |
| "Rule 29 is a fair contractual clause." | "You agreed that if you name us, you'll pay our attorney fees." | Contractual Fairness vs. Fee-Shifting Threat | Rule 29 is used as a sword to chill judicial review, contrary to FAA and public policy. | § 10(a)(4) – Exceeded Powers; § 10(a)(3) – Misconduct (Karaha Bodas)<br><br>Unconscionability under state contract law; FTC Act §5 (coercive clause); State UDAP statutes (TX DTPA, CA UCL, AZ CFA) |
| "We defer to the court to do what they feel is most just." | "We will not respond further and are not a party." | Deference vs. Disengagement | Feigned deference masks strategic obstruction. | § 10(a)(3) – Misconduct<br><br>Contempt of Court risk; State civil procedure rules (failure to comply with summons/service) |

| Claimed Position | Contradictory Admission | Tag | Implication | Other Laws Violated |
|---|---|---|---|---|
| "We're all about empowering people." | "I encourage you to reconsider your approach with respect to FairClaims." | Empowerment vs. Intimidation | <u>Threat of retaliation or reputational harm</u> for pursuing legal rights contradicts empowerment. | § 10(a)(1) – Undue Means<br><br>Witness intimidation statutes (18 U.S.C. §1512 if construed broadly); State consumer protection laws(misrepresentation of empowerment while threatening retaliation) |
| "We're not saying the courts don't have jurisdiction." | "You agreed not to name us as a party or witness." | Jurisdiction Acknowledgment vs. Contractual Gag Clause | Attempting to contract around judicial authority is legally and ethically indefensible. | § 10(a)(4) – Exceeded Powers<br><br>Void against public policy (attempt to contract around judicial authority); State constitutional due process guarantees. State Due Process (e.g., Texas Const. Art. I, §19; California Const. Art. I, §7; Arizona Const. Art. II, §4) |
| "We've spent over a decade doing our very best to live up to fairness." | "We will not seek to aid [Turo] in any way other than providing the same info we provide to you." | Fairness vs. Tactical Minimalism | Withholding responsive engagement while claiming fairness exposes reputational doublespeak. | § 10(a)(3) – Misconduct<br><br>False advertising / misrepresentation under FTC Act §5 and state UDAP laws |
| "FairClaims is merely an administrator, separate from the parties." | "Turo and Travelers benefit from our fee-shifting threats and obstructive stance." | Enterprise-in-Fact vs. Neutral Forum | The contradictions reveal coordinated conduct—FairClaims, Turo, and Travelers operating as an enterprise-in-fact to suppress judicial scrutiny and preserve a biased forum. | § 10(a)(1) – Undue Means; § 10(a)(2) – Evident Partiality<br><br>Civil RICO (18 U.S.C. §1962) (enterprise-in-fact with pattern of obstruction and fraud); State conspiracy statutes |





## Threat: Don't Mention FairClaims, Or Else....

---

## Cover Letter – Service of Filings

**Stephen Kane** <kane@fairclaims.com>                    Tue, Sep 16, 2025 at 5:28 PM
To: azeez.lawal@gmail.com
Cc: FairClaims Support <help@fairclaims.com>

Mr. Lawal - I'm the Founder + CEO of FairClaims. I want to address your legal action and concerns directly. And answer any outstanding questions you may have.

My understanding is that Melissa from our team has provided you with ample resources and information for vacating your arbitration award. And that she has also done her very best to understand how we can be helpful now that you have filed a petition to vacate in federal court.

I have reviewed your arbitration matter including the full written reasoned decision, as well as other aspects of your case including evidence presented by both parties, questions and answers, etc. I have also reviewed recent communications between you and FairClaims.

> False Ally or Straw Advocate Fallacy: Defendant as Plaintiff's Advocate

Given you feel your arbitration award should not stand, I most certainly support your action to petition the court. We started FairClaims to make the legal system more fair + just for more people, especially consumers not represented by attorneys. And we've spent over a decade doing our very best to live up to that. So I'm very sorry to hear you feel we fell short in any way. And totally open to your feedback.

> Contradicts Ex. G1 - G3: FairClaims' value proposition is to corporate clients

That said, the underlying matter is between you and Turo, not FairClaims, and we feel quite strongly that as a neutral third party it is not our place to weigh in on this current legal action. We would take the same position if it were Turo enforcing their award against you, and will not seek to aid them in any way other than providing them with the same info we provide to you. Indeed, we defer to the court to do what they feel is most just, and we trust their good judgment. As you may know, it is highly uncommon for arbitration providers to respond to petitions to vacate or enforce since we are not a party to the dispute. In fact, it could be considered improper for us to take a position since we are to remain neutral. We take our neutrality and related ethics very seriously and always have. I hope that's clear and obvious.

> Performative Contradiction/Hypocrisy (Tu Quoque) Fallacy: Contradicts Ex E Series (Arbitrator Bias); G3 (Kane's interview), Regulatory - Washington Addendum  (FOIA); T Series (TTFGG  Enterprise), willful evasion & contempt y risk of contempt

We are an independent third party tribunal and care very deeply about doing our best to connect parties with qualified arbitrators who do their very best to make the fair and right decision. But our role in this has concluded and there is nothing more we can do given the binding nature of our arbitrator's decision. My understanding is we have provided you with access to all the information and resources you may need to vacate your award and do not feel we can offer any assistance to any party or the courts beyond the information you're able to present.

We are not at all trying to evade notice of this legal action. In fact, we followed up and asked you multiple times to confirm that you filed a petition to vacate and named FairClaims. We always want to know when someone makes a filing like this and we do track these sorts of things to incorporate whatever feedback the court might have. But we genuinely feel we cannot add any value by responding any further. The court can look at our arbitration award and the record, and make a decision based on that and whatever you and the other parties provide.

I see you raised concerns about one of our rules, Rule 29. Our rules are a contract between both parties and FairClaims, a contract you agreed to when you signed up. We're not saying the courts don't have jurisdiction. As a lawyer I'm well aware of the court's jurisdiction. We're saying that you agreed under contract that you would not add us as a party or witness. You also agreed that, if you do add us as a party or witness, you will be responsible for any attorney fees and other expenses we undertake in responding. I trust and hope it won't come to that. But want to confirm you're aware of it. I'm a lawyer but not your lawyer, just pointing out what the rules say and attempting to clear up any miscommunication.

> **T - Threat**

> **A - Arbitrator Bias**

> **C - Concealment**
> **K - Knowledge of Harm**

> **S - Skewed Rules**

Note that we have very carefully crafted our rules with expert assistance. The person who drafted Rule 29 is the person Congress goes to when they have questions about arbitration regulation. It adheres very closely and quite properly to the Federal Arbitration Act and case law. I don't expect you to be an expert at any of this but we are experts and had assistance from someone with tremendous expertise in designing these rules, as well as from other top lawyers around the country including myself.

> TTFGG: No disclosure

We're a very fair and highly ethical provider with an excellent track record. Should you decide to accuse us of anything further as you mentioned in your last exchange, you are certainly free to do so. But it will not change how we respond to any of this. And I encourage you to consider the trade offs of such a move. Will it help you win favor with the court? Will it help you vacate the arbitration award? Will it help you make your case any further? Or will it simply distract from your goal? Again, I'm not your attorney. Just offering up the information and my thoughts.

For what it's worth, in reviewing your matter and decision, I feel our arbitrator did an excellent and rather thorough job detailing why he decided what he decided. And it seems quite clear to me that he patiently reviewed evidence and statements from both parties before reaching a decision. If I felt he felt short, I'd admit it. But nevertheless, it's not up to me and it's certainly possible I and our arbitrator are both wrong. It's of course up to the Judge you're in front of to decide whether it should stand. And if it does not stand we'll accept that as feedback, learn from it and move on.

We have now spent hours responding to your requests. And have done our best to explain our position. It may or may not be productive to continue our dialogue. But I do pray this was helpful information and context for you. If we can answer any other substantive questions please do let us know. If not, we plan to sit this out and leave it to the relevant parties to present their cases to the court.

I truly do admire how you're standing up for yourself and making your case. We're all about empowering people. But I ask you to strongly reconsider your approach with respect to FairClaims. We are simply not a party to your dispute and have nothing to directly gain or lose from participating in this action. We want the right decision to stand between the parties, whether our arbitrator got it right or wrong.

Best of luck to you!

Best,
Stephen
[Quoted text hidden]
--
Stephen Kane
Founder + CEO, FairClaims
LinkedIn

**False Ally,
Straw Advocate, Performative
Contradiction or Hypocrisy (Tu
Quoque) Fallacy:
Defendant as Plaintiff's
Advocate**

**R - Refusal
√ Dares the court
√ Contempt in writing
√ Obstruction
declaration**


FairClaims

TechCrunch | Above the Law | Stanford CodeX Project

**Good for FairClaims, Its Client (Turo) , Owner (Greenlight Re) & TTFG Enterprise (Ex. T4)**
√ Arbitrator employed by captured forum  **suppresses evidence** and rules for its  client/ paymaster!
√ Turo **compels  arbitration with  FairClaims**, FairClaims integrates and rules for Turo.
√ FairClaims **resists judicial review, dares the Court**, and risks contempt for Turo.
√ Another ipsi dixit with Quid Pro Quo Symbiosis!
√ A feedback loop of Bias and Procedural Evasion
**DESTROYS NEUTRALITY CLAIM**

# 🏛 Arbitral Licensing Agencies / ADR Bodies

## ☑ Texas

- State Bar of Texas ADR Section – Educates and certifies ADR professionals
- Texas Department of Insurance – Manages billing dispute arbitrators

## ☑ Arizona

- Arizona Academy of Mediators & Arbitrators – NADN-affiliated vetting body
- State Bar of Arizona ADR Section – Promotes ADR standards and training

## ☑ California

- JAMS California Panel – Largest private ADR provider
- ADR Services Inc. – Statewide ADR provider with 130+ neutrals
- National Academy of Distinguished Neutrals – CA Chapter – Peer-vetted arbitrators

# 📄 Statutes Potentially Violated

## ▨ Federal

- FAA §10(a) – Evident partiality, misconduct, undue means
- FTC Act §5 – Unfair/deceptive practices (threats, concealment)
- Civil RICO (18 U.S.C. §1962) – If pattern of obstruction and fraud is proven (Ex. T1 – T3 already map RICO predicates across 20 precedents. Plaintiff will update accordingly)

## ▨ Texas

- Texas Civil Practice & Remedies Code §154 – ADR standards; misconduct may void award
- Texas Deceptive Trade Practices Act (DTPA) – Threatening fee exposure to suppress rights

## ▨ Arizona

- Arizona Rule 72 Arbitration – Requires neutrality and disclosure
- Consumer Fraud Act (A.R.S. §44-1521) – Misrepresentation and concealment

## ▨ California

- AB 51 (Labor Code §432.6) – Prohibits mandatory arbitration in employment
- Unfair Competition Law (Bus. & Prof. Code §17200) – Broad catch-all for deceptive practices

---

# 🛡 Regulatory Contacts

### 🏛 FTC Regional Offices

- Bureau of Consumer Protection
- FTC Regional Offices Directory – Includes Dallas, Los Angeles, and Western Region

### 🏛 State Attorneys General

- Texas AG – Consumer Protection Division
- Arizona AG – Consumer Protection
- California AG – Public Inquiry Unit
- California Department of Consumer Affairs - Dispute Resolution Advisory Council & Division of Consumer Services

### 🏛 Securities and Exchange Commission

- Referral with Exhibit Regulatory already on-file

### 🏛 Department of Justice

- Corporate and White-Collar Crimes Division
- Criminal Division: Fraud and Racketeering Sections

-

# Exhibit G5 Captured Forum Report:

*How FairClaims' Business Model Corrupts Arbitration and Demands Vacatur — Report & Evidence Summary (Exhs. G3–G4)*

## Abstract

**FAIRCLAIMS DEFAULTED SEE DOCKET 71, P. 122**

**This report cross-references an ex parte email sent to the plaintiff by FairClaims' founder (G4) with his public YouTube statements (Ex. G3) and other marketing materials**. The CEO's email, public videos, and KPI-driven revenue model reveal an institutional conflict of interest that destroys neutrality, aligns the forum's incentives against individual claimants, in defiance of the court — justifying vacatur and expedited discovery.

> **G5: Captured Forum Report (Synthesis Document)**
> **Combines G3-G4 to prove:**
> √ Evident partiality (FAA §10(a)(2))
> √ Procedural misconduct (§10(a)(3))

## Executive Summary

This report presents a comprehensive legal and evidentiary analysis demonstrating that the arbitration award rendered in the matter of (Lawal v Turo, Travelers and FairClaims) must be vacated. The award is the product of an arbitral forum, FairClaims, that is compromised by pervasive institutional bias, procedural misconduct, and the enforcement of an unconscionable arbitral scheme (Ex. G1-G4). FairClaims, far from being a neutral third party, operates as a structural mechanism designed to serve the financial interests of its repeat-player corporate clients, such as Turo. This is a fact betrayed by the forum's own business model and its CEO's direct admissions.

The documented evidence establishes multiple statutory grounds for vacatur under the Federal Arbitration Act (FAA) §10(a). Specifically, the award is subject to vacation for evident partiality (§10(a)(2)) due to FairClaims' undisclosed, financially dependent relationship with a corporate client and the concealment of the arbitrator's status as a staff employee with a significant case volume. Furthermore, the forum is culpable for procedural misconduct (§10(a)(3)) for refusing to hear material evidence and engaging in a **post-award pattern of intimidation and obstruction aimed at chilling judicial review**. Finally, the forum exceeded its powers (§10(a)(4)) by enforcing unconscionable rules that **attempt to prospectively waive a party's right to seek statutory relief in court**. We demonstrate a multifaceted legal strategy including the vacatur of the award, targeted jurisdictional discovery, and a motion for sanctions based on FairClaims' pattern of bad faith conduct.

## Introduction: The Arbitral Promise vs. Institutional Reality

The Federal Arbitration Act was enacted to promote the efficient and fair resolution of disputes outside of the judicial system. It posits that arbitration agreements should be treated "upon the same footing as other contracts".[1] However, this **judicial deference is fundamentally predicated on the assurance that the arbitral process will be fair, impartial, and conducted with a basic degree of procedural integrity**. When a forum fails to uphold these foundational principles, the courts retain their statutory authority to intervene and vacate an award.

This report focuses on three explicit grounds for vacatur enumerated in 9 U.S.C. §10(a):

- **Evident Partiality (§10(a)(2)):** This provision allows a federal court to vacate an award when there is "evident partiality or corruption in the arbitrators, or either of them".[3] This standard is a critical safeguard against biased proceedings.

-

- **Procedural Misconduct (§10(a)(3)):** The FAA also permits vacatur where arbitrators are "guilty of misconduct... or of any other misbehavior by which the rights of any party have been prejudiced".[3] This includes the refusal to hear evidence pertinent and material to the controversy.
- **Exceeding Powers (§10(a)(4)):** An award can be vacated if the arbitrators "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made".[3] This provision can encompass situations where the arbitral process itself is so flawed that it denies a party's statutory rights or where the rules of the forum are found to be unconscionable.

The evidentiary record in this case, particularly the FairClaims CEO's direct email communications (Exhibit G4) and public statements (Exhibit G3), provides a unique and powerful demonstration of a forum that undermines the very principles it claims to uphold. The analysis herein will show a complete breakdown of the arbitral process and the forum's subsequent attempts to obstruct legitimate judicial review.

## Factual and Evidentiary Background

The claims presented in this report are not based on a single, isolated event but on a pattern of conduct that reveals a fundamental contradiction at the core of the FairClaims business model. This section will construct a narrative from the fragmented data, meticulously detailing the forum's stated mission versus its operational reality.

### A. The FairClaims Business Model: Public Claims vs. Private Deliverables

On its public-facing website, FairClaims presents itself as a user-friendly, fast, and cost-effective alternative to court for small claims disputes.[5] The forum's mission, as publicly stated by its CEO, Stephen Kane, is to "improve access to justice" and ensure that the process is "fair for both sides" ~ see Table 2.[5]

However, the forum's private-facing business model for enterprise clients tells a starkly different story. FairClaims is designed as a Software-as-a-Service (SaaS) solution for corporate entities, particularly "sharing economy marketplaces" like Turo [User Query]. The value proposition offered to these clients is to "save employee time, protect your brand, limit liability, & reduce litigation spend".[7] The CEO's interviews reveal that Turo was one of the first two customers and that these companies "feed us disputes" (Exhibit G3). The CEO also touts a key performance indicator (KPI) for the company: reducing client complaints by two-thirds!

This fundamental tension is illustrated in the following juxtaposition of the forum's public-facing claims and its private, revenue-generating deliverables (see links in Table 2):

| FairClaims Public Claim | FairClaims Enterprise Deliverable | Evidence of KPI Alignment |
|---|---|---|
| "Easy alternative to court," "100% online," "highest rated arbitrators," "industry leading satisfaction scores".[5] | "Save employee time," "limit liability," "reduce litigation spend," "fight chargebacks".[7] | CEO admission: marketplaces "feed" disputes and the self-touted KPI of reducing client complaints by two-thirds.[7] |
| "Committed to fairness in every aspect".[6] | "Preserve your NPS score and mitigate social media + PR backlash by making people feel heard".[7] | The business value is not a just outcome, but customer "satisfaction" scores and brand protection for the corporate client.[7] |

-

This contrast is central to the entire analysis. By framing a self-proclaimed neutral forum's public mission against its private, revenue-generating value proposition, a prima facie case of inherent institutional bias is established. **The business is not designed to ensure justice; it is designed to manage risk and reduce liability for its clients. The contradiction between a commitment to "fairness" and a contractual deliverable of "reducing complaints" for a corporate client is a powerful legal and rhetorical tool.**

## B. Chronology of Misconduct: The CEO's Statements and FairClaims' Conduct

The CEO's email (Ex. G4) and public statements (Ex. G3) constitute a direct evidentiary record of a forum's strategic conduct. Rather than being isolated comments, they form a cohesive pattern of procedural obstruction and bad faith.

The CEO initially praised the arbitrator, stating, "I feel our arbitrator did an excellent and rather thorough job detailing why he decided what he decided" ~ Ex. G4. This statement, however, is directly contradicted by public admissions that the forum's business model is "focused on sharing economy marketplaces" like Turo, a client that "feed[s] us disputes" (Ex. G3). By defending the merits of the award, FairClaims abandoned its claim of neutrality and demonstrated a clear institutional interest in the outcome of the award, directly supporting a claim of evident partiality (<u>FAA § 10(a)(2)</u>).

The CEO's email also reveals a strategic use of "double-speak" (Ex. G4). While professing, "I most certainly support your action to petition the court," the CEO simultaneously attempts to chill that action with a direct threat: "You agreed under contract that you would not add us as a party or witness... <u>you will be responsible for any attorney fees</u>." This contradictory language, paired with the CEO's later <u>admission that the company uses "carrots and sticks" to bring parties in, demonstrates a strategy of coercion and intimidation</u> ~ Exhibit G3. This behavior is not merely a statement; it is an act of procedural obstruction that reveals the forum's active role as an adversary, not a neutral party.

Finally, the CEO's claim of neutrality is further undermined by a pattern of evasive conduct. When the litigant attempted to engage with FairClaims, the CEO stated, "We are not at all trying to evade notice... but we cannot add any value by responding any further" ~ Ex. G4. This claim of "non-involvement" is directly contradicted by the CEO's admission that "we track these sorts of things to incorporate whatever feedback the court might have," This demonstrates that FairClaims was actively monitoring the case while simultaneously refusing to cooperate, creating an appearance of bias that courts find suspicious.

## C. A Legal & Evidentiary Table

The following table lays out the core legal and evidentiary arguments against the FairClaims award, demonstrating a comprehensive failure of the arbitral process. Each CEO quote is a concession that supports a direct legal attack on the award and the forum. The combination of these statements, when corroborated by external evidence and legal precedent, makes FairClaims' defense untenable. This table serves as a roadmap for vacatur, aligning Defendants' own words with the legal arguments already before this Court—including those previously submitted to the Honorable Judge Sean D. Jordan and Magistrate Judge Bill Davis.

## Maps CEO Admissions to Statutory Vacatur Grounds

### Table 1: Exhibit A — Captured Forum: CEO Admissions & Corroborating Evidence Supporting Vacatur under FAA §10

*Evidence set forth below supports vacatur under FAA §10(a)(2)–(4) because it shows institutional partiality, procedural intimidation, and excess of power*

| CEO/Founder's Email Excerpt (Stephen Kane) | Summary Thematic Title/Legal Doctrine or Principle | Precedent (direct quote) & Authority | FairClaims Rebuttal (R) Plaintiff's Counter (C) | G3 Cross-Reference (CEO/Founder's Interview, Timestamp) — G3-G4 Corroboration | Evidentiary Relevance / Relief Sought |
|---|---|---|---|---|---|
| "I feel our arbitrator did an excellent and rather thorough job detailing why he decided what he decided." <br><br> "We are a neutral third party … it would be improper for us to weigh in." | **Evident Partiality & Institutional Bias:** FairClaims' defense of the award and its **concealment of material business ties** in violation of Canon II and III, state mandated disclosure requirements despite timely challenge directly support vacatur under FAA § 10(a)(2). <br><br> **Refusal to Disclose:** √ **Texas Civil Practice and Remedies Code § 172.056;** √ **Arizona Revised Statutes § 12-3012 and** √ **California Code of Civil Procedure § 1281.9 (a)** √ **ABA Model Cde for Judicial Conduct** | **Commonwealth Coatings (393 U.S. 145):** "Arbitrators should disclose to the parties any dealings which might create an impression of possible bias." <br><br> **Positive Software v. New Century (476 F.3d 278):** "Evident partiality is present when a reasonable person would have to conclude that an arbitrator was partial to one party." "Appearance of bias alone can be enough" <br><br> **Monster Energy v. City Beverages (940 F.3d 1130):** Nondisclosure of repeat-player ties mandates vacatur." <br><br> **Karaha Bodas (364 F.3d 274):** Refusal to hear material evidence can "deprive a party of a fair hearing." [13] | **R:** No disclosure required — arbitrator was not staff, but an independent third party; ties are standard and disclosed. <br><br> **C:** Concealed Arbitrator's (500+ cases) and employment + **API/vendor ties = structural dependence beyond repeat-player bias** → meets FAA §10(a)(2). | **G3 — Interview I (7:50–8:29) & Interview III (12:36–12:50):** √ CEO praises arbitrator while admitting dependence on sharing-economy marketplaces like Turo, concealed in arbitration. This reveals a **financial incentive to favor and protect its corporate clients.** <br><br> √ **Ex. E series** show arbitrator Bespalko was an employee who has handled over 500 cases (both concealed despite state-mandated disclosure requirements)—CEO's praise is an impeachable ipsi Dixit fallacy. <br><br> **G3 — Interview I (10:06–10:44):** Kane repeats Turo as feeder client. **"Our first two customers were Thumbtack and Turo … they feed us disputes."** | **Relief:** Proves institutional bias; supports vacatur and adverse inference. <br><br> **FAA § 10(a)(2):** Institutional partiality is a clear and present danger to the integrity of the arbitral process. <br><br> **RFPD:** Expedited production of FairClaims staffing/payroll and assignment logs, API/vendor contracts, client billing, answers to interrogatories on legal tests of employment. <br><br> **RFPD:** Turo/Travelers for contracts, API docs, revenue/billing, and communications referencing FairClaims. |

-

| CEO/Founder's Email Excerpt (Stephen Kane) | Summary Thematic Title/Legal Doctrine or Principle | Precedent (direct quote) & Authority | FairClaims Rebuttal (R) Plaintiff's Counter (C) | G3 Cross-Reference (CEO/Founder's Interview, Timestamp) — G3-G4 Corroboration | Evidentiary Relevance / Relief Sought |
|---|---|---|---|---|---|
| "You agreed under contract that you would not add us as a party or witness... you will be responsible for any attorney fees..." | **Improper Prospective Waiver & Abuse of Process:** This constitutes an improper threat that attempts to chill a litigant's statutory right to challenge the award in federal court, supporting claims of unconscionability under FAA § 10(a)(4).<br><br>**Procedural Intimidation + Abuse of Process** | **Hadnot v. Bay, Ltd. (344 F.3d 474):** "Arbitration agreements may be invalidated if they operate… as a prospective waiver of a party's right to pursue statutory remedies."<br><br>**Hall Street v. Mattel (552 U.S. 576):** FAA grounds for vacatur are exclusive; private contract cannot strip judicial review. [26]<br><br>**Mitsubishi Motors v. Soler Chrysler-Plymouth, 473 U.S. 614, 637 n.19 (1985):** "So long as the prospective litigant effectively may vindicate its statutory cause of action…." | **R:** Rule 29 is binding contractual term; fee-shift warning is standard and mirrors case law.<br><br>**C:** √ Contract can't prospectively **strip statutory right to judicial review**; √ Rule 29 functions as coercive prospective waiver and is unenforceable. √ The threat of fee-shifting against a pro se litigant, is an **act of procedural intimidation and a clear abuse of process**. | **G3 — Interview II (14:22–15:20):** Kane admits companies embed FairClaims in their Terms of Service to make the process mandatory. This confirms a **forced funnel**; **Rule 29 thus functions to suppress judicial oversight of that funnel.** | **Relief:** Declaratory judgement FairClaims Rule 29 unenforceable, and enjoin enforcement, **Sanctions:** Sanctions for improper/ex parte intimidation.<br><br>**RFPD:** production of "carrots and sticks" strategy documents |
| "Will it help you win favor with the court? … Or will it simply distract from your goal?""I most certainly support your action to petition the court." | **Defendant As Plaintiff's Advocate (Disingenuous & Contradictory Conduct):** This "double-speak" is a strategic tactic to appear neutral while simultaneously defending the award and threatening the litigant. This betrayal of trust supports claims of procedural misconduct under FAA § 10(a)(3). | **Karaha Bodas Co. v. Pertamina (364 F.3d 274):** Arbitrators' and forums' behavior can "depriv[e] a party of a fair hearing." ~ Misconduct<br><br>**Davis v. Prudential Sec. (59 F.3d 1186):** An arbitration must provide a "fundamentally fair hearing." "The touchstone for judicial review is fundamental fairness." | **R:** Benign guidance from a neutral admin; not intended to chill rights.<br><br>**C:** √ Paired praise + fee threats = tactical coercion; supports §10(a)(3) misconduct and sanctions. √ Demonstrates a willful intent to chill a party's legal rights. It is a "*carrot and stick*" (Ex. G3) tactic designed to coerce a litigant to abandon their statutory right to judicial review. | **G3 — Interview II (12:47–13:04):** Kane admits use of "**carrots and sticks**" to bring parties — corroborates a strategy of coercion; the email is the practical application of that tactic to a pro se litigant.<br><br>**G3 — Interview I (33:11–33:22; 23:39–23:45):** The CEO admits **forum's value = "reduce complaints."**<br><br>This shows that the CEO's "support" is cosmetic, | **Relief:** Use email as evidence of intimidation to support a request for sanctions and adverse inference.<br><br>**RFPD:** Order FairClaims to produce communications showing any internal decision to discourage challenges.<br><br>**RFPD:** Discovery into FairClaims' |

-

| CEO/Founder's Email Excerpt (Stephen Kane) | Summary Thematic Title/Legal Doctrine or Principle | Precedent (direct quote) & Authority | FairClaims Rebuttal (R) Plaintiff's Counter (C) | G3 Cross-Reference (CEO/Founder's Interview, Timestamp) — G3-G4 Corroboration | Evidentiary Relevance / Relief Sought |
|---|---|---|---|---|---|
| | | | √ The court must recognize this as an act of procedural obstruction that is sanctionable and grounds for vacatur under FAA § 10(a)(3). | while his internal incentives favor the corporate client. | revenue by client and arbitrator assignment statistics. Provide monitoring logs, vendor/customer billing, KPI dashboards, internal communications. |
| "We are not at all trying to evade notice… but we cannot add any value by responding any further." "…the underlying matter is between you and Turo… we are to remain neutral." "You agreed… we track these sorts of things to incorporate whatever feedback the court might have." | **Evasive Conduct & False Neutrality:** These statements prove FairClaims is actively monitoring the case to protect its own interests while claiming a lack of involvement, creating an appearance of bias that courts find suspicious. | **Commonwealth Coatings (393 U.S. 145):** Undisclosed interest requires vacatur; courts must guard against the "appearance of bias." [8] **Monster Energy (940 F.3d 1130):** The court found a "reasonable impression of bias" in part due to non-disclosure of business ties. The concealment of financial dependence on Turo falls squarely under this doctrine.~Repeat-player non-disclosure **Lifecare Int'l v. CD Medical, 68 F.3d 429, 433 (11th Cir. 1995):** "Even an impression of possible bias may be enough." | **R:** We're a non-party administrator; tracking = product improvement, not advocacy. **C:** √ *Tracking + revenue dependence = active interest to protect outcomes*. √ *Neutral posture is false → supports vacatur/discovery.* | *G3 — Interview III (7:06–7:20; 12:36–12:50):* Kane admits structural dependence on "sharing economy marketplaces" and that "we track these sorts of things," showing active interest, not passive administration. *G3 — Interview I (33:11–33:22; 23:39–23:45):* CEO admits the **forum's value is to reduce customer complaints** — tracking serves corporate interests not neutral adjudication. The forum touted a KPI where it reduced client disputes by two-thirds! | **Relief:** The Court should add FairClaims as a necessary party for discovery/relief and compel its internal monitoring logs and vendor/customer billing. **FAA § 10(a)(3):** The willful and evasive conduct is misconduct that prejudiced the litigant. **Sanctions:** Sanctions for willful obstruction. |
| "Our rules are a contract… Rule 29 adheres very closely to the FAA and case law." | **Ipse Dixit Claim & Contract of Adhesion:** The CEO's claim of adherence to the law is self-serving and unsupported by facts. | **Hooters of Am. v. Phillips (173 F.3d 933):** Arbitration rules that "tilt the process" are unenforceable. | **R:** Rules were consented to in ToS; efficiency and freedom of contract should be respected. **C:** Rules drafted for SaaS enterprise embedding (APIs) in | *G3 — Interview II (0:45–1:03; 8:40–9:13):* Kane admits FairClaims is built as a SaaS for enterprises and embedded into enterprise workflows | **Relief:** The court should strike Rule 29 as unconscionable and seek a declaratory judgment that it |

-

| CEO's/Founder's Email Excerpt (Stephen Kane) | Summary Thematic Title/Legal Doctrine or Principle | Precedent (direct quote) & Authority | FairClaims Rebuttal (R) Plaintiff's Counter (C) | G3 Cross-Reference (CEO/Founder's Interview, Timestamp) — G3-G4 Corroboration | Evidentiary Relevance / Relief Sought |
|---|---|---|---|---|---|
| | Rule 29 is a contract of adhesion drafted exclusively to benefit the enterprise client.<br><br>Unconscionability, excess of forum power | **Hadnot v. Bay, Ltd. (344 F.3d 474):** An arbitration agreement can be invalidated if it operates as "a prospective waiver of a party's right to pursue statutory remedies."<br><br>**Doctor's Associates v. Casarotto, 517 U.S. 681, 687 (1996):** "Courts may invalidate arbitration agreements under generally applicable contract defenses." ~ unconscionability | repeat-player workflows indicate adhesive drafting favoring enterprises → unconscionability; possibly exceeds forum powers (FAA §10(a)(4)).<br><br>**Exhibit G3** proves that these rules were drafted without any input or access from consumers. This is the definition of a contract of adhesion. FairClaims is not a neutral administrator of rules; it is a service provider whose "rules" are a product designed to "tilt the process" in favor of its corporate clients and *shield the arbitration from judicial scrutiny – the demonstrated purpose of Kane's email (Ex. G4)* | (APIs). This shows rules were written to favor enterprise clients, not consumers.<br><br>Rules drafted for SaaS enterprise embedding (APIs) indicate adhesive drafting favoring enterprises → unconscionability; possibly exceeds forum powers (FAA §10(a)(4)). | cannot bar discovery or testimony.<br><br>**FAA § 10(a)(4):** The forum exceeded its powers by enforcing an unconscionable rule that attempts to displace statutory rights.<br><br>RFPD: Move to strike Rule 29; declaratory relief that it cannot bar discovery/testimony; compel drafting/adoption records and client input. |
| "We have now spent hours responding… It may or may not be productive to continue our dialogue."<br><br>"…we plan to sit this out and leave it to the relevant | **Procedural Obstruction & Bad Faith:** This dismissive posture evidences a pattern of stonewalling and a profound lack of good faith, supporting a claim of procedural misconduct. | **Davis v. Prudential Sec. (59 F.3d 1186):** An arbitration must provide a "fundamentally fair hearing."<br><br>**Karaha Bodas Co. v. Pertamina (364 F.3d 274):** Arbitrators' and forums' behavior can "depriv[e] a party of a fair hearing."<br><br>***Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir.** | **R:** Reasonable termination of unproductive dialogue by a non-party admin.<br><br>**C:** √ Pattern of promised transparency followed by disengagement, mirrors earlier suppression of evidence → §10(a)(3) misconduct.<br><br>√ A court will not tolerate a party that "abuses the judicial | *G3 — Interview I (7:31–8:06; 8:42–8:53):* Public promises of live hearings and transparency contradicted in practice (Document Review, retroactive page limits, evidence suppression, stonewalling, procedural entrapment and obstruction). The email refusal to engage mirrors that practice. | **Relief:** Move for an evidentiary hearing under §10(a)(3); seek adverse inferences and sanctions for obstructive conduct.<br><br>Declare FairClaims a captive arbitral Forum (see Page 18, Ex. ServiceAttempts3) |

-

| CEO/Founder's Email Excerpt (Stephen Kane) | Summary Thematic Title/Legal Doctrine or Principle | Precedent (direct quote) & Authority | FairClaims Rebuttal (R) Plaintiff's Counter (C) | G3 Cross-Reference (CEO/Founder's Interview, Timestamp) — G3-G4 Corroboration | Evidentiary Relevance / Relief Sought |
|---|---|---|---|---|---|
| parties to present their cases to the court." | | **1997):** refusal to hear probative evidence is misconduct. | process" by engaging in vexatious litigation tactics.[21] | | |
| "We empower people … but we are not a party to your dispute." | **False Empowerment (PR vs Incentives/Reality)** This claim of empowering users is a public relations façade. The forum's value proposition to its corporate partners is complaint suppression and liability reduction. | **Commonwealth Coatings (393 U.S. 145):** The neutrality of an arbitrator must be real, not merely aspirational or cosmetic. [8] *Jordan v. Maxfield & Oberton Holdings, LLC* **(5th Cir. 2019):** "Procedures that effectively insulate the arbitrator from review undermine fairness." | R: Mission is to empower consumers and provide access to justice; serving businesses does not negate neutrality. C: CEO admissions that the service reduces complaints for corporate partners shows forum capture — mission is cosmetic. Actual mission is not to empower individuals but to serve the financial interests of its corporate clients. The court should reject CEO's claim of "empowerment" as a baseless and cynical marketing ploy. | *G3 — Interview I (33:11–33:22) & G3 — Interview II (33:11–33:22):* Kane admits FairClaims reduces liability/complaints for corporate partners. This proves the forum's deliverable is complaint suppression, not neutrality. | **Relief:** Forum's self-contradiction supports vacatur of the award. |

# I. Evident Partiality under FAA §10(a)(2): The Systemic Repeat-Player Bias

One of the most compelling legal argument for vacating the award is the existence of an undisclosed, structural financial bias that perverts the entire arbitral process.

## A. The Doctrinal Standard: From Commonwealth Coatings to Monster Energy

The standard for evident partiality originates from the Supreme Court's ruling in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, which established that arbitrators must disclose any "dealings which might create an impression of possible bias".[8] The Court emphasized that "arbitrators must avoid even the appearance of bias".[8] This standard is a critical safeguard against undisclosed conflicts of interest.

-

The modern application of this doctrine addresses the "repeat-player problem," where a forum's financial dependence on a corporate client compromises its neutrality. The Ninth Circuit's decision in *Monster Energy Co. v. City Beverages, LLC* is a key precedent.[10] The court vacated an award where an arbitrator failed to disclose his ownership interest in JAMS, which had administered 97 arbitrations for Monster over five years.[10] The court held that the combination of the undisclosed ownership interest and the "nontrivial" business dealings created a "reasonable impression of bias".[11]

## B. The Concession of Structural Dependence

FairClaims' own business model and the CEO's admissions establish a direct and powerful parallel to the repeat-player bias doctrine. The CEO publicly acknowledges that Turo is a "feeder client" and that FairClaims is "focused on sharing economy marketplaces" (Exhibit G3). This financial dependence, where a single corporate client provides a continuous stream of disputes, creates an institutional incentive to favor that client. As the CEO admits, the forum's value proposition to its corporate partners is to "reduce complaints" and "limit liability".[7] This demonstrates that the forum's institutional interests are aligned with the corporate party, which directly supports a claim of evident partiality (Exhibits G1-G4).

## C. Undisclosed Conflicts: The Concealment of the Arbitrator's Employee Status and Case Volume

The facts of this case are arguably **more egregious than those in *Monster Energy***. The arbitrator, Bespalko, was not an independent neutral with a mere economic interest in the forum; he was a FairClaims employee who had handled over 500 cases. This information was concealed from the litigant, despite state-mandated disclosure requirements. While the number of arbitrations in *Monster Energy* (97) was deemed significant enough to warrant vacatur, the arbitrator in this case had a far more extensive relationship with the forum, handling over 500 cases. The concealment of an internal, ongoing employment relationship is a more profound failure of disclosure than a simple economic interest in a third-party firm. It demonstrates an institutional design that is fundamentally compromised and directly aligns with the doctrine of evident partiality.

## II. Procedural Misconduct under FAA §10(a)(3): The Denial of a Fair Hearing

Beyond the issue of institutional bias, the arbitral award is a product of specific acts of procedural misconduct that prejudiced the litigant's rights.

## A. The Doctrinal Standard: The Right to a Fundamentally Fair Hearing

The FAA requires that a party not be "prejudiced" by the arbitrator's "misbehavior".[5] This includes the arbitrator's "refusal to hear evidence pertinent and material to the controversy".[5] The Fifth Circuit in *Karaha Bodas Co. v. Pertamina* held that an arbitrator's behavior can "deprive a party of a fair hearing".[12] The test is whether the forum's conduct denied a party an opportunity to be heard in a "meaningful manner".[14]

-

## B. The Pattern of Obstruction and Suppression of Evidence

The arbitral process itself was procedurally flawed. The record demonstrates the "suppression of Evidence + denial of hearing," as well as retroactive page limits that prevented a full evidentiary presentation (Exhibit C – Final Award). This misconduct is not an isolated incident. The CEO's post-award email exhibits a "dismissive posture" and a refusal to engage further, stating that FairClaims "cannot add any value by responding any further" (Ex. G4). This post-award stonewalling and delay corroborate the initial claims of procedural misconduct during the arbitration itself (See 2ndAmendedMotionToVacate)

## C. The Threat to Chill Judicial Review: A Pattern of Intimidation and Bad Faith

The CEO's email is not merely a communication (Ex. G4); it is a direct act of procedural obstruction. The <u>email contains explicit threats, including the assertion that the litigant would be "responsible for any attorney fees"</u> and the cautionary question, "Will it help you win favor with the court? Or will it simply distract from your goal?" This is a strategic tactic aimed at chilling or deterring a pro se litigant's statutory right to challenge the arbitration award in federal court. This conduct, which attempts to obstruct a party's path to judicial review, constitutes "misbehavior by which the rights of any party have been prejudiced" under FAA §10(a)(3).[3] This pattern of intimidation demonstrates a profound lack of good faith from a platform that professes to be a neutral legal alternative.

## III. Unconscionability & Exceeding Powers under FAA §10(a)(4): The Abusive Nature of Rule 29

An arbitration award can be vacated if the arbitrator exceeds their authority by enforcing unconscionable rules. FairClaims' Rule 29, which attempts to prospectively waive a party's right to challenge an award in court, is a prime example of an unenforceable rule that "tilts the process" in favor of the corporate client.

## A. The Doctrinal Standard: The Impermissibility of Prospective Waivers

The "prospective waiver doctrine" is a well-established principle in arbitration law. Courts have held that arbitration agreements may be invalidated if they operate "as a prospective waiver of a party's right to pursue statutory remedies".[15] The Fourth Circuit's decision in *Hooters of Am. v. Phillips* provides a clear precedent, holding that an arbitration agreement is unenforceable if its rules are "so skewed" that they deny a party a "meaningful sense of the word".[17]

## B. The Factual Basis for Unconscionability: Rule 29 as a Disguised Fee-Shifting Mechanism

FairClaims' Rule 29, as explicitly leveraged in the CEO's email, functions as a "fee-chill" mechanism (Ex. G3). It attempts to <u>use a private contractual rule to deter a litigant from exercising a statutory right to seek vacatur in federal court.</u> The CEO's claim that "Rule 29 adheres very

closely to the FAA and case law" is an *ipse dixit* claim that must be rejected. The purpose of this rule, as demonstrated by its use in the CEO's email, is to prevent judicial oversight of the forum's conduct, which is void as a matter of public policy.

## C. The Contract of Adhesion: The Inherent Imbalance of Power

The CEO's admission that FairClaims is "built as a SaaS for enterprises and embedded into enterprise workflows (APIs)" [User Query] confirms that the rules were written to favor the enterprise, not the consumer. The forced nature of the arbitration clause, combined with a set of rules drafted exclusively for the benefit of one party, creates a contract of adhesion. The CEO's email demonstrates that the forum is fully aware of its power and is willing to leverage it to obstruct a legitimate challenge. This imbalance, combined with the other procedural and bias issues, proves that the arbitral process was fundamentally unfair and that the arbitrator exceeded their powers by enforcing the unconscionable scheme.

## IV. Relief and Remedial Action

Based on the cumulative force of the arguments presented, the following remedies are recommended to rectify the injustice and hold FairClaims accountable for its misconduct.

## A. Vacatur of the Arbitral Award

The primary relief sought is the vacatur of the arbitral award based on the cumulative evidence of evident partiality (§10(a)(2)), procedural misconduct (§10(a)(3)), and the enforcement of an unconscionable arbitral scheme (§10(a)(4)).[3] The evidence shows a systemically biased forum that failed to provide a fair and impartial hearing. The award cannot stand. A full evidentiary hearing with full duisclosures and production of documents is warranted to uphold the rule of law and hold the defendants to account!

## B. A Motion for Sanctions and Adverse Inference for Obstructive Conduct

The CEO's email (Ex. G4) is not just evidence; it is a basis for sanctions. The post-award conduct, including the threats and refusal to engage, is a direct act of bad faith and procedural obstruction. Courts have the "inherent power" to impose sanctions for conduct that "abuses the judicial

process".[21] The email, which explicitly threatens and attempts to chill a party's legal rights, constitutes a willful act of obstruction. This willful conduct, combined with the forum's "strategic silence, warrants an adverse inference. Under the spoliation doctrine, a party's destruction or obstruction of evidence with a "culpable mental state" can warrant a presumption of relevance.[22] The CEO's admission that the forum tracks these things and that its KPI is to "reduce complaints" for its clients provides the motive and intent behind this willful obstruction. In the public interest the following remedy is also warranted:

A **declaration that FairClaims is a captive arbitral forum, one that purports to place itself above FAA statutes and is therefore irredeemably structurally tainted, rendering it incapable of conducting neutral or impartial arbitration**. This is consistent with 5th Circuit authority recognizing that procedural avoidance and forum control can undermine arbitral neutrality (Geiserman v. MacDonald, 893 F.2d 787, 791 (5th Cir. 1990)). For reference, courts have consistently held that arbitration-related defenses must be grounded in statutory authority, not private rulebooks. (Source: Ex. ServiceAttempts3, Page  18)

## Conclusion

The evidence presented demonstrates that the FairClaims arbitral forum is undermined by its own design. It is not a neutral arbiter but a business partner to its corporate clients. The judicial deference afforded to arbitration agreements is conditioned on a showing of good faith and procedural fairness, neither of which was present in this case. The arbitral award is a direct product of a captured relationship, procedural abuse, and a deliberate attempt to enforce an unconscionable scheme. The court must exercise its power to vacate the award under the statutory grounds of evident partiality and procedural misconduct. The evidence further warrants a request for targeted jurisdictional discovery and sanctions against FairClaims for its willful, bad faith conduct. The integrity of the arbitral system depends on holding forums accountable when their institutional interests so clearly and pervasively contaminate the process.

## Table 2: FairClaims Quoted Text

| # | Quoted Text | Primary Source URL | Wayback Saved URL | notes | date_accessed |
|---|---|---|---|---|---|
| 1 | Easy alternative to court | https://x.com/fair_claims | https://web.archive.org/save/https://x.com/fair_claims | Found on FairClaims X/Twitter profile; also echoed on company profiles (BuiltInLA). | 2025-09-17 |
| 2 | 100% online | https://www.fairclaims.com/how-it-works | https://web.archive.org/save/https://www.fairclaims.com/how-it-works | How It Works page: marketing copy 'It only takes 2 to 3 weeks and is 100% online.' | 2025-09-17 |

Exhibit G5 Captured Forum: *How FairClaims' Business Model Corrupts Arbitration and Demands Vacatur — Report & Evidence Summary*

| 3 | highest rated arbitrators | https://www.fairclaims.com/ | https://web.archive.org/save/https://www.fairclaims.com/ | Homepage/marketing content referencing arbitrator ratings and satisfaction scores. | 2025-09-17 |
|---|---|---|---|---|---|
| 4 | industry leading satisfaction scores | https://www.fairclaims.com/ | https://web.archive.org/save/https://www.fairclaims.com/ | Homepage testimonial/marketing block containing phrase. | 2025-09-17 |
| 5 | Save employee time; limit liability; reduce litigation spend; fight chargebacks | https://www.fairclaims.com/enterprise | https://web.archive.org/save/https://www.fairclaims.com/enterprise | Enterprise benefits slide/content lists these phrases (marketing to enterprise clients). | 2025-09-17 |
| 6 | Committed to fairness in every aspect | https://law.stanford.edu/2017/11/07/take-two-stephen-kane/ | https://web.archive.org/save/https://law.stanford.edu/2017/11/07/take-two-stephen-kane/ | Stanford Law / CodeX interview with Stephen Kane quoting the phrase. | 2025-09-17 |
| 7 | Preserve your NPS score and mitigate social media + PR backlash by making people feel heard | https://www.fairclaims.com/enterprise | https://web.archive.org/save/https://www.fairclaims.com/enterprise | Enterprise page marketing benefits (preserve NPS, mitigate PR backlash). | 2025-09-17 |

## Works cited

1. HOOTERS OF AMERICA INCORPORATED v. << (1999) - FindLaw Caselaw, accessed September 16, 2025, https://caselaw.findlaw.com/court/us-4th-circuit/1068799.html
2. HOOTERS OF AMERICA, INC. v. PHILLIPS | 173 F.3d 933 | 4th Cir. | Judgment - CaseMine, accessed September 16, 2025, https://www.casemine.com/judgement/us/5914bb2fadd7b0493479527c
3. 9 U.S. Code § 10 - Same; vacation; grounds; rehearing - Legal Information Institute, accessed September 16, 2025, https://www.law.cornell.edu/uscode/text/9/10
4. 9 U.S.C. § 10 - U.S. Code Title 9. Arbitration § 10 | FindLaw, accessed September 16, 2025, https://codes.findlaw.com/us/title-9-arbitration/9-usc-sect-10/
5. FairClaims: Resolve Disputes With Online Arbitration, accessed September 16, 2025, https://www.fairclaims.com/
6. Take Two: Stephen Kane - CodeX - Stanford Law School, accessed September 16, 2025, https://law.stanford.edu/2017/11/07/take-two-stephen-kane/
7. Helping Enterprise Resolve Disputes Online - FairClaims, accessed September 16, 2025, https://www.fairclaims.com/enterprise
8. Commonwealth Coatings v. Continental Cas. | 393 U.S. 145 (1968), accessed September 16, 2025, https://supreme.justia.com/cases/federal/us/393/145/

9. Commonwealth Coatings Corp. v. Continental Casualty Co. (1969) - Case Analysis, accessed September 16, 2025, https://callidusai.com/wp/ai/cases/107798/commonwealth-coatings-corp-v-continental-casualty-co
10. Arbitrator Disclosures: The Effects of Monster Energy | Hanson Bridgett, accessed September 16, 2025, https://www.hansonbridgett.com/our-blogs/appellate-insight/arbitrator-disclosures-effects-monster-energy
11. Ninth Circuit Vacates Arbitration Award Because of ... - Lathrop GPM, accessed September 16, 2025, https://www.lathropgpm.com/insights/ninth-circuit-vacates-arbitration-award-because-of-arbitrators-failure-to-disclose-ownership-in-arbitral-forum/pdf
12. Karaha Bodas Co., L.l.c., Plaintiff-appellee, v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara; et al., Defendants,perusahaan Pertambangan Minyak Dan Gas Bumi Negara, Defendant-appellant, 364 F.3d 274 (5th Cir. 2004) - Justia Law, accessed September 16, 2025, https://law.justia.com/cases/federal/appellate-courts/F3/364/274/532990/
13. Karaha Bodas Co. v. Perusahaan Pertambangan Minyak, 364 F. 3d 274 - US: Court of Appeals, accessed September 16, 2025, https://www.newyorkconvention.org/media/uploads/pdf/1/6/1611_us-482.pdf
14. United States / 23 March 20... - 1958 New York Convention Guide, accessed September 16, 2025, https://newyorkconvention1958.org/index.php?lvl=notice_display&id=653
15. Forced Waiver of Claims Proves Fatal to Arbitration Clause Under Tribal Law, accessed September 16, 2025, https://www.americanbar.org/groups/state_local_government/resources/state-local-law-news/archive/forced-waiver-claims-proves-fatal-arbitration-clause-under-tribal-law/
16. Arbitration Waiver and Prejudice - Michigan Law Review, accessed September 16, 2025, https://michiganlawreview.org/journal/arbitration-waiver-and-prejudice/
17. Hooters' Employee Not Bound to Dispute Arbitration Agreement, accessed September 16, 2025, https://feminist.org/news/hooters-employee-not-bound-to-dispute-arbitration-agreement/
18. Hooters of America, Inc. v. Phillips Case Brief | Lexplug | Lexplug, accessed September 16, 2025, https://www.lexplug.com/casebrief/hooters_of_america_inc_v_phillips_65a2f8467e449db77fb66f3e
19. Discovery | FINRA.org, accessed September 16, 2025, https://www.finra.org/arbitration-mediation/about/arbitration-process/discovery
20. Compelling Evidence from Non-Parties in Arbitration in the US | Practical Law - Westlaw, accessed September 16, 2025, https://content.next.westlaw.com/practical-law/document/Id642a5156c0711e498db8b09b4f043e0/Compelling-Evidence-from-Non-Parties-in-Arbitration-in-the-US?viewType=FullText&transitionType=Default&contextData=(sc.Default)
21. Inherent Power Sanctions – Extrajudicial Misconduct: 1. Unilaterally obtaining $300 million arbitration award, absent an arbitration agreement or notice to adversary, is sanctionable even though it precedes commencement of bad faith attempt to confirm award in federal court. 2. District Court retained jurisdiction to rule on sanctions motion filed prior to notice of appeal of decision vacating, accessed September 16, 2025, https://jhany.com/2023/08/10/inherent-power-sanctions-extrajudicial-

misconduct-1-unilaterally-obtaining-300-million-arbitration-award-absent-an-arbitration-agreement-or-notice-to-adversary-is-sanctionable-even-th/

22. 4.18.1 Spoliation - New York State Unified Court System, accessed September 16, 2025, https://www.nycourts.gov/judges/evidence/4-RELEVANCE/4.18.1_Spoliation.pdf

23. Spoliation | Practical Law - Westlaw, accessed September 16, 2025, https://content.next.westlaw.com/practical-law/document/I0fa034abef0811e28578f7ccc38dcbee/Spoliation?viewType=FullText&transitionType=Default&contextData=(sc.Default)

24. How Nice to See You Again: The Repetitive Use of Arbitrators and the Risk of Evident Partiality - Insight @ Dickinson Law, accessed September 16, 2025, https://insight.dickinsonlaw.psu.edu/cgi/viewcontent.cgi?article=1099&context=arbitrationlawreview

25. Repeat Player Bias In Arbitration Questioned - American Bar Association, accessed September 17, 2025, https://www.americanbar.org/groups/litigation/resources/litigation-news/2020/repeat-player-bias-arbitration-questioned/

26. Manifest Disregard as Grounds for Vacatur after Hall Street - Bressler, Amery & Ross, P.C., accessed September 16, 2025, https://www.bressler.com/publication-manifest-disregard-as-grounds-for-vacatur-after-hall-street

27. The Proper Use of Sanctions in Litigation- The Overlooked Weapon in Today's Atmosphere, accessed September 16, 2025, https://www.leesfield.com/the-proper-use-of-sanctions-in-litigation-the-overlooked-weapon.html

**Exhibit G6: Comparative Integrity Matrix — FairClaims vs. AAA**

| Dimension | AAA (American Arbitration Association) | FairClaims Arbitration | Judicial Implication |
|---|---|---|---|
| **Arbitrator Vetting & Selection** | Public pool of vetted professionals; parties may rank or strike arbitrators | No public arbitrator directory; arbitrator selection opaque; **repeat-player** risk | **FAA §10(a)(2):** Increased risk of evident partiality due to undisclosed repeat appointments |
| **Discovery & Evidentiary Rights** | Allows limited document production, depositions, third-party subpoenas | Strict page limits; no subpoena option; retroactive exclusion of exhibits | **FAA §10(a)(3):** Refusal to hear **material evidence** via restrictive architecture |
| **Impartiality Protocols** | Challenge procedures under Consumer **Due process** Protocol; disclosure obligations | No formal challenge process; disclosures not mandatory; vague independence checks | Monster Energy precedent risk; **FAA §10(a)(2):** Appearance of bias |
| **Governing Law Adherence** | Honors forum selection and governing law clauses per contract | Arbitrator may override chosen law (e.g., applied CA law despite AZ clause) | **FAA §10(a)(4):** Exceeded powers by ignoring contractually chosen law |
| **Procedural Safeguards & Appeals** | Briefing calendars, pre-hearing conferences, optional appellate review | No appellate process; timeline controlled by party (e.g., Turo); limited procedural notice | **FAA §10(a)(3): Due process** violations and lack of neutral calendar |
| **Transparency & Recordkeeping** | Full review certification, record available for court | No certification of full review; platform-filtered submission; no transcript | FAA §10(a)(3–4): Judicial inability to assess merit due to record opacity |
| **Bias Mitigation** | Industry-neutral platform with diversified case types | Corporate-centric; >40% cases from Turo or similar entities; liability-minimizing mission | Supports structural bias theory; **repeat-player** economics incentivize skewed outcomes |

> **FairClaims fails ALL 7 arbitral integrity metrics vs AAA:**
> **1. Arbitrator vetting/selection - OPAQUE**
> **2. Discovery rights - SEVERELY RESTRICTED**
> **3. Impartiality protocols - NONE**
> **4. Governing law adherence - VIOLATED**
> **5. Procedural safeguards - NONE**
> **6. Transparency - ZERO**
> **7. Bias mitigation - INVERTED (bias incentivized)**

# Exhibit G7: FairClaims Investor Matrix

| Entity | Profile for Escalation | Amount Invested | Date Invested |
|---|---|---|---|
| **Greycroft** | As a lead seed investor in **FairClaims**, Greycroft's reputation for *ethical tech investments* makes it a high-value escalation target. Notifying them could trigger internal due diligence on **bias and evident partiality** allegations (as documented in closing arguments), raising concerns over portfolio valuation and reputational risk. | Part of $1.8M seed round | June 28, 2017 |
| **Crosslink Capital** | Crosslink's early-stage tech strategy exposes it to reputational and fiduciary risk if tied to arbitration misconduct. Highlighting **FairClaims**' exclusive role in **Turo disputes** (see Graphviz diagram) could trigger investor-level reviews and pressure **FairClaims** toward settlement to mitigate exposure to **RICO** claims. | Part of $1.8M seed round | June 28, 2017 |
| **Fika Ventures** | With a B2B SaaS investment thesis, Fika is vulnerable to escalation linking **FairClaims**' **Turo favoritism** (**FairClaims** screenshot) to regulatory fallout. Investor notification may prompt portfolio-level intervention to prevent reputational and compliance damage (e.g., TDI referrals in *Regulatory Exhibit*). | Part of $1.8M seed round | June 28, 2017 |
| **FJ Labs** | FJ Labs' expertise in marketplaces makes it sensitive to evidence of bias against consumers (e.g., **ignored service of motion cover letter**). Escalation here could drive investor scrutiny and reconsideration of continued funding, creating pressure on **FairClaims** to settle. | Part of $1.8M seed round | June 28, 2017 |
| **Y Combinator** | As **FairClaims**' accelerator, YC's **alumni prestige** magnifies escalation. Notice of arbitration misconduct (e.g., closing arguments docket) could provoke network backlash and accelerate regulatory probes, undermining YC's reputational positioning in ethical startup support. | Approx. $500,000 | Winter 2016 (Batch) |
| **Amplify Partners** | Amplify's tech portfolio could be exposed to reputational contagion if associated with **FairClaims**' biased proceedings. Escalation framed around **Travelers' underwriting counsel** and **RICO** exposure may trigger portfolio-wide compliance reviews. | Part of $1.8M seed round | June 28, 2017 |
| **Homebrew** | Homebrew's early-stage reputation for founder advocacy makes it sensitive to escalation highlighting **procedural flaws** (e.g., ignored services in motion). Investor | Part of $1.8M seed round | June 28, 2017 |

| Entity | Profile for Escalation | Amount Invested | Date Invested |
|---|---|---|---|
| | awareness may prompt internal pressure on **FairClaims** to resolve liability and reputational exposure. | | |
| **Initialized Capital** | Initialized's emphasis on **founder alignment** makes escalation effective by pointing to systemic bias (e.g., BBB complaint patterns). This could drive portfolio-level risk reviews and incentivize settlement pressure. | Part of $1.8M seed round | June 28, 2017 |
| **Obvious Ventures** | Obvious' **purpose-driven mandate** amplifies escalation risk if tied to **consumer-unfriendly arbitration bias** (e.g., Reddit complaints). Exposure here could lead to internal ethical misalignment reviews, withdrawal threats, and investor intervention. | Part of $1.8M seed round | June 28, 2017 |
| **Greenlight Re (NASDAQ: GLRE)** | **Greenlight Re**'s dual role as a **reinsurer and FairClaims investor** provides the strongest escalation angle. Its undisclosed financial conflict (funding the forum while reinsuring **Travelers/Turo** risk) raises questions of securities omissions, **RICO** exposure, and regulatory capture. Notification could trigger **SEC and insurance code scrutiny**. | Undisclosed (Series A) | May 20, 2019 |

Timeline Note   **GLRE invested BEFORE Turo exclusivity = PREMEDITATED CAPTURE**

- While a precise public record does not confirm when Turo adopted FairClaims, online complaints **suggest exclusive reliance on FairClaims for arbitration** by September 2020 - notably after **Greenlight Re**'s investment.

## Supporting References

- **Reddit discussion on FairClaims arbitration bias:**
  - **Reddit thread**
  - **YouTube discussion**
- **Greenlight Re press release confirming FairClaims investment (May 2019):**
  - **Greenlight Re Press Release**%20("Greenlight,Share%20this%20article)

Retrieved from: https://greenlightre.com/press-releases/greenlight-re-innovations-invests-in-online-insurance-dispute-resolution-business-fairclaims on Sept 19 2025

**GLRE PUBLICLY NAMED TURO AS FAIRCLAIMS CLIENT IN THE INVESTMENT ANNOUNCEMENT ~ See page 2**



# GREENLIGHT RE

## Exhibit G8: Greenlight Re Invests in FairClaims 2019

**FOR IMMEDIATE RELEASE**

## Greenlight Re Innovations invests in online insurance dispute resolution business FairClaims

> **1. Corporate Structure Confirmed:**
> √ GLRE → GRI → FairClaims
> √ NASDAQ Listed Offshore Company

GRAND CAYMAN, Cayman Islands – May 20, 2019 – Greenlight Re Innovations, part of Greenlight Capital Re, Ltd. (NASDAQ: GLRE) ("Greenlight Re" or the "Company"), a specialist property and casualty reinsurance company headquartered in the Cayman Islands, has announced it has made a strategic investment in FairClaims, an online insurance and consumer dispute resolution startup.

FairClaims, based in Los Angeles, California, has developed an online system that educates, empowers, and engages claimants to drive settlement via negotiation and mediation. Insurers benefit significantly from FairClaims by reducing claims litigation, improving their customers' experience, enhancing trust and strengthening their Net Promoter Score. Through FairClaims' online mediation and arbitration platforms, claims can be resolved in a dramatically shorter time frame than through traditional routes, benefitting all parties involved.

> **2. The Business Model Admission:** Benefit insurers, claim suppression, corporate reputation

Greenlight Re Chief Executive Officer Simon Burton said: "The U.S. property and casualty insurance industry alone spends nearly $30 billion annually to defend claims. It is widely recognised that current methods for resolving insurance disputes in the US are time consuming, inefficient, and expensive. FairClaims is a technology-driven solution to this problem that delivers real benefits to all stakeholders in the claims process. We are very excited to partner with Stephen Kane and the FairClaims team on their vision for improving the claims experience."

> **3. The Financial Incentive:** insurance cost/claims reduction; $30 billion market

FairClaims Founder and Chief Executive Officer Stephen Kane said: "Greenlight Re's investment will allow us to accelerate our expansion into the insurance industry, and we're thrilled to be working with them. Consumers and insurance companies alike benefit from increased transparency and greater efficiency in claims resolution. And while carriers are quite experienced at handling claims, our platform empowers consumers to directly submit and manage their own claims while feeling heard. As a third party, neutral dispute resolution platform we provide an alternative to litigation for claims. We hope this means more consumers can get a fair settlement more quickly while insurance companies benefit from shorter cycle times, less overhead and more brand affinity."

FairClaims is the sixth insurance technology business which Greenlight Re Innovations has invested in since it was set up in March 2018.

> **5. The Scale Admission:** Pattern of potential conflicts across GLRE insurance investments.

> **4. The Neutral 3rd-Party Fraud:** √ Neutral party threatening plaintiff (via G4); and Using "carrots and sticks" to bring participants to the table (G3); surrendering tribunal to Turo (Ex. Regulatory - Washington Addendum I)

**About Greenlight Capital Re, Ltd.**

Established in 2004, Greenlight Re (www.greenlightre.com) is a NASDAQ listed company with specialist property and casualty reinsurance companies based in the Cayman Islands and Ireland. Greenlight Re provides risk management products and services to the insurance, reinsurance and other risk marketplaces. The Company focuses on delivering risk solutions to clients and brokers by whom Greenlight Re's expertise, analytics and customer service offerings are demanded. With an emphasis on deriving superior returns from both sides of the balance sheet, Greenlight Re manages its assets according to a value-oriented equity-focused strategy that supports the goal of long-term growth in book value per share.

> **6. Diversified Profit Motive**
> **International "Risk capacity" Confirms:**
> 1. Diversified profit motive
> 2. GLRE likely provides reinsurance to FairClaims Clients - see Ex. T Series, especially T11 and T12
> 3. International (offshore, EU, trans-Atlantic) Exposure
> 4. Asymmetric / Black Swan risks mirror the concealed pattern of bundled deriviative risks causing 2008 Subprime mortgage crises

> **7. The Smoking Gun:**
> √ **Turo Named Explicitly;** √ **GLRE knew FairClaims adjudicates in Turo disputes 10 months before Turo/FairClaims exclusivity**

Greenlight Re Innovations (GRI) was launched as the innovation unit of Greenlight Re in March 2018. The unit supports technology innovators in the (re)insurance space by providing investment, risk capacity, and access to a broad insurance network. GRI's team consists of experienced actuaries, underwriters and insurance executives with a deep understanding of (re)insurance and the ability to help startups navigate the complex insurance ecosystem.

**About FairClaims**

FairClaims (www.fairclaims.com) is a consumer-friendly online dispute resolution platform that works with organizations like the Better Business Bureau, HomeAdvisor, Turo, and HomeAway to make it 10x easier, quicker, cheaper to resolve claims online. FairClaims is applying these consumer dispute resolution insights to help resolve first and third-party property and casualty insurance claims directly between insurance companies and consumers and getting the same great results.

**Forward Looking Statements**

This news release contains forward-looking statements within the meaning of the U.S. federal securities laws. The Company intends these looking statements to be covered by the safe harbor provisions for forward-looking statements in the U.S. Federal securities laws. These statements involve risks and uncertainties that could cause actual results to differ materially from those contained in forward-looking statements made on behalf of the Company. These risks and uncertainties include the impact of general economic conditions and conditions affecting the insurance and reinsurance industry, the adequacy of our reserves, our ability to assess underwriting risk, trends in rates for property and casualty insurance and reinsurance, competition, investment market fluctuations, trends in insured and paid losses, catastrophes, regulatory and legal uncertainties and other factors described in the Company's annual report on Form 10-K filed with the Securities Exchange Commission. The Company undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

For further information contact:

**8. No Regulatory Disclosure to IRS, CIMA or SEC in EDGAR Documents:**
Corporate communications confirms official, deliberate disclosure to investment community - but NOT to consumers, regulators (SEC CIMA and IRS) or arbitration participants

**Investor Relations**

Adam Prior
The Equity Group Inc.
(212) 836-9606
IR@greenlightre.ky

**Public Relations/Media:**

Stephen Breen
Rein4ce
+44 (0)7843 076556
Stephen.breen@rein4ce.co.uk

> **Circular Conflict Proven:**
> GLRE (Reinsurer of Turo/Travelers risk)
> ↓ **Invests in (May 2019)**
> FairClaims (Adjudicator)
> ↓ **Adjudicates claims against**
> Turo Hosts/Guests
> ↓ **Suppressed claims benefit**
> GLRE (through lower loss ratios)

# Exhibit G8

# Material Omissions Matrix:

| Required Disclosure | To Whom | Authority | Status |
|---|---|---|---|
| Related-party transaction | SEC (GLRE 10-K) | Reg S-K, SOX §302 | **OMITTED** |
| Arbitration conflict | Turo investors | Securities Act §11 | **OMITTED** |
| Financial interest | Arbitration participants | Commonwealth Coatings | **OMITTED** |
| Reinsurer investment | CIMA | CIMA regulations | **OMITTED** |

# Core Implications of GLRE Funding of FairClaims (Ex. G7 & G8)

**Premeditated Capture** GLRE's May 2019 investment in FairClaims predates Turo's September 2020 exclusive adoption. That timeline alone reframes the conflict as engineered, not incidental.

**Direct Documentary Proof** The press release explicitly names Turo as a FairClaims client. This destroys any plausible deniability defense.

**Scienter Evidence** CEO-level quotes, legal/compliance boilerplate, and investor relations dissemination show knowing concealment, not negligence.

**Multi-Layered Disclosure Failures** Your table in Section IV is devastating: SEC, CIMA, state ADR statutes, and arbitration ethics all triggered, all omitted.

**Circular Conflict Model (TTFGG)** The Figure 1 schematic is powerful: GLRE reinsures Travelers/Turo risk, funds FairClaims, which adjudicates against consumers, funneling suppressed claims back into GLRE's profit cycle.

**Vacatur Motions** G7–G8 provide the "evident partiality" hook under *Commonwealth Coatings*. The press release is admissible without authentication.

**Regulatory Referrals** SEC (Reg S-K, SOX §302), state insurance regulators, and CIMA all have jurisdictional hooks. The omission is not just ethical—it's statutory.

**Media Narrative** The "they announced it publicly, then hid it from consumers and regulators for six years" line is a headline in itself. It reframes you from alleging bias to exposing concealment.

**Countering Travelers' Motion** Their "we only fronted paper risk" defense collapses when juxtaposed with GLRE's reinsurer role and the covert treaties brokered by Guy Carpenter. They're part of the same circular scheme.

# Memorandum: Implications of Exhibits G7-G8

## I.  EXHIBIT G7: FairClaims Investor Matrix

**Document Type:**

Investigative financial intelligence table

**Purpose:**

Strategic mapping of FairClaims' investor base to identify escalation targets and leverage points for regulatory/legal pressure

**Ten Key Investors Documented:**

1. Nine Seed Round Investors ($1.8M - June 28, 2017):

2. One Accelerator Y Combinator (~$500K - Winter 2016 batch);

3. **THE SMOKING GUN:** Greenlight Re (NASDAQ: GLRE) - Undisclosed Series A investment, May 20, 2019

**Critical Intelligence in G7:**

**Timeline Note (Bottom of Exhibit):**

"While a precise public record does not confirm when Turo adopted FairClaims, online complaints suggest exclusive reliance on FairClaims for arbitration by **September 2020 -** notably **after Greenlight Re's investment**."

**Implication:** The reinsurer invested in the arbitration platform **before** it became Turo's exclusive dispute resolution forum - suggesting **premeditated capture**.

**Supporting References Cited:**

- Reddit discussions documenting FairClaims/Turo arbitration complaints
- YouTube discussions of bias
- **Greenlight Re press release (May 2019)** ← Links to Exhibit G8

## II.   EXHIBIT G8: Greenlight Re Investment Disclosure Failure

### A. Document Type:

Corporate press release (primary source document) + analysis

### The Press Release (May 20, 2019):

**Header:**

"FOR IMMEDIATE RELEASE

Greenlight Re Innovations invests in online insurance dispute resolution business FairClaims"

**Location:** Grand Cayman, Cayman Islands

## B. Key Excerpts & Their Legal Significance

| Key Evidence / Admission | Quotation / Admission | Legal Inference / Impact |
|---|---|---|
| **1. Corporate Structure Confirmed** | "Greenlight Re Innovations, part of Greenlight Capital Re, Ltd. (NASDAQ: GLRE)... has announced it has made a strategic investment in FairClaims" | • Confirms corporate structure: GLRE → GRI → FairClaims<br>• "Strategic investment" = more than passive; implies operational interest<br>• NASDAQ listing = U.S. securities law jurisdiction confirmed |
| **2. The Business Model Admission** | "FairClaims has developed an online system that educates, empowers, and engages claimants to drive settlement via negotiation and mediation. Insurers benefit significantly from FairClaims by **reducing claims litigation, improving their customers' experience, enhancing trust and strengthening their Net Promoter Score**." | • Admits FairClaims' purpose is to benefit insurers (reduce insurer costs not neutral adjudication)<br>• "Reducing claims litigation" = claims suppression as business objective<br>• NPS (Net Promoter Score) = corporate reputation management, not justice |
| **3. The Financial Incentive** | "The U.S. property and casualty insurance industry alone spends nearly $30 billion annually to defend claims... FairClaims is a technology-driven solution to this problem that delivers real benefits to all stakeholders." | • GLRE CEO Simon Burton frames FairClaims as cost-reduction tool for insurance industry<br>• **"$30 billion" = quantifies the financial incentive to suppress claims**<br>• "All stakeholders" language = euphemism for "we help insurers pay less" |

| Key Evidence / Admission | Quotation / Admission | Legal Inference / Impact |
|---|---|---|
| **4. The Neutral Third-Party Fraud** | FairClaims CEO Stephen Kane quoted: "As a third party, neutral dispute resolution platform we provide an alternative to litigation for claims. We hope this means more consumers can get a fair settlement more quickly while insurance companies benefit from shorter cycle times, less overhead and more brand affinity." | • Claims "neutral" status while simultaneously promising insurers "less overhead" (= fewer payouts)<br>• Claims neutrality while threatening plaintiff (G4), admitting to coercion (the use of "carrots and sticks" to bring participants to the table) ~ Ex G4, and surrendering tribunal to Turo (Ex. C_The Award, Ex. Regulatory – Washington Addendum I)<br>• Admission against interest: neutrality is marketing, not operational reality |
| **5. The Scale Admission** | "FairClaims is the sixth insurance technology business which Greenlight Re Innovations has invested in since it was set up in March 2018." | • GLRE has systematic strategy of investing in insurance tech<br>• Pattern of potential conflicts across portfolio<br>• Suggests due diligence failure OR intentional regulatory arbitrage |
| **6. Diversified reinsurance profit motive** | About Greenlight Re Innovations (GRI):<br>• Launched March 2018 as "innovation unit"<br>• Provides "investment, risk capacity, and access to a broad insurance network" | **Internation "Risk capacity" =**<br>• Confirms diversified profit motive<br>• International (Offshore, EU, trans-Atlantic) Exposure<br>• Asymmetric / Black Swan risks mirror the concealed pattern of bundled derivative risks causing 2008 Subprime mortgage crises<br>• GLRE likely provides reinsurance to FairClaims clients, deepening conflict (see Ex. T Seriers, especially T11 and T12) |
| **7a. About Sections (Bottom of Press Release)** | **About Greenlight Re:**<br>• "NASDAQ listed company"<br>• "Cayman Islands and Ireland" operations | • Confirms profit motive.<br>• FairClaims investment designed to enhance GLRE shareholder value by suppressing claims expense |

| Key Evidence / Admission | Quotation / Admission | Legal Inference / Impact |
|---|---|---|
| | • "Value-oriented equity-focused strategy that supports long-term growth in book value per share" | |
| **7b. THE SMOKING GUN - Turo Named Explicitly** | "FairClaims, based in Los Angeles, California... works with organizations like the Better Business Bureau, HomeAdvisor, **Turo**, and HomeAway..." | • Direct documentary proof GLRE knew FairClaims was adjudicating Turo disputes<br>• Published 10 months before documented Turo/FairClaims exclusivity (Sept 2020)<br>• Vertically integrated insurance enterprise<br>• Destroys any "we didn't know" defense |
| **8. No Regulatory Disclosures / Forward Looking Statements (Boilerplate) /Contact Information** | Standard securities law disclaimer, ironically highlighting that this press release is a securities disclosure document that should have triggered SEC filing requirements for related-party transactions<br><br>**Investor Relations:** Adam Prior, The Equity Group Inc.<br>• Public Relations/Media: Stephen Breen, Rein4ce | **No Disclosure to IRS, CIMA or SEC in EDGAR Documents:**<br>Corporate communications infrastructure confirms this was official, deliberate disclosure to investment community - but NOT to consumers, regulators, or arbitration participants |

## III.   What Makes G7-G8 "The Smoking Gun"

| Question | Status |
|---|---|
| Does GLRE invest in FairClaims? | **YES - documented in press release** |
| Does GLRE know about Turo? | **YES - Turo named in press release** |
| Is relationship material? | **YES - reinsurer funding adjudicator** |
| Should it be disclosed? | **YES - securities law + arbitration ethics** |
| Does GLRE trade risks with Travelers? | **YES – Guy Carpenter provides the risk derivative vehicles and covert risk transfer treaties facilitating plausible deniability and concealment from CIMA, IRS, SEC and other regulators** |
| What is TTFGG? | **A vertically integrated insurance enterprise with the sole purpose of suppressing insurance claims and oversight where**<br>**√ FairClaims (funded by Greenlight Capital Re and repeat-player integrated captive of Turo) acts as the enforcer**<br>**√ Travelers acts as the fronting or sleeper insurer - lends its license to Turo to induce reliance and collects premiums for paper risk. It is present in marketing, absent in claims, adjustment and litigation (UDAAP, TIC).**<br>**√ Turo - the customer facing marketing node. The architect of regulatory fragmentation and trichotomy of plan disclosures. It sells illusory protections and funnels disputes to its captive arbitral forum (FairClaims). Argues its protection plan is not insurance despite  cease and desist / consent orders in many states, and contrary admissions to the SEC.** |

| Question | Status |
|---|---|
| | √ **Guy Carpenter brokers the covert offshore diversification, transfer and laundering of risk between Travelers and Greenlight capital Reinsurance. Creates a seeming barrier of communication and plausible deniability where Travelers and GLRE do not need to be in direct communication** <br> √ **Greenlight Capital Reinsurance (GLRE) harvests the gains of claim suppression offshore and rewards FairClaims with funding.** <br><br> **Figure 1 (The Circular Conflict) reiterates the foregoing** |

## Figure 1: TTFGG Circular Conflict

**GLRE**
- Reinsures Travelers/Turo risk
- Benefits from suppressed claims (inflated Capital Adequacy Ratios)

*Invests in May 2019*

**FairClaims (Turo Captive Arbitration Forum)**
- Reduces claims litigation
- Benefits insurers
- Names Turo as client in the same press release

*Adjudicates Claims Against*

**Turo Hosts/Guests (including Lawal)**
- Forced into FairClaims Arbitration (Sept 2020+)
- Never told about GLRE investment, corporate integration, procedural taint or repeat-player bias
- Claims systematically denied

*Losses Flow Back to*

**Turo, Travelers, GLRE, Guy Carpenter**
- Profit from suppressed claims
- Ignored disclosure obligations to Regulators (CIMA SEC & IRS), participants and the courts

## IV.   Why Defendants Can't Explain This Away

## 1. The Disclosure Failure is Multi-Layered Across TTFGG Members

| Required Disclosure | To Whom | Authority | Status |
|---|---|---|---|
| Related-party transaction | SEC (GLRE 10-K/10-Q) | Reg S-K, SOX §302 | Δ OMITTED |
| Material arbitration conflict | Turo S-1/A investors | Securities Act §11 | Δ OMITTED |
| Financial interest in forum | Arbitration participants | *Commonwealth Coatings* | Δ OMITTED |
| Arbitrator conflicts | Parties (Lawal) | State ADR disclosure laws | Δ OMITTED |
| Reinsurer investment in ODR | Insurance regulators | State insurance codes | Δ OMITTED |
| Related-party transactions | Cayman Monetary Authority | CIMA regulations | Δ OMITTED |

## 2. The Press Release Proves Scienter

They can't claim ignorance because:

- CEO-level approval (Simon Burton quoted)

- Legal/compliance review (Forward Looking Statements section)

- Investor relations dissemination (formal press release)

- Public website publication (retrieved Sept 19, 2025)

- Archive.org preservation (wayback machine evidence)

CEO Level approvals and legal review show this is not negligence - it's knowing

concealment.

## 3. The Timeline is Damning

| Date | Event | Implication |
|---|---|---|
| **May 20, 2019** | GLRE invests in FairClaims; Turo named as client | Investment **precedes** exclusivity |
| **Sept 2020** | Turo adopts FairClaims exclusively (per Reddit/complaints) | **After** GLRE investment |
| **2020-2025** | Thousands of arbitrations processed | All tainted by undisclosed conflict |
| **Sept 16, 2025** | Stephen Leon Kane (FariClaims Lawyer-CEO)threatens plaintiff with fees and promises to sit out court hearings | Active concealment continues |

**The conflict existed from inception and was never remediated.**

# V. Exhibit G8's Devastating Final Section

**"About FairClaims":**

"FairClaims (www.fairclaims.com) is a consumer-friendly online dispute resolution platform that works with organizations like the Better Business Bureau, HomeAdvisor, **Turo**, and HomeAway to make it 10x easier, quicker, cheaper to resolve claims online."

**Translation:** *"We're consumer-friendly... by helping corporations like Turo resolve claims 10x faster (i.e., deny them more efficiently)."*

## VI.  The Exhibits

**G7 Provides:**

- Strategic investor map for vacatur and regulatory referral

- Timeline establishing premeditation

- Cross-references to supporting evidence (Reddit, BBB, regulatory exhibits)

**G8 Provides**

- **Irrefutable documentary proof** of the relationship

- **Admissions against interest** from both GLRE CEO and FairClaims CEO

- **Securities-grade disclosure** that creates legal obligations

- **Public record** (press release) = admissible without authentication

## VII.  Bottom Line:

**Exhibit G7-G8 transforms the case**

**From:**

- *"Plaintiff alleges a conflict"*

**To:**

- *"Defendants publicly announced the conflict in a corporate press release, then concealed it from consumers, regulators, and the court for 6+ years."*

# VIII. Conclusion

Travelers is now requesting the court to dismiss the claims against it, acting as if its role in the alleged arbitration fraud and RICO scheme is insignificant. Even though there is evidence of its knowing participation across various states (refer to Ex. Regulatory – Washington Addendum), it claims, "I'm only here to provide a license and collect premiums. Turo's methods for handling and paying claims are not my concern. Why am I being added to this case now after not being included for the past six years?" Travelers' motion admits the facts alleged: that Travelers is a fronting or sleeper insurer which induces reliance, collects premiums for paper risks without participating in claims handling. It launders the proceeds offshore through diversified covert reinsurance treaties. The court should look beyond these procedural tactics. This maneuvering has already outpaced regulatory authorities in numerous states. The defendants' last resort appears to be relying on procedural arguments to counter the candor and diligence of a Pro Se litigant.

# IX.  Judicial Note

Turo refused summons at its service address. It asked the court send summons by phone or email. At one point, it even denied that it had a physical address. It took the plaintiff's diligent emails to its legal principles for it to respond. FairClaims argues that its self-authored Rule 29

supersedes this court's authority. It evaded summons, provided a fake address, it refused to pick up its mail. In response to the email notice sent by Plaintiff, FariClaims CEO explicitly that FairClaims will sit-out the court's proceedings even as he threatened plaintiff with fee-shifting. The court was made aware of all these actions and the court has not yet responded. This court is the first theater to be made aware of TTFGG's tricks before its game begins. Plaintiff documented it across sattes in Exhibit Regukatory Series. Will the court now permit Travelers' procedural gymnastics? TTFGG has already ping-ponged state and federal regulators. Will the defendants succeed in their attempts to ping-pong the courts?

# Supplemental Brief: Greenlight Re Press Release Confirms Structural Capture

## I. Documented Fact

The smoking gun is no longer concealed - it was published by defendants themselves Exhibit G7 - G8: GLRE-FairClaims investment **is** *proven **fact (see Ex. G Series.*** The Exhibits confirm:

- Greenlight Re publicly announced investment in FairClaims on May 20, 2019**. The p**ress release explicitly names Turo as a FairClaims client

- The **i**nvestment **was** made through "Greenlight Re Innovations" (corporate structure documented)

- The **t**imeline shows investment preceded Turo's exclusive use of FairClaims (September 2020+). In other words, <u>The reinsurer invested in the arbitration platform **before** it became Turo's exclusive dispute resolution forum - suggesting **premeditated capture (G7).**</u>

- The Press Release Smoking Gun (G8): "FairClaims is applying these consumer dispute resolution insights to help resolve <u>first and third-party property and casualty insurance claims... works with organizations like... Turo</u>"

## II. Legal Assessment

### A. Evident Partiality (FAA §10(a)(2)) — NOW IRONCLAD

| Element | Exhibit G7 - G8 |
|---|---|
| Financial Connection | Documented, public, corporate |
| Materiality | Indisputable (reinsurer funds adjudicator) |
| Disclosure Duty | Violated — no disclosure to parties |
| Vacatur Standard | Presumptively satisfied |

**Key Legal Implications:**

1. **Per Se Conflict Under *Commonwealth Coatings*:**

   o   Reinsurer investing in arbitration platform that adjudicates claims against its insured = structural conflict

   o   **Court held** disclosure required for *any* relationship creating "impression of bias"

   o   This exceeds *Monster Energy* (97 cases) - here, reinsurer controls dispute resolution for own risk

2. **Fifth Circuit *Positive Software* Standard Met:**

   o   "Reasonable person would conclude arbitrator partial to one party"

   o   No reasonable person would believe neutral adjudication possible when:

      ▪   Reinsurer funds forum

      ▪   Forum adjudicates claims against reinsurer's insured

      ▪   Relationship undisclosed to claimant

3. **Exceeds Precedent:**

   o  *Monster Energy*: Arbitrator owned shares in JAMS → vacatur

   o  ***This case*:** Reinsurer owns stake in forum → exponentially more egregious

## B. Securities Fraud (Rule 10b-5) - PROSECUTABLE

**Material Omissions Documented:**

The Greenlight Re press release from May 20, 2019 explicitly discloses the FairClaims investment and names Turo as a client, yet this related-party transaction was never disclosed in Greenlight Re's SEC filings, Turo's S-1/A registration statements, or to arbitration participants.

**Three-Party Disclosure Failures:**

| Entity | Required Disclosure | Actual Disclosure | Violation |
|--------|--------------------|--------------------|-----------|
| Greenlight Re | Related-party transaction with adjudication forum for insured risk | None in 10-K/10-Q | Rule 10b-5, SOX §302 |
| Turo | Material conflict in mandatory arbitration clause | None in S-1/A | Securities Act §11 |
| FairClaims | Financial relationship with reinsurer | None to parties/regulators | State ADR disclosure laws |

**Criminal Exposure Enhanced:**

- **Scienter:** Press release proves *actual knowledge* of relationship

- **Materiality:** Investment designed to "accelerate expansion into insurance industry"

- **Reliance:** Investors/consumers deceived about neutrality of dispute resolution

## C. RICO Enterprise Structure - PROVABLE

**The Press Release as Enterprise Blueprint:**

**Greenlight Re CEO Simon Burton stated:** "FairClaims is a technology-driven solution that delivers real benefits to all stakeholders in the claims process," while FairClaims CEO Stephen Kane noted the platform provides "an alternative to litigation for claims" benefiting insurance companies through "shorter cycle times, less overhead and more brand affinity."

**Translation:** *Claims suppression as mutual financial objective*

**RICO Elements Satisfied:**

| Element | Evidence | Strength |
|---|---|---|
| Enterprise | GLRE → FairClaims → Turo documented in press release | Proven |
| Pattern | Multi-year systematic claims denial (BBB 131 templates**, FOIA from Washington, Arizona, and Maryland – more states are still under coming**) | Documented |
| Racketeering Acts | Wire/Mail Fraud (concealment), Securities Fraud (10b-5) | Predicate acts proven |

| Element | Evidence | Strength |
|---------|----------|----------|
| **Injury** | Suppressed claim + forced to biased forum | Direct causation |

# III. Defendant-by-Defendant Impact

## A. Greenlight Re (GLRE) - Now PRIMARY Target

**Before Exhibits G7-G8, defendants:**

- Could argue GLRE is a peripheral player

- Could claim no consumer interaction

- Jurisdictional defenses viable

**After Exhibits G7 - G8, plaintiff has proven:**

- Direct liability for securities fraud (undisclosed related-party transaction)

- Evident partiality - funded the forum that adjudicated claims benefiting its risk

- RICO conspiracy - press release = written admission of enterprise purpose

**Vulnerabilities Exposed:**

1. **SEC Investigation Mandatory:**

    o  Related-party transaction not disclosed in 10-K/10-Q

    o  SOX §302 certification violated (CEO/CFO signed off)

   o   Potential delisting from NASDAQ

2. **Cayman Islands Monetary Authority (CIMA):**

   o   Undisclosed conflict violates insurance regulatory standards

   o   License sanctions possible

3. **Shareholder Derivative Suits:**

   o   Board knew of investment (press release) but failed to disclose

   o   Caremark/Marchand duty breach

**New Discovery / Regulatory Referral Targets:**

- Board minutes approving FairClaims investment

- Due diligence materials on conflict screening

- Communications between GLRE and FairClaims re: Turo cases

- Financial flows: investment amount, ownership percentage, revenue sharing

## B. FairClaims - Now INDEFENSIBLE

**CEO Kane's Email (G4) Now Self-Impeaching:**

**His threat:** *"You agreed not to name us as a party" (see Ex. G Series – Ex G4: Ex Parte Email From Stephen Kane, page 38)*

**Response:** *"You concealed your reinsurer-investor while adjudicating claims against that reinsurer's insured - your 'neutrality' is corporate theater."*

**Comparison to CFPB v. Ejudicate (see Ex. G9):**

| Factor | Ejudicate (Banned) | FairClaims | Assessment |
|---|---|---|---|
| Structural bias | Corporate client dependency | Same + reinsurer funding | More severe |
| Disclosure failures | None documented | Documented (GLRE) | More severe |
| Procedural abuses | Evidence suppression | Same (retroactive limits) | Equal |
| Intimidation | Not documented | CEO fee-shift threat | More severe |

**Outcome:** FairClaims' misconduct exceeds the threshold that triggered CFPB ban of Ejudicate

## C. Turo - JOINTLY LIABLE

**Press Release Implicates Turo:** The press release identifies Turo as a client using FairClaims for dispute resolution, creating constructive knowledge of the GLRE investment.

**Legal Implications:**

1. **Turo Knew or Should Have Known:**

    o   Public press release naming Turo

    o   Due diligence on arbitration provider required

    o   Continued use = ratification of conflict

2. **Fraudulent Inducement:**

    o   ToS mandates "neutral" arbitration

    o   Knew arbitrator funded by reinsurer

    o   Constitutes fraud in the inducement → contract voidable

3.  **Enterprise Liability:**

- o   Named in press release as beneficiary

- o   Feeds dispute to its captured forum

- o   RICO conspiracy liability attaches

## D. Travelers - Exposure Increased

The Reinsurance Triangle is Proven:

```
      Travelers (Fronting / Sleeper
                 Insurer)

   ↓ (Policy name in marketing, collects paper
          premiums from consumers/Turo
               reinsures risk with)

  Greenlight Re (Offshore Reinsurer)

            ↓ (invests in)

      FairClaims (Captive Forum)

 ↓ (adjudicates against Consumer, minimizes payout
          and obstructs oversight)

        Consumer (Lawal)

   ↓ (buys illusory protection plan from)

     Turo (Unlicensed Insurer)
```



↓ (funnels disputes → FairClaims feeds back to Travelers)

**Travelers' Knowledge:**

- Reinsurance treaties with GLRE (required disclosure)

- GLRE's FairClaims investment (public)

- Turo's mandatory FairClaims clause (public)

**= Actual or Constructive Knowledge of Circular Conflict**

**Travelers' Liability Theory:**

- Aiding and Abetting securities fraud (knowingly participated in undisclosed scheme)

- Conspiracy under RICO (furnished insurance license to enable arbitral suppression scheme)

- Breach of Fiduciary Duty (owed to policyholders/regulators to disclose conflicts)

# IV. State of The Case (Pretrial)

## A. Plaintiff Relief.

We have asked the court for:

1. Court grants expedited discovery on **GLRE-FairClaims-Turo-Travelers** relationship

2. Award vacated on evident partiality grounds (overwhelming evidence) **with immediate relief**

3. Referral to NAAG, SEC, CFPB, DOJ, IRS and FTC for multistate multi-agency enforcement

4. Precedent-setting opinion declaring FairClaims structurally compromised

## B. Defendant Travelers Motion to Strike

To ensure judicial efficiency, we must address Travelers' procedural motion directly. Essentially, their motion seeks delay amidst clear links to fraud and fails basic plausibility. **<u>Severance will not prevent further referrals from various jurisdictions.</u>** If granted, the court would have to accept Travelers implied answers in the table below and disregard:

- GLRE – FairClaims Public press releases

- The undisclosed GLRE-FairClaims financial ties

- Admissions by FairClaims' CEO (G3/G4)

- The mandatory referral duty under 18 U.S.C. § 3057(a), as reasonable grounds and relevant statutes are met

| Question | Actual Status | Yet, Travelers Seems to Argue |
|---|---|---|
| Does GLRE invest in FairClaims? | YES - documented in press release | *Alleged, unproven* |
| Does GLRE know about Turo and Travelers? | YES - Turo named in press release | *Inferential* |
| Is relationship material? | YES - reinsurer funding adjudicator | *Arguable* |
| Should it be disclosed? | YES - securities law + arbitration ethics | *Debatable* |
| Is Turo's protection plan illusory or deceptive? Do FairClaims judgements benefit, Turo, Travelers and GLRE? Is Turo's protection plan possible because of Travelers' license? | YES - Minimized payouts + arbitral suppression + multi-state sanction orders + multi-state claim theft + SEC candor vs Regulatory denial + Travelers' Evasion of Joinder + Defendants' Evasion of Summons + FairClaims Rule 29 judicial obstruction + promise to sit out court proceedings + Travelers' procedural theatrics / motion practice | *It wasn't me I am just here to lend a license and collect premiums* |

Travelers' immateriality defense is a procedural sleight of hand, not a substantive denial of participation. The Supreme Court has long held that undisclosed relationships creating even an *appearance of bias* are sufficient to vacate an arbitral award. *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 149 (1968). GLRE's funding, Travelers' licensing, Turo's capture and their direct benefit from the FairClaims-tainted process were concealed and then suppressed by the arbitral forum itself. To accept Travelers' position would invert established

law, treating concealed participation as irrelevant and rewarding the very misconduct that the Federal Arbitration Act forbids. See 9 U.S.C. § 10(a)(4) (vacatur where arbitrators "exceeded their powers"). Travelers does not deny its role in the RICO enterprise; it merely asserts that because it was not previously named, it is immune from accountability. Travelers was named and notified of joinder during arbitration. The joinder was suppressed by FairClaims – the TTFGG co-conspirator and enforcer. Travelers' evasive argument mirrors FairClaims' self-serving declaration of arbitral supremacy over court processes.  Travelers argues misconduct disappears because it was never alleged before even when the arbitral records show it was alleged. Lawal's discovery and mapping of Travelers' role in the enterprise, and FairClaims' retroactive suppression of those allegations, are precisely why Travelers is properly joined in this Court. Without further debate, the following table addresses any variations of the counter argumebts that Travelers and other defendants may bring

## Common Defense Arguments:

| Defense Claim | Court's Typical Response | Controlling Principle |
|---|---|---|
| "I wasn't named originally" | Conspiracy charges can add co-conspirators | Salinas, Boyle |
| "This is a new charge" | Same transaction/occurrence test | Krupski, Foman |
| "Statute of limitations expired" | Discovery rule: fraudulent concealment | Merck, Hobson |
| "I had no notice" | Press release/public filings = constructive notice | Singletary |
| "Plaintiff could have found this earlier" | Concealment tolls diligence requirement | Monster Energy |
| "Adding me now is prejudicial" | No prejudice from your own concealment | Krupski |

# Exhibit G9: FairClaims Structural Taint vs. CFPB Enforcement Action (Ejudicate)

https://
www.consumerfin
ance.gov/
enforcement/
actions/ejudicate-
inc-dba-brief/

**Comparative Analysis of Arbitration Platform Misconduct**

Table 1 provides a direct comparison between the misconduct attributed to Ejudicate—a banned

arbitration platform—and the allegations raised against FairClaims in the Lawal v. Turo vacatur

motion. This comparative framework is based on an in-depth analysis of both cases, paying

particular attention to the nature and severity of the infractions involved.

**Scope of Alleged Misconduct**

The alleged misconduct by FairClaims Inc. encompasses structural, procedural, and financial

domains. These issues are found to surpass the violations identified in Ejudicate, indicating that

the extent and complexity of the accusations against FairClaims are more severe. This highlights

the importance of further investigation and the need for additional evidentiary support.

**Evidentiary Sufficiency and Outstanding Requirements**

The current evidentiary record is sufficient to support FAA Vacatur and to initiate a criminal

referral. Despite this, both regulatory and judicial authorities face a critical gap in the prosecution

file: the absence of forensic proof of spoliation or tampering, and direct evidence of corporate

intent. Filling these gaps is essential for improving judicial efficiency and facilitating the

administration of justice. Should regulators decide to proceed, securing such proof would further

strengthen the case and expedite legal proceedings. Table 2 outlines what additional evidence and legal findings are necessary for a successful prosecution and regulatory ban.

**Judicial Notice: Assessment of Misconduct Scale and Consumer Harm**

The scale of misconduct alleged against FairClaims exceeds the proven UDAAP violations attributed to Ejudicate. In addition to established structural and procedural abuses, FairClaims is accused of engaging in criminal predicate acts and partaking in complex offshore financial relationships. These factors collectively elevate the severity and scope of the misconduct, making it broader and more serious than previously prosecuted cases. FairClaims further threatened plaintiff with fee-shifting to block judicial review. It cited its Rule 29 which implies arbitral supremacy over federal courts, promised to sit out court orders and refused summons.

To accurately assess the breadth of consumer harm (Table 1) resulting from FairClaims' alleged misconduct, further discovery is required. This process should focus on quantifying consumer impact metrics, which include:

- The total number of consumers affected by FairClaims' alleged misconduct.
- The extent of financial harm suffered by consumers, including calculations of restitution owed.
- Assessment of long-term consequences for impacted consumers, such as adverse effects on credit scores and increased legal expenses.

Comprehensive discovery addressing these issues will be crucial for regulatory, judicial and congressional authorities to fully understand the impact and pursue appropriate remedies.

**Final Verdict: Compelled Vacatur and Regulatory Ban**

The arbitration process conducted by FairClaims is deemed fundamentally compromised due to misconduct that is both structurally and criminally more severe than the fraudulent practices previously condemned in CFPB v. Ejudicate Inc. In the Ejudicate case, a permanent ban was imposed because of violations related to Unfair, Deceptive, or Abusive Acts or Practices (UDAAP), which included deceptive conduct and lack of neutrality in proceedings.

In comparison, FairClaims is alleged to have committed not only similar abuses—such as structural bias and deceptive marketing—but also additional serious violations. These include obstruction of justice, which constitutes a felony criminal predicate; evident partiality arising from undisclosed financial interests; and evidence suppression. Each factor provides independent and substantial grounds for vacatur under the Federal Arbitration Act (FAA), without the need for remand.

The structure of the TTFGG Enterprise is specifically designed to disadvantage consumers and impede regulatory oversight. Given the scale and severity of these problems, the only proportionate regulatory response is a permanent ban on FairClaims' continued participation in consumer financial dispute resolution.

**Critical Conclusion**

This comparison demonstrates that the alleged misconduct by FairClaims not only replicates the core structural violations that led to Ejudicate's ban but also escalates the severity by introducing felony obstruction and complex financial conflicts.

## Table 1: Comparative Table of Arbitration Platform Misconduct: CFPB v. Ejudicate vs. FairClaims (Lawal v. Turo)

This table presents a direct, side-by-side comparison of the misconduct attributed to Ejudicate, as established by CFPB enforcement, and the more severe allegations against FairClaims in the Lawal v. Turo vacatur motion. It highlights the escalation in structural, procedural, and criminal abuses, underscoring the need for regulatory intervention and judicial review.

| Factor/Metric | CFPB Charges Against Ejudicate (Proven UDAAP Violation) | FairClaims Allegations (Lawal Vacatur Claims & Evidence) | Comparative Status | Verdict Nexus / Statutory Ground |
|---|---|---|---|---|
| **I. Financial Conflict & Neutrality** | Falsely claimed to be "neutral and unbiased" despite having a financial interest in corporate settlement outcomes. | Undisclosed Investment Nexus: Greenlight Re **(Turo's Offshore Reinsurer) is a** financial investor in FairClaims **(Claims Adjudicator).** [1] | **EXCEEDED** | Evident Partiality (FAA § 10(a)(2)):**The conflict is structural, vertical (linking risk finance to claims suppression), and constitutes a material** SEC Disclosure Violation **(Reg S-K Item 404).** [1] |
| **II. Procedural Due Process** | Used a "bogus process" that denied consumers the opportunity to gather evidence or clarify facts. | Active Evidence Suppression: **Arbitrator imposed a** retroactive 50-page evidence cap [1] **after explicitly authorizing the claimant to submit voluminous evidence, and** falsified the record **(claiming a hearing occurred when none did).** [1] | **EXCEEDED** | Misconduct/Due Process (FAA § 10(a)(3)): **Violation involves** active procedural entrapment**designed to strategically suppress material evidence (e.g., felony police reports), not mere passive lack of opportunity.** [1] |
| **III. Coercion & Fee Abuse** | Initiated proceedings | Abusive Coercion (Fee-Shifting): **FairClaims CEO issued a direct,** | **EXCEEDED** | **Abusive Act (Dodd-Frank § 1031):** The fee-shifting threat is a |

| Factor/Metric | CFPB Charges Against Ejudicate (Proven UDAAP Violation) | FairClaims Allegations (Lawal Vacatur Claims & Evidence) | Comparative Status | Verdict Nexus / Statutory Ground |
|---|---|---|---|---|
| | without consumer consent; used platform for debt collection. | **unsolicited** fee-shifting threat **to the *pro se* claimant for seeking judicial review.** [1] Claim Theft: **Facilitated Turo's imposition of an** illegal $250 deductible **on a non-at-fault host.** [1] | | direct, coercive effort to chill the statutory right to appeal, a clear **UDAAP** violation. |
| **IV. Criminal/Litigation Taint** | N/A (CFPB enforcement was purely civil and UDAAP-focused). | Felony Concealment & Obstruction: **Turo's counsel minimized a police-certified** felony ATM burglary **to a "traffic violation" in arbitration.** [1] **All three defendants** coordinated refusal of service **in federal court.** [1] | **EXCEEDED** | Obstruction of Justice (18 U.S.C. § 1512(c)): **The tribunal was corrupted by criminal fraud on the record, compelling** Mandatory Judicial Referral **under 18 U.S.C. § 3057(a).** [1] |

# Table 2: Critical Evidentiary and Legal Gaps in Arbitration Misconduct Prosecution: Required Elements for Judicial and Regulatory Action

This table outlines the key missing elements in the evidentiary record and legal process that must be addressed to strengthen the case against FairClaims and ensure effective judicial and regulatory remedies. It emphasizes the importance of metadata, internal audit trails, and a definitive judicial ruling on arbitration clause validity.

| Missing Element | Why it Matters to the Judge (SDJ/Davis) | Implication for Counsel/TTFGG |
|---|---|---|
| **1. Metadata Evidence of Spoliation/Tampering** | **The Motion requested Turo's internal records metadata (ITSM reports, police communications) to expose scripted delay and** tampering with governmental records (Tex. Penal Code § 37.09). [1] **The ESI production must meet the standard set in *Lorraine v. Markel Am. Ins. Co.*.**[1] | Defense counsel must produce an affidavit that this metadata has been preserved in the ordinary course of business (FRE 803(6)). Any *failure* to produce the metadata, or any metadata proving the deletion/alteration of the felony flag, moves the case immediately from civil fraud to **Criminal Spoliation** and **Judicial Contempt**. |
| **2. Corporate Discovery Playbook/Audit Trail** | The case relies on the **inference** that claims suppression is policy. Direct proof requires Turo's internal documents: the **FairClaims Contract** (to show volume pricing/incentives), **Internal Audit Reports** on claims handling, and **Counsel's Directives** on minimizing felony exposure. | These documents are currently withheld under attorney-client privilege. The court must compel disclosure, arguing that the crime-fraud exception (attorney advice used in furtherance of the Obstruction scheme) vitiates the privilege. This is the **highest leverage discovery point** to prove the "meeting of the minds" element required for **RICO Conspiracy**. |
| **3. Judicial Ruling on Arbitration Clause Validity** | **The ultimate judicial victory is not just vacatur, but a ruling that the** Turo's arbitration clause is void *ab initio* **due to structural unconscionability (i.e., failure under *Mitsubishi* due to lack of an adequate forum).** [1] | Without this ruling, the case remains technically subject to potential remand to a "neutral" arbitrator. A final ruling that the Turo-FairClaims system is structurally illegal (as Ejudicate was banned by the |

| Missing Element | Why it Matters to the Judge (SDJ/Davis) | Implication for Counsel/TTFGG |
|---|---|---|
|  |  | CFPB) eliminates the defense's only shield of a structurally corrupt system. |

**Table 2:**

**Table 2: Comparative Analysis of Arbitration Misconduct: CFPB v. Ejudicate vs. FairClaims Allegations**

This table outlines the key missing elements in the evidentiary record and legal process that must be addressed to strengthen the case against FairClaims and ensure effective judicial and regulatory remedies. It emphasizes the importance of metadata, internal audit trails, and a definitive judicial ruling on arbitration clause validity.

| Factor/Metric | CFPB Charges Against Ejudicate (Proven Facts) | FairClaims Allegations (Vacatur Facts) | Comparative Status | Verdict Nexus |
|---|---|---|---|---|
| Structural Financial Conflict | Financial interest in consumers settling with corporate client (Prehired). | Undisclosed Investment Nexus: Greenlight Re (Offshore Reinsurer of Turo's risk) is a financial investor in FairClaims (Claims Adjudicator). [1] | EXCEEDED | Vertical Integration of Fraud: The conflict involves a NASDAQ-listed reinsurer funding the adjudicator to artificially suppress losses, an SEC disclosure violation. [1] |
| Deceptive Neutrality | Falsely claimed to be a "neutral and unbiased" arbiter in communications with consumers. | Outcome-Based Marketing: FairClaims commercial outreach promises corporate clients the ability to "Limit liabilities" and "Suppress claims." [1] | SIMILAR | Both platforms used deception about their core mandate. FairClaims' intent is formalized in its marketing strategy. [1] |

| Factor/Metric | CFPB Charges Against Ejudicate (Proven Facts) | FairClaims Allegations (Vacatur Facts) | Comparative Status | Verdict Nexus |
|---|---|---|---|---|
| Procedural Due Process | Bogus process that left consumers with little opportunity to gather evidence or clarify facts. | Active Evidence Suppression: Arbitrator imposed a retroactive 50-page evidence cap after the pro se claimant was expressly authorized to submit large volumes of evidence. [1] | EXCEEDED | FAA Misconduct (FAA § 10(a)(3)): FairClaims moved beyond passive neglect to active procedural entrapmentand misconduct by changing rules mid-course to suppress material evidence. [1] |
| Binding & Consent | Unfairly attempted to bind consumers to sham proceedings upon merely reviewing claims; initiated arbitration without consent. | Defiance of Federal Court: FairClaims asserted its internal Rule 29 overrides statutory mandates and attempted to evade service in the federal vacatur action. [1] | EXCEEDED | Obstruction of Justice:FairClaims' conduct, in concert with Turo and Travelers, constitutes Obstruction of Judicial Process (RICO predicate) [1], a far graver offense than the UDAAP violation of initiating proceedings without consent. |

| Factor/Metric | CFPB Charges Against Ejudicate (Proven Facts) | FairClaims Allegations (Vacatur Facts) | Comparative Status | Verdict Nexus |
|---|---|---|---|---|
| Consumer Fee Abuse | Used the platform to facilitate debt collection/large financial claims against borrowers. | Coercion & Claim Theft: FairClaims CEO issued a direct, unsolicited fee-shifting threat against the consumer for seeking judicial review.[1] Turo imposed an illegal $250 deductible on a non-at-fault host ("Claim Theft").[1] | EXCEEDED | Abusive Act (UDAAP):The fee-shifting threat is a direct, abusive, and willful act intended to chill statutory judicial rights, which warrants immediate CFPB action. [1] |

# Exhibit G10: GLRE's Vertical Integration and Offshore Claims Suppression Strategy (GLRE Interview)

## Summary

In this episode of the Sphere IT Podcast, host Peter Rackliff interviews Kagabo Ngiruwonsanga (Chief Underwriting Officer, GLRE). Greenlight Capital has evolved from a traditional reinsurer to a forward-looking firm that combines conventional reinsurance with investments in insurtech startups like FairClaims. The company operates across multiple geographies, including Cayman, Dublin, London, and Australia, managing a portfolio of about 40 companies and underwriting roughly $150-160 million in premium.

Table 1 presents the 5 main excerpts from Kagabo Ngiruwonsanga's statements with the verbatim transcript, an objective inference and theme for each statement. |GLRE's leadership leveraged its actuarial expertise and offshore structure to vertically integrate investment and claims adjudication (FairClaims), enabling control over loss ratios (claim suppression) in the short-term rental insurance market (Turo). This strategy exposes the company to significant regulatory risks across multiple jurisdictions due to undisclosed investments and procedural capture of claims resolution.

Table 2 preserves  the complete transcript of the interview to avoid any loss of information or context.

## Key Takeaways

1. GLRE's leadership intentionally designed a system to suppress claims and control loss ratios, potentially constituting fraud or procedural unfairness. The explicit connections between investment, claims adjudication, and offshore structuring serve as evidence of a coordinated enterprise.
2. The concealed (undisclosed) investments and procedural capture, violate disclosure, transparency, and fair claims handling requirements.
3. The references to international regulatory exposure and the risk of non-compliance is particularly concerning.

> **Exhibits G3, G4, and G10 are corroborative: G4 substantiates the coercion revealed in Mr. Kane's G3 interviews—admissions against interest—by showing practice as confession by conduct.**
>
> **Taken together, G3 and G10 confirm the deployment of embedded loss-minimization reinsurance software with corporate-aligned KPIs, concealed from consumers and omitted from mandatory CIMA and SEC related-party disclosures.**

**Legal Impact: GLRE CUO explicitly states they invest in insurtechs to CONTROL LOSS RATIOS in SHORT-TERM RENTAL (Turo market)**

**Table 1: 5 Main Points**

| Point | Time Stamp | Speaker | Transcript Excerpt | Objective Inference | Summary Theme |
|---|---|---|---|---|---|
| 1. | 01:17 | Guest (Kagabo) | "I started my career in the US... did actorial science... reinsurance pricing at Liberty so then eventually I moved to the Cayman Islands... for the last two and a half years I head up the Innovation underwriting group" | **Expertise and Situs for Arbitrage:** Kagabo's background as an actuary specializing in reinsurance pricing confirms expertise in the financial function directly affected by claims suppression (loss reserves). His position in the Cayman Islands establishes the official nexus for the **offshore harvest**, and his role as Innovation head places him in charge of the unit that made the strategic FairClaims investment. | **Executive Expertise & Offshore Situs** (GLRE's Cayman base and leadership's financial expertise provide the infrastructure and knowledge necessary for the claims suppression scheme). |
| 2. | 02:29 | Guest (Kagabo) | "we started investing in uh Innovation so we take you know **minority investments** into different insure tech companies... alongside with that we provide them with **capacity** uh through our Cayman paper as reinsurance" | **Proving the Vertical Integration Model:** This explicitly confirms GLRE's dual strategy of providing both **equity capital (investment)** and **risk capacity (reinsurance paper)** to InsurTech partners. The TTFGG Enterprise is precisely this model: investment capital to FairClaims and reinsurance capacity to the Travelers/Turo risk. | **Vertical Integration Strategy & Enterprise Structure** (Investment + Capacity): The structural core of the RICO enterprise that links the reinsurer (GLRE) to the adjudicator (FairClaims). |
| 3. | 03:39 | Guest (Kagabo) | "we do stuff in like **short-term rental**... a very Innovative product that you know you can kind of **control** and you know make sure that uh the **loss ratio performs quite well**" | **Establishing Motive and Target:** The explicit mention of **"short-term rental"** directly names the Turo market. The key strategic goal of ensuring the **"loss ratio performs quite well"** provides the clear economic *motive* for the **undisclosed FairClaims investment**. The only way GLRE achieves this "control" over claims is by controlling the adjudication funnel | **Motive: Loss Ratio Control** (GLRE's economic necessity to suppress claims is the motive for funding the captive claims platform, satisfying the *scienter* element of fraud). |

| Point | Time Stamp | Speaker | Transcript Excerpt | Objective Inference | Summary Theme |
|---|---|---|---|---|---|
| | | | | itself (FairClaims is marketed to "reduce claims litigation" ). | |
| 4. | 06:09 | Guest (Kagabo) | "the reason why we like those products is because if there's an adverse development because it's quite **short tail you can change the scheme right**, you can you can change the pricing, you are **learning as you go**... quite quickly" | **Justification for Claims Suppression System:** The preference for "short tail" risk (which resolves quickly) necessitates the fast claims resolution offered by FairClaims' 30-day document-only process. Litigation would destroy the "short tail" nature. This structural need justifies the imposition of the captive forum and its expedited, outcome-driven procedures to ensure GLRE can rapidly adjust the "scheme" (or price). | **Justification for Procedural Capture and Expedited Claims Handling** (The need for rapid data/control drives the adoption of a non-neutral, highly accelerated arbitral funnel, FairClaims, over slow litigation). |
| 5. | 07:09 | Guest (Kagabo) | "we have quite a lot of Europe now especially with the opening of The Syndicate so we have a team our team is mostly bed in **kayman but now we have a team in London**... Europe is quite **highly regulated**" | **International Regulatory Arbitrage:** Reaffirms GLRE's multi-jurisdictional structure (Cayman, London, Dublin-Ireland for GRIL). Acknowledging the high regulation in Europe underscores the legal risk GLRE faces under **EU Solvency II** and **CBI disclosure mandates** for concealing the FairClaims investment, which affects the integrity of its reported loss reserves and capital adequacy. | **Regulatory Arbitrage & International Exposure** (Confirms exposure to stringent EU/CIMA disclosure requirements, making the SEC omission a global governance failure). |

**INTERNATIONAL EXPOSURE:** Acknowledges EU Solvency II exposure, confirms CIMA/CBI jurisdiction

**Justification for Speed:** Need for rapid data drives adoption of FairClaims' 30-day process

## Table 2: Complete Transcript

| Timestamp | Speaker | Transcript |
|---|---|---|
| 00:00:08 | Host (Peter Rackliff) | hi everybody Welcome to the sphere it podcast my name is Peter rackliff I'll be hosting the podcast today again we're broadcasting from inure Tech insights in London it's 19th of March 2024 and I'm honored to invite kagabo to the podcast who works for green light capital a very important player in the insurance and reinsurance space big Investment Company welcome kbo |
| 00:00:43 | Host / Guest | yeah thank you I appreciate it good good so I was really excited to get you on here because I looked at your background industry expert been around a bit know the marketplace working for a very inovative business can you tell me a little bit about your background where you started where you are now and what you do |
| 00:01:17 | Guest (Kagabo) | yeah thanks uh so I started my career in the US I went to school there in college uh then I ended up doing actoral science my first job was in MetLife a large insurer out of Rhode Island I was doing a Property and Casualty stuff So eventually I moved to Liberty Mutual which is a well-known career and I was an actor student graduated from the ACT program and did a lot of reinsurance pricing at Liberty so then eventually I moved to the Cayman Islands to work for green light about 13 years ago so first I went as a reserving actuary and then I moved into pricing so and then I I was heading up the pricing and analytics them but for the last two and a half years I head up the Innovation underwriting uh group |
| 00:01:52 | Host | wow wow so what what is the heart of the business then can you describe that and talk a little bit about what you do in your area |
| 00:02:29 | Guest (Kagabo) | yeah so green light overall is a reinsurance company started in cman in 2004 for a while we were doing a lot of regular old resurance strees uh in you know behind insurance companies in the US in 2017 we changed our strategy so we now have an office in kman in Dublin and here in London but we started doing a lot more London Market uh business so we do a lot of business at ly uh still traditional reinsurance but along that changing strategy we started investing in uh Innovation so we take you know minority investments into different insure tech companies most MGS uh and then alongside with that we provide them with capacity uh through our Cayman paper as reinsurance and we also have a Lloyd Syndicate that we opened up about two years ago that's the the only Innovation Syndicate at Lloyds |
| 00:03:05 | Host | wow so right now we have about 40 companies in our portfolio which is a mix of both investment and underwriting so we write about maybe 150 160 million of premium in in in our portfolio and we're looking |

## TURO-FAIRCLAIMS EMBEDDED SaaS (G3)    TURO

| Timestamp | Speaker | Transcript |
|---|---|---|
| | | to grow wow wow so so how are you selecting those those partners are they generally in the typical space that you work in or you try to diversify the model |
| 00:03:39 | Guest (Kagabo) | it depends right so I mean one of the things we discovered earlier on uh because obviously we started the unit 6 years ago there's some areas that I had to compete in so a lot of the personal lines uh the big carriers have it covered right so we like a lot of product you know especially the ones that maybe it might be too small for the big companies but they are not too small for us uh so we do stuff in like short-term rental we do some stuff in travel we do some stuff in cargo really Innovative product so that's usually an interesting area a very Innovative product that you know you can kind of control and you know make sure that uh the loss ratio performs quite well but we still do the traditional markets but when we do that we bring other capacity alongside with us maybe they have a lot more resources and knowledge |
| 00:04:08 | Host | sure sure so so on the Innovation side the these businesses have they've got an idea which is powered by technology modern technology they maybe applying different types of AI or data Sciences to the problems can you talk a bit about one that you're actually quite impressed with and you thought that's quite an interesting business doing it slightly differently |
| 00:04:37 | Guest (Kagabo) | well so obviously everybody has different technology and for us we are you doing some Innovative underwriting or do you have a some sort of software you're using to do things differently we like a lot of embedded product so one we are really particularly keen on is called vertical it's based out of the US and they really like you know it's a vertical software it you will they embed themselves in the in the software program of their different uh customers so for example if it's if it's like a sports club and they have a software that they use for parents to book uh their kids um you know soccer season or things like that so we'll provide insurance through the software as an addition to the booking uh for the parent so the distribution then is quite easy alious there a lot of policies so it's easy to sell those policies in many ways without necessarily uh spending too much money and you know we like those kinds of products as well |
| 00:05:40 | Host | yeah I think the embedded the way the world goes with embedded Financial Services anyway is really interesting I think Insurance generally it it's it's not a friendly space for customers it never has been even in the P2P Market you know I don't want to buy insurance but yeah in that kind of environment where you're you're tagging onto something that's important the he and it's very easy to buy you don't need to fill out all sorts of forms without understanding what's covered everything is covered in some senses you but from an analytic point of view in that example isn't it more is there you have to expediate that capability to provide the price so how does it how does that change through the technology and how you underwrite it so |

## CAPTIVE ARBITRATION SUBSIDIARY (FAIRCLAIMS)    TURO

# EMBEDDED REINSURANCE API IN SHORT-TERM RENTAL (TURO)

| Timestamp | Speaker | Transcript |
|---|---|---|
| 00:06:09 | Guest (Kagabo) | we we Prett agree on red you know with with our MGS so we already know how the product is going to perform we obviously give incentivize them to make sure that uh they perform quite well uh but that's again the reason why we like those products is because if there's an adverse development because it's quite short tail you can change the scheme right you can you can change the pricing you are learning as you go uh quite quickly and those are the kind of products we like some of the traditional Insurance product it's going to be years before you know how it's performed so we still do that and you know a lot of companies know our pfolio do that but you know the ones that you can actually like adjust as you go out the on that were particularly interested in |
| 00:06:38 | Host | so would you say a lot of your modern portfolio or innovation portfolios all US based at the moment |
| 00:07:09 | Guest (Kagabo) | and your yeah there's a lot of us uh we have quite a lot of Europe now especially with the opening of The Syndicate so we have a team our team is mostly bed in kayman but now we have a team in London uh so who are also sourcing opportunity we have opportunities in Australia so we're kind of a bit worldwide uh hence why we're at this conference as well because we need to the conversation to continue going we're interested in Europe uh a lot uh there's a lot of opportunities coming from here and Lloyd is a great Market as well there's a lot of Regulation coming as well around AI yeah aware of the EU mandate recently and how rather typically vague a lot of it is |
| 00:07:41 | Host | um how do you see that going when you're looking at these kind of influential relationships through insurance for example you know CU there's there's from what I understand of some of the regulations yeah you got subliminal mess which can be quite difficult to prove or disprove in AI what's your position on that when you when you think about it |
| 00:08:12 | Guest (Kagabo) | we I don't have a position necessarily so Europe is quite highly regulated as you can imagine especially also you know working a l so there's a lot of especially as a Syndicate there's so many Hoops you have to go through um only because they've learned right so they have hundreds of years of experience behind the regulation when it comes to AI we have a company actually called our um oura AI they out of Canada we invested in them and we provide them capacity so we we provide AI guarantee for models you know for model performance so if the model doesn't deliver quite the level of performance that they have promised their customers there's a guarantee behind that right so you're already dispelling harm that could happen ahead of time |

## REGULATORY ARBITRAGE            REGULATORY ARBITRAGE

| Timestamp | Speaker | Transcript |
|---|---|---|
| 00:08:45 | Guest (Kagabo) | yeah exactly and the second thing will be they interested in developing further products that will help with the AI model you know to to limit some of that damage so so those guys are were find particularly interesting have to look into that have a conversation |
| 00:09:18 | Host | okay then crystal ball crystal ball what is the insurance industry going to look like over the next 5 years how different would it look you know |
| 00:09:49 | Guest (Kagabo) | I don't think it'll be that much different people think insurance is going to change it's ready for disruption and everybody's going to come and you know I love the technology that many people are brought into the Legacy companies are obviously using it in some ways they still have a lot of scale so they've been around for a long time and I still think they will still be there for a long time I think our advantage is that we are small and agile we don't have the scale it's not a bureaucracy so we can get things done quite quickly and uh and we've demonstrated that eventually obviously we're going to become uh quite a big scale as well but I'm saying that the Legacy companies are still going to control the market and that you know the cycle is going to continue at least for now now in 10 years from now it might be completely different you know a lot of the early insur Tech winners they are going to grow and maybe they're going to push the market alongside with them but we're still I feel like we're still a little bit early in the insurance Tech space |
| 00:10:18 | Host | yeah I I I think so you know if you look at the banking Market back in the day how quickly finc the they sort of the big players in that space just embraced it they already on it they already had incubators um it s just been a bit slower to catch up but it's happening um and I think you know the likes of the hyperscalers creating marketplaces um there's a lot of noise a lot of positivity around what can happen |
| 00:10:47 | Guest (Kagabo) | um there's going to be if I can't beat them I'm going to join them so the investment there is that right and I mean this conference has grown like crazy I mean there's almost now an insured conference everywhere in Vegas here in Asia and you can see a lot of Legacy careers now attending cuz and they also have dedicated departments uh to this Innovation so it's going to change you know it changes slow but you know sometimes once the flood gets open you know there's no stopping it is it five years I don't know because one of the things going on in the insurance market right now uh it's a very hard market so they are doing quite well insurers so maybe some some that might slow down some of yeah yeah yeah too broke don't fix it exactly exactly |
| 00:11:17 | Host | gabo love speaking with you thank you so much so much for taking the time really appreciate I appreciate the opportunity no brilliant thank you cheers |

**References:**

1.  Sphereit by VirtusLab: "Innovative Investments: Exploring Opportunities in the Insurance Industry | Kagabo Ngiruwonsanga," an interview of Kagabao Ngiruwonsanga (Chief Underwriting Officer, GLRE) recorded at Insurtech Insights 2024; retreuved from YouTube on November 6 2025: https://youtu.be/lHTzBKK8W3A?si=Kyn4yLlBYSwpbLkg

# Exhibit G11: Comparative Arbitration Sources (with FAA Violations) For Exhibit G2, pp. 18 - 26

## Executive Summary

The FairClaims award must be vacated under FAA §§ 10(a)(1) - (4) because undisclosed financial conflicts, repeat-player bias, and suppression of material evidence prove the forum is structurally partial and legally incapable of neutrality."

As demonstrated in the Exhibit G2 (<u>Comparative Table: Structural Bias and Repeat-player Risk:</u>, pp. 18-26), each metric - win rates, client concentration, transparency, arbitrator selection, and appeal rights - maps directly onto statutory vacatur grounds under FAA §§ 10(a)(1) - (4), proving that FairClaims is structurally partial and legally incapable of neutrality."

## 1.    Relevance to Lawal v. Turo, et al.

- **Every row ties directly to an FAA vacatur ground** (10(a)(1)–(4)).
- **Direct quotes** for judicial efficiency.
- **Relevance column** shows why each source matters.

**FAA violation column** makes it easy to immediately see the statutory hook.

| Source | Standard Citation (Bluebook style) | Hyperlink | Relevance | Direct Quote Supporting Theory | FAA Violation Supported |
|---|---|---|---|---|---|
| **Cornell ILR Arbitration Study (2019)** | **Alexander J.S. Colvin & Mark D. Gough,** *Comparing Mandatory Arbitration and Litigation: Access, Process, and Outcomes*, Cornell Univ. ILR School (2019). | [Cornell ILR School PDF](#) | Shows consumer win rates are lower in arbitration; highlights repeat-player bias. | "Employees prevailed in only 28% of mandatory arbitration cases, compared to 41% in litigation." | FAA §10(a)(2) (evident partiality – statistical bias from repeat-player effect) |
| **AAA Consumer Arbitration Statistics** | **American Arbitration Association,** *Consumer Arbitration Statistics* (updated quarterly, pursuant to Cal. Civ. Proc. Code § 1281.96). | [AAA Consumer Arbitration Statistics](#) | Demonstrates AAA transparency obligations; contrasts with FairClaims' opacity. | "AAA publishes quarterly consumer arbitration statistics… including win rates, award amounts, and case durations." | FAA §10(a)(3) (misconduct – refusal to disclose material data; transparency failures) |
| **AAA Consumer Clause Registry** | **American Arbitration Association,** *Consumer Clause Registry* (public database of arbitration clauses and outcomes). | [AAA Clause Registry](#) | Shows AAA discloses arbitration clauses; FairClaims does not. | "The Registry provides public access to arbitration clauses and related case information." | FAA §10(a)(2) (evident partiality – concealment of clauses; lack of disclosure) |
| **Repeat-Player Bias Study (AAA)** | **Imre S. Szalai,** *The Repeat Player Effect in Consumer Arbitration*, 1 J. Disp. Resol. 1 (2019). | [SSRN Abstract](#) | Confirms repeat-player bias: frequent corporate users fare better. | "Repeat-player companies are significantly more likely to win in arbitration than one-shot participants." | FAA §10(a)(2) (evident partiality – repeat-player bias undermines neutrality) |
| **JAMS Annual Report (2023)** | **JAMS,** *Annual Report 2023: Global Case* | [JAMS Annual Report](#) | Provides consumer win rate (~38%) | "In 2023, consumers prevailed in 38% of JAMS arbitrations, | FAA §10(a)(3) (misconduct – FairClaims denial of |

| Source | Standard Citation (Bluebook style) | Hyperlink | Relevance | Direct Quote Supporting Theory | FAA Violation Supported |
|---|---|---|---|---|---|
| | *Statistics and Outcomes* (2023). | | and transparency practices. | with detailed case statistics published annually." | appeal/transparency compared to JAMS norms) |
| **Honeycutt v. JPMorgan Chase** | **Honeycutt v. JPMorgan Chase Bank**, N.A., 25 Cal. App. 5th 909, 925 (2018). | Justia Case Text | Case law recognizing statistical disparities as evidence of bias. | "Statistical evidence of disparate outcomes may support an inference of bias in arbitration proceedings." | FAA §10(a)(2) (evident partiality – statistical bias as proof of unfairness) |
| **Commonwealth Coatings v. Continental Casualty** | Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145 (1968). | Supreme Court Opinion | Establishes duty to disclose arbitrator relationships; supports evident partiality claim. | "Arbitrators must disclose any dealings that might create an impression of possible bias." | FAA §10(a)(2) (evident partiality – nondisclosure of GLRE/FairClaims ties) |
| **AT&T Mobility v. Concepcion** | AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011). | Supreme Court Opinion | Confirms neutrality of arbitration forums is essential. | "Arbitration is favored only when the forum is neutral and fair to both parties." | FAA §10(a)(2) (evident partiality – forum neutrality compromised by client concentration) |
| **Eastman Kodak Co. v. Image Tech. Servs.** | Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451 (1992). | Supreme Court Opinion | Supports antitrust "essential facility" doctrine; relevant to coercive channeling into FairClaims. | "A monopolist's control of an essential facility can constitute exclusionary conduct under antitrust law." | FAA §10(a)(3) (misconduct – coercive funneling into a single biased forum) |

-



**Potential Fraud on the Court and Evidence Spoliation in Progress**
Holland & Knight filed Dkt. 66 on Dec. 19, 2025, asserting FairClaims "has not yet appeared" and seeking delay of the Rule 26(f) conference—despite Turo having updated its Terms of Service the prior day (Dec. 18) to notify users of FairClaims' closure, without disclosing this to the Court. As of Jan. 19, 2026, counsel has failed to correct the record, even after Plaintiff's Dec. 20 notice. This imminent shutdown threatens irreversible loss of arbitration records, impeding judicial review, ongoing investigations, and merits adjudication in EDTX



Hi there,

On December [...]
of Service ("TOS"). Key changes include:

- **New arbitration provider:** We are elevating the American Arbitration Association ("AAA") to be the primary arbitration service for all disputes. AAA was previously the backup option to FairClaims, which is closing its operations.

- **Updated rules:** We've modified AAA's generally applicable rules for disputes involving less than $200,000. Parties will pay their own arbitration fees pursuant to AAA's fee schedule.

Please note that these TOS changes will apply to any disputes that have not yet been filed.

You don't need to take any action, but we encourage you to review the full Terms of Service for more details.

**Review Terms of Service**

As always, thank you so much for being a part of the Turo community!

Team Turo

**EX. G12: PROOF OF BAD FAITH**
Demonstrates Turo knew the forum (FairClaims) was closing on Dec 18, yet filed a Motion to Stay (Doc 66) on Dec 19 without disclosing this material fact.

Turo Inc., 111 Sutter St, San Francisco, CA 94104

You're receiving this email because it's been deemed an important update regarding your Turo account, and not a marketing communication. You'll continue to receive important communications like this as long as you use Turo actively. To unsubscribe from marketing communications, **go to your Turo account** and uncheck "Promotions and announcements".

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

AZEEZ LAWAL,

**Docket 71 / EXHIBIT G13**

V.

Civil No. 4:25-cv-00810-SDJ-BD

TURO INC., et al,

CLERK'S ENTRY OF DEFAULT

The record reflects that service of process was made upon the Defendant(s)

named below and that Defendant(s) has/have failed to plead or otherwise defend within the

time allowed.

Therefore, DEFAULT is entered against Defendant(s) named below:

FairClaims, Inc.

**Ex. G4 CEO's Letter = Written confession**
**Admission of liability** (can't defend = liable)
**Conspiracy** (coordinated with Turo/Travelers to abandon the forum)
**Fraudulent intent** (created sham forum, then fled when exposed)
**Punitive damages justification** (willful, malicious conduct)

DAVID A. O'TOOLE, CLERK

Date: **12/29/2025**

/s/ M. Cox

By: Deputy Clerk

**DEFAULT + CEO Letter + GLRE Kickback Funding = Sham Forum; TTFGG Exposed: Honest Services Fraud**

The default judgment, obtained after proper service and accompanied by the FairClaims CEO's written promise not to appear, establishes that the arbitration forum was a sham and supports **joint-and-several liability** against Turo and Travelers.
• **Admission of Liability:** CEO's letter is an implicit admission that FairClaims could not or would not defend the forum's conduct.
• **Consciousness of Guilt:** The decision to "not appear" evidences flight from accountability rather than a legitimate defense.
• **Sham Forum / Conspiracy:** The default judgment, CEO correspondence and GLRE funding together establish that FairClaims functioned as a coordinated instrument with Turo and Travelers to suppress claims and **OBSTRUCT** justice.
• **Legal Effect:** These facts negate the independence defense and materially support joint-and-several liability, conspiracy, and evidentiary inferences (including adverse inference and sanctions). **EVERY ARBITRATION IS VOID AB INITIO**

**THE LINK BETWEEN FAIRCLAIMS OBSTRUCTION AND CAPITAL ADEQUACY RATIO**

The file **CAR_FairClaimsDefault_RegulatoryConvergence.pdf** and Exhibit T15 set out the Capital Adequacy Ratio (CAR) equation and demonstrates, in straightforward mathematical terms, how systematic suppression of claims by FairClaims artificially inflates reported solvency for Travelers and Greenlight Capital Re (GLRE). By preventing valid claims from being recognized as incurred losses, the FairClaims adjudication process reduces reported liabilities and thereby **inflates CAR metrics submitted to the Cayman Islands Monetary Authority and state departments of insurance.**

Those distorted solvency metrics, together with the deliberate misclassification of insurance products as "protection plans," underpin representations made to the Internal Revenue Service and the SEC. Turo, Travelers, GLRE, and Marsh McLennan have not disclosed the related-party relationships and operational dependencies that make these representations possible. The scheme also implies significant tax avoidance, including **misclassification /evasion of premium and excise taxes on a conservative estimate of more than $15 billion** in revenue. In short, the arbitration mechanism operated through FairClaims functions not merely as a repeatable obstruction device but as an instrument enabling legal malpractice, honest-services fraud, insurance and securities misstatement, and tax fraud by concealing liabilities and misrepresenting financial condition. Implicated agencies include **DOJ Tax division + SEC + IRS Criminal investigations/CIMA for Tax treatment fo protection plan + NAIC/State DOIs for syndication of unlicensed insurance and false advertising after NY Consent Order.**

**Subject: URGENT LEGAL NOTICE: Demand for Immediate Preservation of Evidence Regarding FairClaims "Winding Down" & Warning of Spoliation Sanctions**

**EXHIBIT G14**

Distinguished Counsel,

In good faith, it has typically been my practice to inform you of the weight of evidence I possess to facilitate transparency and de-escalate this dispute. Unfortunately, history has shown that this courtesy is misused. The first time I disclosed significant evidence to Turo during arbitration, Turo responded not with engagement, but the evidence suddenly disappeared from the Better Business Bureau (BBB) website. Later, I found out BBB is a FairClaims client.

We are now facing a repeat of that pattern on a much larger, systemic scale.

In November, I sent the team an email stating my clear intention to seek an injunction to stop Turo from using the FairClaims platform. Mr. Teters responded that Turo "would not agree" to such a stipulation.

It is now clear that immediately following my notice - and contrary to the spirit of your meet and confer obligations - Turo went back in bad faith and initiated the "unwinding" of the FairClaims system to achieve the same result but potentially to destroy the evidence in the process. Holland and Knight subsequently filed Docket 66 (annotated and attached) claiming all parties had not appeared without disclosing the unwinding state of FairClaims.

$$\underline{\textbf{\textit{Inference of Guilt}}}$$
$$= (\textbf{\textit{FairClaims Service Evasion}} + \textbf{\textit{Default}}$$
$$+ \textbf{\textit{Contempt per se}} + \textbf{\textit{GLRE kickback}})$$
$$\times (\textbf{\textit{Accelerated Dissolution}})$$
$$\times (\textbf{\textit{H\&K Esau Concealment}})$$

Your clients' legal duty to preserve this evidence is absolute and was triggered, at the latest, by June when I first brought up your RICO enterprise-in-fact (as per Sedima) predicates. As established in the landmark ruling *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003), "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."

Therefore, considering the active dissolution of the FairClaims vendor/captive-subsidiary relationship, you are hereby placed on formal notice to immediately demand that your clients Turo Inc., Travelers, FairClaims and their respective affiliates and their vendors preserve all relevant data.

Specifically, **Mr. Stephen Leon Kane** (copied here) and **FairClaims Inc.**, **Turo** and **Travelers** must preserve the following in its native, unaltered state, suspending any auto-delete or decommissioning protocols:

1. The "embedded shared software" source code, indices, metrics and business logic engines used to define claim routing, delays, loss-minimization and arbitration outcomes between Turo and FairClaims.
2. All historic API log transactions between GLRE systems, Travelers systems, Turo systems and FairClaims systems.
3. All indices, databases, and metadata recording the true intake dates, duration, and final disposition of all claims referred by Turo.
4. All communications between Travelers, GLRE, Turo and FairClaims regarding the decision to "wind down" or cease operations.

**Be advised:** Any destruction, alteration, or "migration" of the data identified above after your duty to preserve will be met with a motion for the severest available sanctions under **Fed. R. Civ. P. 37(e)**.

In the Fifth Circuit, the intentional destruction of evidence to avoid its disclosure allows the court to instruct the jury that the lost information was unfavorable to the spoliator. See *Adkins v. Wolever*, 554 F.3d 650 (5th Cir. 2009); see also *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598 (S.D. Tex. 2010) (imposing severe sanctions where deletion of electronic evidence was found to be in bad faith).

This specific email chain has just become evidence in an active ***federal-transnational*** investigation concerning regulatory fraud and spoliation. ***The Safe Harbor Notice expires on December 26th 2025.***

Govern yourselves accordingly.

Azeez Lawal

azeezlawal@gmail.com



**FairClaims Access Ending- Login by Feb 26**

1 message

**FairClaims Team** <emails@fairclaims.com>                                    Fri, Jan 16, 2026 at 9:04 AM
Reply-To: FairClaims Team <emails@fairclaims.com>
To: azeez.lawal@gmail.com

View this email in your browser

EXHIBIT G15 - FAIRCLAIMS EMAIL NOTIFICATION OF CLOSURE



# We are sorry to announce, FairClaims will be closing its doors.

Defunct + Default (Docket 71) = ?

Access to the FairClaims website and help desk services will be ending soon. We are winding down our operations, which means you will soon no longer have access to the platform to download arbitration records, including the arbitration award and any submitted evidence, and the help desk will no longer be available to answer questions.

**If you want to retain a copy of your FairClaims arbitration award and/or any other materials currently available on FairClaims.com, please log in and download them before midnight on Thursday, February 26, 2026.** If you have forgotten your password, you may reset it directly on the FairClaims website.

**The FairClaims help desk will no longer be available as of Friday, February 27, 2026**.
*As we wind down, we may not be able to respond to new inquiries submitted after Friday, February 20, 2026.

**If you need anything from FairClaims, you must reach out by February 20, 2026.** If you need to access the platform or any information from FairClaims.com, please login by Thursday, February 26, 2026 or you may forever lose access.

Please note, the organization that referred your arbitration to FairClaims may retain some records for your convenience, but this is not at all guaranteed. It is strongly recommended

that you personally download any materials you may need while you still have access.

-FairClaims Team

# FAQ's

## Does this mean the decision won't hold up in the future?

The arbitration decision remains valid and enforceable, even if FairClaims ceases operations. The Arbitration Agreement and FairClaims Rules & Procedures clearly state that by submitting the dispute to arbitration, both parties waived their right to litigate, and the arbitrator's decision is final and legally binding.

This means the award is enforceable in court and will remain final.

## How do I pay?

Details to remit payment are determined by the awarded party's preference and can be found on the Main Dispute Page of the platform. Simply select the large teal "payment preferences" button to view how to pay. Be sure to access this before the website closes. We recommend you do so by mid February in case you have any questions.

If this button does not currently show on your Main Dispute Page, the party has not yet submitted their preference. Once the owed party has submitted their payment preference, you will receive an email notification.

## What if I cannot pay in the given timeframe?

As FairClaims is a neutral arbitration platform, we do not handle payment processing or billing, and unfortunately, we do not have the authority to facilitate payment plans or extensions. We sincerely apologize for any inconvenience this may cause.

Given that you may not be able to make the full payment by the due date but are exploring your options, we strongly recommend reaching out directly to the other party. They are the only ones who can agree to a different payment timeline outside of the standard 14-day period.

Prior to the closure of the website, you can contact them through the "Chat Messages" feature on your Dashboard by selecting the corresponding tab on the left-hand side of the main page. Many other parties have found this tool helpful for open and direct communication. If you want to do this, please do so by mid February, 2026 to give them an opportunity to respond before the website is closed.

If you are able to reach an agreement, you're welcome to move forward with payments according to that arrangement. Please note, however, that the owed party retains the right to proceed with enforcement at any time if the agreement is not upheld.

## What if the owing party does not pay?

When payment is not made voluntarily, the next step is to begin the enforcement process. The first step is to petition your local court to confirm the arbitration award. This is typically a straightforward process. You can download the award decision and arbitration agreement directly from your portal on our platform as they will need to be submitted with the paperwork to Confirm.As the platform will no longer be accessible after midnight on Thursday, February 26, 2026, please be sure to download any materials you may need as soon as possible.

Once the award is confirmed by the court, enforcement procedures can begin. Please note, you are also entitled to recovering the fees associated with filing for confirmation and enforcement per bullet 6 of your arbitration agreement. The specific process for enforcement varies by state and county but may include actions such as wage garnishment, bank levies, or liens, depending on local laws and the debtor's assets.

You can access more information from the FairClaims website by clicking **here**. But note that this information likely will not be available after Friday, February 27, 2026. You may wish to conduct your own research or consult with an attorney regarding how to enforce an arbitration award, as enforcement procedures vary by locality.

1/16/26, 11:58 AM Gmail - FairClaims Federal Ruling, Login by Feb 2.

Case 4:25-cv-00810-SDJ-BD    Document 74-2    Filed 01/19/26    Page 128 of 129 PageID #:  19656

## What if I do not agree with the decision?

Unfortunately with Arbitration there is no true ability to appeal the decision in the traditional sense, but instead you can file with your local court to vacate, if you wish. This means to essentially have the decision thrown out.

A court may consider vacating an arbitration decision if there was a fundamental issue with how the case was handled. The court can review the circumstances and determine whether there are valid grounds to vacate the award. However, it's important to note that courts will generally only overturn arbitration decisions in limited and specific situations, such as:

- Fraud, corruption, or misconduct by the arbitrator.
- If your rights were significantly prejudiced during the hearing.
- If the arbitrator overstepped their authority or failed to disclose a disqualifying conflict of interest.

If you believe that justice was not served, then please do follow-up with the court.
As a formality, we must remind you that the current award is a legally binding decision. Just as with a court judgment, if it goes unpaid the other party can enforce upon it to legally retrieve the amount stated in the award, and possibly any fees attached to that process. That said, generally, a court will not enforce an arbitration award while a motion to vacate is pending.

## If these records are not being retained by FairClaims on my behalf, what documentation should I keep for my own records?

We recommend logging in to the platform ASAP (and definitely no later than mid February) to download all relevant materials for your case. On the left-hand menu of your Main Dispute Page, you can access and download evidence submitted by both parties, as well as the arbitration agreement.

The full written decision can be downloaded using the large orange "Download Decision" button at the top of the screen. For any items that do not open in a downloadable window, you may take screenshots for your records. You may also wish to download the FairClaims Rules & Procedures to keep for reference.

## What steps can I take now to protect myself if this matter arises again in the future or is brought to court?

The Arbitration Agreement and FairClaims Rules & Procedures clearly state that by submitting the dispute to arbitration, both parties waived their right to litigate, and the arbitrator's decision is final and legally binding. If the other party brings the same action to court, you can let the court know that you agreed to arbitrate and received a final, binding award. So we highly recommend you download all relevant materials (see above on what records you should download).

Please keep in mind that the other party may take the arbitration decision to a local court to request confirmation of the award and begin enforcement if payment is not made, or potentially to seek to vacate the award. For this reason, it is important that you maintain a complete file of all case materials, with particular attention to the written arbitration award, for your records.

We recommend logging in to the platform to download all relevant materials for your case no later than mid February, 2026. On the left-hand menu of your Main Dispute Page, you can access and download evidence submitted by both parties, as well as the arbitration agreement.

The full written decision can be downloaded using the large orange "Download Decision" button at the top of the screen. For any items that do not open in a downloadable window, you may take screenshots for your records. You may also wish to download the FairClaims Rules & Procedures to keep for reference.



*Please do not reply to this email. If you need assistance, reach out to the FairClaims helpdesk directly.*

This email was sent to azeez.lawal@gmail.com

*why did I get this?*   unsubscribe from this list   update subscription preferences

FairClaims · 777 S Alameda · Los Angeles, CA 90014 · USA